IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No.  05 CR 9-1 |
| ADAM B. RESNICK | ) | |
| | ) | Judge Wayne Andersen |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOMINIC POETA, | ) | |
| | ) | |
| Third-Party Citation Respondent. | ) | |

**UNITED STATES' MOTION FOR LEAVE TO FILE
ITS PETITION FOR RELIEF AGAINST DOMINIC POETA**

The United States of America, by PATRICK J. FITZGERALD, United States Attorney for

the Northern District of Illinois, requests leave to file the attached Petition for Relief Against

Dominic Poeta.  The United States further requests that should leave be granted that the court set

a response date no sooner than 20 days hence for Dominic Poeta to answer or otherwise plead to the

Petition.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s Joseph A. Stewart
    JOSEPH A. STEWART
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 469-6008

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No.  05 CR 9-1 |
| ADAM B. RESNICK | ) | |
| | ) | Judge Wayne Andersen |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DOMINIC POETA, | ) | |
| | ) | |
| Third-Party Citation Respondent. | ) | |

**UNITED STATES' PETITION
FOR RELIEF AGAINST DOMINIC POETA**

The United States of America, through its attorney, Patrick J. Fitzgerald, United States

Attorney for the Northern District of Illinois, pursuant to Fed. R. Civ. P. 69, and § 2-1402 of the

Illinois Code of Civil Procedure (735 ILCS 5/2-1402), petitions this court for relief against Dominic

Poeta to assist the United States in enforcing the judgment the court entered in its favor and against

the defendant, Adam Resnick.  The United States seeks the avoidance of $891,000 fraudulently

transferred from Adam Resnick to Dominic Poeta in payment of illegal gambling debts.  In further

support of its claims the petitioner states as follows:

**PARTIES**

1.      Plaintiff-petitioner is the United States.

2.      Defendant Adam Resnick  pleaded guilty to wire fraud under 18 U.S.C. § 1343.  In

January 2007, this court sentenced Resnick to 42 months in prison, and ordered him to pay

restitution in the amount of $10,234,909 (which was later amended to be $10,457,825)

3.      Third-party citation respondent  Dominic Poeta, a/k/a Domenic Poeta, is a resident of Highwood, Illinois and the proprietor of a butcher shop that is also in Highwood, Illinois.  Poeta is an acquaintance of Resnick, and, as detailed below,  from about August 2001 to June 2002 Poeta operated as a bookie for defendant and received hundreds of thousands of dollars in illegal wagers from Resnick.

## JURISDICTION

4.      Under 18 U.S.C. § 3613(a) the United States may enforce a criminal money judgment according to the practices and procedures for enforcing civil judgments under state law. The Court has jurisdiction over Poeta in this post-judgment enforcement proceeding by virtue of a third party citation to discover assets served on the respondent pursuant to Fed. R. Civ. P. 69, which incorporates state post-judgment enforcement procedures, and § 2-1402 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1402) and Illinois Supreme Court Rule 277, which govern citations to discover assets.

5.      In August 2007, Poeta appeared personally and with counsel at the offices of the United States Attorney for examination by counsel for the United States pursuant to a third-party citation to discover assets that was personally served on him.

## BACKGROUND

### The Underlying Criminal Case

6.      In January 2005, a six-count indictment was filed in the captioned criminal case against Adam Resnick, and others, charging him with conspiracy to misapply funds; misapplying funds; bank fraud; aiding and abetting, and wire fraud.  The defendant appeared and pleaded not guilty to the charges.

2

7.      Resnick and his codefendants engaged in a check-kiting scheme by manipulating account balances at Universal Federal Savings Bank, where one of the codefendants worked, and at American National Bank (n/k/a JP Morgan Chase Bank), where Universal had a correspondent account.  From about December 2001 to June 2002, the checking kiting scheme allowed Resnick to siphon from Universal about $10.2 million only a fraction of which was recovered by the government.  Resnick gambled away a substantial portion of this money in legal gambling establishments and through use of illegal bookies.

8.      On July 6, 2006, pursuant to a written plea agreement with the United States, the defendant withdrew his plea of not guilty and entered a plea of guilty to count five of the indictment alleging wire fraud.

9.      On January 16, 2007, this court sentenced Resnick to 42 months in prison and found him liable for $10.2 million in restitution, of which $9.75 million is owed to the Federal Deposit Insurance Corporation.  The FDIC was forced to take over Universal in June 2002 when Universal collapsed upon discovery and as the direct result of Resnick's check-kiting scheme.

10.      Pursuant to 18 U.S.C. § 3613(c), upon the entry of judgment on January 22, 2007, a lien arose upon all property and rights in property belonging to Adam Resnick.  On March 8, 2007, the United States perfected its lien by recording a notice of lien in the Lake County Recorder of Deeds Office as document number 6148484.

**Resnick's transfer of $891,000 to Poeta for illegal gambling debts**

11.      Resnick met Dominick Poeta in or about August 2001.  Resnick's check-kiting scheme began in December 2001.  Also in December 2001, Resnick began paying Poeta money, the source of which was check-kiting scheme proceeds.

12. Attached as Exhibit 1 is a recapitulation which truly and accurately describes the negotiable instruments Resnick gave to Poeta and which Poeta negotiated to his own benefit.

13. Resnick made the checks payable to Dominic Poeta or to "cash," and Poeta then negotiated the checks — both those made to himself and to cash — as evidenced by his endorsement on the reverse side of the instrument as well as the deposit records obtained concerning accounts Poeta maintained at various financial institutions where the instruments were deposited. However, one of the checks, written for $48,111, Poeta endorsed over to Semersky Enterprises, a Highland Park Saab dealership, as payment for a vehicle.

14. In total, Resnick paid Poeta $891,211.11. Exhibit 1. The money is directly traceable to the proceeds of Resnick's check-kiting scheme.

15. Adam Resnick was a gambler who made wagers legally, in lawful gambling establishments, as well as wagering illegally with bookies.

16. During all times relevant to this petition, Dominic Poeta, among other things, was a "bookie" — *i.e.*, a person who: (1) accepts illegal wagers on sporting events and other such things, on his own account, his own "book" or on the account of another person; and (2) collects "juice," which is the fee charged on a lost wager and can also be interest charged on a lost wager that is not paid on time.

17. The $891,111 Resnick transferred to Poeta was entirely the result of illegal gambling and in payment of lost wagers and juice.

18. At the time of each transfer detailed in Exhibit 1, Resnick was rendered insolvent and increasingly so. Resnick had few assets of his own. With each transaction that he siphoned money from Universal Bank, Resnick became indebted to Universal for the amount of fraud proceeds he

obtained. His debt to Universal alone — which would later be reduced to a restitution judgment for over $9 million — greatly exceeded his meager assets from the very first transaction in which he obtained illegal fraud proceeds and then transferred them to Poeta to pay his unlawful gambling debts. Moreover, Resnick knew or should have known at the time of each of the transfers that he would face civil and criminal restitution claims in excess of the amounts transferred.

### The Citation Proceedings

19. On April 9, 2007, the United States served a citation to discover assets on Poeta.

20. Pursuant to the citation, on August 23, 2007 Poeta appeared with counsel to be examined under oath as to the assets of Adam Resnick. Exhibit 2, transcript of the citation examination of Dominic Poeta, partially redacted and without exhibits.

21. At the citation examination, having first been duly sworn, to specific questions regarding the financial transactions between himself and Resnick Poeta repeatedly invoked his Fifth Amendment right not to be compelled to give testimony that might tend to incriminate him criminally. Ex. 2, pp. 8-10 and *passim*. Among other things, Poeta invoked his Fifth Amendment privilege to the following questions:

(A) That Poeta was in fact the bookie that Adam Resnick describes by the pseudonym, "Luciano 'Lucky' Petrelli" in his book, *Bust*. Ex. 2, pp. 18-21.

(B) That Poeta was in fact a bookie for Adam Resnick. Ex. 2, p. 21.

(C) That Poeta in fact received all the negotiable instruments detailed in Exhibit 1. Ex. 2, pp. 26-43.

(D) That Poeta received all the negotiable instruments listed in Exhibit 1 totaling $891,111 in payment of illegal gambling debts. Ex. 2, p. 43.

## COUNT I
### Fraudulent transfer under 28 U.S.C. § 3304(b)(1)(A)

1-21. The United States realleges and incorporates by reference paragraphs one through twenty-one above as paragraphs one through twenty-one of this Count I.

22. Resnick transferred $891,111 to Poeta with actual intent to hinder, delay or defraud the United States and Universal Federal Savings inasmuch as Resnick received no legal consideration in exchange from Poeta at the time the transfers occurred; the transfers rendered Resnick insolvent; the transfers were payment of unlawful gambling debts, which, as a matter of law, provides no consideration for a legally enforceable contract; and Resnick, at the time of the transfers, believed or reasonably should have believed that he would incur debts beyond his ability to pay.

23. Resnick undertook the aforesaid acts and omissions in violation of 28 U.S.C. § 3304(b)(1)(A).

Wherefore, the United States requests this court to:

a) find the facts in favor of the United States and against Dominic Poeta;

b) pursuant to 28 U.S.C. § 3306(a)(1), void the transfers from Resnick to Poeta to the extent necessary to satisfy the debts owing to the United States;

c) pursuant to 28 U.S.C. § 3306(a)(2), issue a writ of execution so that the United States may levy on the assets of Poeta to satisfy the restitution debt owed to the United States;

d ) pursuant to 28 U.S.C. § 3306(a)(3), enter judgment in favor of United States and against Dominic Poeta for $891,111 plus prejudgment interest to the extent necessary to satisfy the restitution debt owed to the United States; and

e) pursuant to 28 U.S.C. § 3306(a)(3), grant any other relief the circumstances may require.

## COUNT II
### Fraudulent transfer under 28 U.S.C. § 3304(b)(1)(B)(ii)

1-21.  The United States realleges and incorporates by reference paragraphs one through twenty-one above as paragraphs one through twenty-one of this Count II.

22.  Resnick transferred $891,111 to Poeta without receiving reasonably equivalent value in exchange, because, as a matter of law, the opportunity to illegal gamble provides no consideration for a legally enforceable contract, and Resnick intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay

23.  Resnick undertook the aforesaid acts and omissions in violation of 28 U.S.C. § 3304(b)(1)(B)(ii).

Wherefore, the United States requests this court to:

a) find the facts in favor of the United States and against Dominic Poeta;

b) pursuant to 28 U.S.C. § 3306(a)(1), void the transfers from Resnick to Poeta to the extent necessary to satisfy the debts owing to the United States;

c) pursuant to 28 U.S.C. § 3306(a)(2), issue a writ of execution so that the United States may levy on the assets of Poeta to satisfy the restitution debt owed to the United States;

d ) pursuant to 28 U.S.C. § 3306(a)(3), enter judgment in favor of United States and against Dominic Poeta for $891,111 plus prejudgment interest to the extent necessary to satisfy the restitution debt owed to the United States; and

e) pursuant to 28 U.S.C. § 3306(a)(3), grant any other relief the circumstances may require.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: s/ Joseph A. Stewart
   JOSEPH A. STEWART
   Assistant United States Attorney
   219 South Dearborn Street
   Chicago, Illinois 60604
   (312) 469-6008

EXHIBIT 1

| Item | Date Paid | Check No. | Check Amt. | Cleared | Payee | FDIC | 1st Midw | JP Morgan | Chicago Comm. | Lake Forest | Smith Barney |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/20/2001 | 127 | 27,400.00 | 27,400.00 | Dominick Poeta | ✔ | | | | | |
| 2 | 1/11/2002 | 213949 | 27,400.00 | 27,400.00 | Dominick Poeta | | ✔✔ | ✔ | | | |
| 3 | 1/3/2002 | 214034 | 15,000.00 | 15,000.00 | Dominick Poeta | | ✔✔ | ✔ | | | |
| 4 | 2/14/2002 | 247 | 20,000.00 | 20,000.00 | Cash | ✔ | | | | | |
| 5 | 2/25/2002 | 258 | 20,000.00 | 20,000.00 | Cash | ✔ | ✔✔ | | | | |
| 6 | 3/4/2002 | 264 | 20,000.00 | 20,000.00 | Cash | ✔ | ✔✔ | | | | |
| 7 | 3/8/2002 | 273 | 50,000.00 | 50,000.00 | Cash | ✔ | ✔ | | | | |
| 8 | 3/22/2002 | 294 | 25,000.00 | 25,000.00 | Cash | ✔ | ✔ | | | | |
| 9 | 3/25/2002 | 305 | 25,000.00 | 25,000.00 | Cash | ✔ | ✔ | | | | |
| 10 | 3/28/2002 | 339 | 30,000.00 | 30,000.00 | Cash | ✔ | ✔ | | | | |
| 11 | 3/30/2002 | 214822 | 100,000.00 | 100,000.00 | Dominick Poeta | ✔ | | ✔ | | | |
| 12 | 3/31/2002 | 214825 | 100,000.00 | 100,000.00 | Dominick Poeta | ✔ | | ✔ | | | |
| 13 | 4/2/2002 | 350 | 55,000.00 | 55,000.00 | Cash | ✔ | ✔✔ | | | | |
| 14 | 4/5/2002 | 356 | 12,300.00 | 12,300.00 | Cash | ✔ | ✔✔ | | | | |
| 15 | 4/23/2002 | 215077 | 100,000.00 | 100,000.00 | Dominick Poeta | ✔ | | ✔ | | | |
| 16 | 4/26/2002 | 215099 | 144,000.00 | 144,000.00 | Dominick Poeta | ✔ | | ✔ | | | |
| 17 | 5/15/2002 | 452 | 72,000.00 | 72,000.00 | Cash | ✔ | ✔✔ | | | | |
| 18 | 5/15/2002 | 453 | 48,111.11 | 48,111.11 | Cash | ✔ | ok | | | ✔ | |
| 19 | 7/1/2002 | 215401/4001317 | 60,000.00 | | Dominick Poeta | ✔ | ok | ✔ | ✔ | ✔ | |
| 20 | 7/1/2002 | 215402/4001315 | 65,000.00 | | Dominick Poeta | ✔ | ok | ✔ | ✔ | ✔ | |
| | | | 1,016,211.11 | 891,211.11 | | | | | | | |

**EXHIBIT 1**

✔✔ deposited into Midwest checking
✔ deposited into Midwest loan

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           ) No. 05 CR 9-1
                                   )
ADAM B. RESNICK,                   )
                                   )
          Defendant,               )
                                   )
     vs.                           )
                                   )
DOMINIC POETA,                     )
                                   )
          Third-Party Citation     )
          Respondent.              )

          The Citation to Discover Assets
Deposition of DOMENIC POETA, taken before Lisa R.
Lisit, a Notary Public within and for the County of
Cook and State of Illinois, and a Certified
Shorthand Reporter of said State, taken in
accordance with the applicable rules pertaining to
the taking of Citations to Discover Assets at 230
South Dearborn Street, Suite 3948, Chicago,
Illinois, on the 23rd day of August, 2007, at the
hour of 10:40 a.m.

APPEARANCES:

     MR. PATRICK J. FITZGERALD
     United States Attorney
     BY:  MR. JOSEPH A. STEWART
          219 South Dearborn Street
          Suite 500
          Chicago, Illinois  60604
          (312) 469-6008

               On behalf of the Plaintiff;


     LAW OFFICES OF LORAINE A. RAY
     BY:  MS. LORAINE A. RAY
          27247 N. Fairfield Road
          Wauconda, Illinois  60084
          (847) 526-8422

               On behalf of the Witness and
               Third-Party Citation Respondent.


Also Present:  Ms. Shari Chizana


          *    *    *    *    *    *

I N D E X

WITNESS                                      PAGE
DOMENIC POETA
     Direct Examination By Mr. Stewart       4


E X H I B I T S

NUMBER                                       PAGE
GOVERNMENT DEPOSITION EXHIBIT
     No. 1                                    27
     No. 2                                    27
     No. 3                                    27
     No. 4                                    28
     No. 4-A                                  28
     No. 5                                    28
     No. 6                                    28
     No. 7                                    29
     No. 8                                    17
     No. 9                                     7
     No. 10                                   51

# EXHIBIT 2

(Witness sworn.)
WHEREUPON:

               DOMENIC POETA,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:
               DIRECT EXAMINATION
BY MR. STEWART:
     Q.  Good morning, Mr. Poeta.
     A.  Good morning.
     Q.  My name is Joseph Stewart.  I'm going to
ask some questions today to find out about assets
belonging to Adam Resnick to be applied to the
judgment that was entered against him in this case.
          I'm going to ask you some questions.  I'd
like you to respond verbally to each question so
that the court reporter can hear your answer.  Do
you understand that?
     A.  Yes.
     Q.  If you don't hear a question, please say
so and I'll repeat it.  If you don't understand a
question, please say so and I will rephrase the
question.
          If you realize that an earlier answer you
gave was inaccurate or incomplete, tell me so and
you'll be given an opportunity to correct your

5

answer, okay?

A. Okay.

Q. If you need to take a break to use the restroom or to get some water or coffee or anything else or if it gets too warm in this room, please let me know and we'll take a break, okay?

A. Okay.

Q. If you don't know or do not remember information necessary to answer a question, please say so.

When you answer a question, I'll assume that you've heard it, you've understood it and given an answer to the best of your recollection, okay?

A. Okay.

Q. Do you understand the instructions I've just given you?

A. Yes.

Q. Are you under any medication right now that affects your ability to recall facts or prevents you from otherwise being able to give testimony?

A. No.

Q. Have you ever been deposed before?

A. I'm not sure.

6

Q. Have you ever been a party in a lawsuit?

A. No.

MS. RAY: He's undergoing a divorce, so if you consider that a lawsuit, then he's a party in that.

THE WITNESS: I'm sorry.

MS. RAY: He's not an attorney so --

MR. STEWART: Thank you.

MS. RAY: Whether he's been a plaintiff or a defendant in anything else other than his divorce, would that be your question then?

MR. STEWART: Yes.

BY MR. STEWART:

Q. Have you been a plaintiff or a defendant in any other case other than the divorce?

A. No.

Q. Where was the divorce case filed?

A. It hasn't been filed yet. I have yet -- I've had two scheduled meetings with an attorney.

MS. RAY: If it's going to be filed, it will be filed in Lake County.

THE WITNESS: Right. She postponed both of them.

BY MR. STEWART:

Q. I'm sorry. Who postponed it?

A. My attorney.

7

Q. Your attorney.

Now, you're here pursuant to a citation to discover assets; is that correct, Mr. Poeta?

MS. RAY: That's why he's here.

MR. STEWART: Can Mr. Poeta answer?

BY THE WITNESS:

A. Yes.

Q. We've marked what's been called Exhibit No. 9.

MR. STEWART: Can you take that out, Loraine.

BY MR. STEWART:

Q. And is that the citation that you're here in response to, sir, Exhibit No. 9?

A. Yes.

Q. And you're here represented by counsel; is that correct?

A. Yes.

Q. And you have been represented by counsel since shortly after that citation to discover assets was served on you?

A. Yes.

MS. RAY: Actually your office knows I've represented him since 2002, so it was during the same time when your agents went and had a conversation with him without calling to my office.

8

MR. STEWART: Is that an objection to the question that I've asked?

MS. RAY: Just clarification. Same agents who were --

MR. STEWART: This is my deposition, and I'm asking questions. So if you want to make a record at the end, that's fine. Right now I appreciate just being able to ask questions.

MS. RAY: That will be fine.

BY MR. STEWART:

Q. The citation, if you look on the third page of the citation, Mr. Poeta, there's a list of documents there; is that correct?

A. Yes.

Q. And do I understand correctly that you refused to produce documents responsive to the citation on Fifth Amendment grounds?

A. I respectfully refuse to produce any records or personal papers based upon my rights under the Fifth Amendment of the United States Constitution.

Q. Mr. Poeta, I've just asked you if you refused to produce documents responsive to the citation. Do you understand the question I just asked you?

**9**

MS. RAY: I would object. He's answered the question.

MR. STEWART: I'm just going through my privilege check.

MS. RAY: Whatever you need to do.

BY MR. STEWART:

Q. Do you understand the question I have just asked you, Mr. Poeta?

A. Yes.

Q. And you refused to answer the question by invoking your Fifth Amendment privilege; is that correct?

A. Correct.

Q. You understand that under the Fifth Amendment of the United States Constitution you have a right not to be compelled to give testimony that might tend to incriminate you criminally; is that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

MS. RAY: I would object to any line of question like that. My client is not a lawyer, nor is he expected to understand what the implications of his statements may be, criminal or other

**10**

liability.

BY MR. STEWART:

Q. You are represented by counsel, Mr. Poeta?

A. Yes.

Q. And you're refusing to answer questions on Fifth Amendment grounds based on the advice of counsel; is that correct?

MS. RAY: I would object to that.

BY MR. STEWART:

Q. You are refusing to answer the question I just posed on Fifth Amendment grounds; is that correct?

A. Correct.

Q. Your name is Dominick Poeta; is that correct?

A. Yes.

Q. Is that spelled D-o-m-i-n-i-c-k?

A. The correct way to spell it is D-o-m-e-n-i-c.

Q. And do you have a middle initial?

A. No.

Q. You have no middle name?

A. No.

Q. And your last name is spelled how?

**11**

A. P-o-e-t-a.

Q. And how old are you?

A. Fifty.

Q. And what is your profession?

A. I own a grocery store, meat market.

Q. You reside at ▮▮▮▮▮ in ▮▮▮▮?

A. No.

Q. Where do you reside?

A. ▮▮▮▮

Q. In what town?

A. ▮▮▮▮

Q. ▮▮▮▮

A. ▮▮▮▮

Q. ▮▮▮▮

A. ▮▮▮▮

Q. ▮▮▮▮

A. ▮▮▮▮

Q. ▮▮▮▮

A. ▮▮▮▮

Q. ▮▮▮▮

**12**

A. ▮▮▮▮

Q. ▮▮▮▮

A. ▮▮▮▮

Q. ▮▮▮▮

MS. RAY: I'm going to object to this line of questioning.

MR. STEWART: Very good.

BY MR. STEWART:

Q. You stated that you operate a butcher shop?

MS. RAY: I'm going to object to this line of questioning also.

MR. STEWART: On what grounds?

MS. RAY: It has nothing to do with the rules for a citation to discover assets.

MR. STEWART: It's a matter of identity. These addresses are identified in documents that we've produced to you.

MS. RAY: That's fine. I'm objecting to the question and any probing into his employment or who owns his employment or his interest.

MR. STEWART: Unless the witness is refusing

13

to answer on Fifth Amendment grounds, the witness must answer the question if it's a legitimate question.

You can make any evidentiary objection you want for the record, but the witness must still answer the question.

BY MR. STEWART:

Q. So I would ask you again, Mr. Poeta, where is the butcher shop located that you mentioned before?



Q. Do you know a man named Adam Resnick?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

Q. I just want to clarify something, Mr. Poeta, that from now on when you invoke your Fifth Amendment right I'm going to assume that you've heard the question that I've asked, that you understand the question that I've asked, that you're represented by counsel, and that you're refusing to answer the question based on the Fifth Amendment of the United States Constitution, okay?

14

A. Correct.

Q. So I don't have to go through that routine of questions again, when you assert the Fifth Amendment right I'm going to assume all of these things, okay? Do you understand that?

A. Yes.

Q. You met Adam Resnick in August 2001; is that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

Q. And you had both a social and a business relationship with Adam Resnick; is that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

Q. Adam Resnick is the defendant and judgment debtor in this case; isn't that correct?

MS. RAY: Objection.

MR. STEWART: What's the objection?

MS. RAY: My client has no way of confirming what you're talking about. It's your documents. This is your citation.

BY MR. STEWART:

Q. If you look at the top of Exhibit No. 9,

15

Mr. Poeta --

MS. RAY: I think the question would more properly be, Does it read "United States of America v. Adam B Resnick"?

BY MR. STEWART:

Q. Do you want to answer that question, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

Q. You know that Adam Resnick was convicted of embezzling money from Universal Federal Savings Bank; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment of the United States Constitution.

Q. And Adam Resnick's embezzlement led to the collapse of Universal Bank; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And the collapse of Universal Bank caused the Federal Deposit Insurance Corporation to step in and redeem the depositor's money; isn't that correct?

A. I respectfully refuse to answer based

16

upon my rights under the Fifth Amendment.

Q. And the FDIC absorbed about a $10 million loss as a result of the collapse of the Universal Bank?

MS. RAY: I would object to that. My client has absolutely in no way, shape or form an ability to know that. This is beyond the scope, and it's an improper line of question for this particular third-party citation.

MR. STEWART: It's background to the citation to discover assets.

MS. RAY: I object to this line of questioning, just for the record.

MR. STEWART: Is your client saying that he is not aware of this?

MS. RAY: My client is taking the Fifth Amendment to these questions.

MR. STEWART: To all these questions?

MS. RAY: Yes, sir.

BY MR. STEWART:

Q. You're aware of the fact that Adam Resnick wrote a book entitled *Bust*; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

**17**

Q. I'm going to direct your attention to Exhibit A --

MS. RAY: It's 8.

MR. STEWART: I'm sorry.

BY MR. STEWART:

Q. -- Exhibit 8, which is excerpts from the book entitled *Bust*, and I am going to direct your attention to pages 186 to 187 of that book.

MS. RAY: If you can just hang on one moment, please, while my client and I have an opportunity to review this section.

BY MR. STEWART:

Q. I'll direct your attention to the very last paragraph of page 186, beginning, "You'd think I would've learned a lesson . . . ."

MS. RAY: I would object to any line of questioning regarding this book. First and foremost, this has nothing to do with the third-party citation to discover assets.

Second of all, Mr. Resnick in this book time and time again indicates that he's a liar and a compulsive liar.

Bringing up anything like this in this particular setting isn't appropriate, and I object.

MR. STEWART: Loraine, if you have an

**18**

evidentiary objection, I'd be more than happy to have it on the record. But if you want to argue, I don't think that's appropriate. This is my deposition. I'd like to ask my questions.

MS. RAY: We'll determine later on what's appropriate or not. I have a right to make an objection and give my reasons.

MR. STEWART: What is your objection?

MS. RAY: I've made it already. We're done.

MR. STEWART: Is that based on any rule of evidence?

MS. RAY: First of all, this has nothing to do with this. This has nothing whatsoever to do with the third-party citation to discover assets so it's outside of the scope.

MR. STEWART: I will get to that.

MS. RAY: All right.

BY MR. STEWART:

Q. I have directed your attention to pages 186 and 187, and I quote. Adam Resnick writes, "You'd think I would've learned a lesson, but no. By August, without any lasting consequences, I was playing with another bookie, Luciano Petrelli, a star high school athlete in his mid-forties, owned a local deli and took bets while he worked."

**19**

In 2002/2001, Mr. Poeta, you were about in your forties; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you were a star high school athlete; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you own a local deli; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. The person Adam Resnick identifies as Luciano Petrelli or Lucky is in fact you, Domenic Poeta; is that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. You understand the term "bookie," don't you?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. It's a person who accepts illegal wagers on sporting events and other such things on his own account, on his own book or on the account of another person; isn't that correct?

**20**

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. A bookie also collects what's commonly referred to as juice; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you understand the term "juice," don't you?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Isn't juice a fee that's charged on illegal wagers that are lost?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. You were in fact the bookie Mr. Poeta identifies as Lucky in his book, isn't that correct --

MS. RAY: You mean that Mr. Resnick identifies.

BY MR. STEWART:

Q. -- that Mr. Resnick identifies as Lucky in his book?

MS. RAY: I object, asked and answered.

MR. STEWART: No, I asked him if he was the person identified as Luciano Petrelli.

**21**

I'd like to ask my question again for the record.

BY MR. STEWART:

Q. You are a bookie Mr. Resnick identifies as Lucky; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. You were in fact Adam Resnick's bookie collecting money for illegal wagers and juice, weren't you?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Mr. Resnick correctly identifies as having met you in August 2001; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And at pages 196 to 197 of the book *Bust* --

MS. RAY: Hang on one moment, Counsel. 196 to 197 you said?

MR. STEWART: It's the excerpt we were just looking at.

MS. RAY: Oh, that's 186 to 187.

MR. STEWART: Please correct the record. It's 186 to 187.

**22**

MS. RAY: There is no question pending, if you're waiting on that.

BY MR. STEWART:

Q. At pages 186 to 187, that correctly identifies the time period within which you met Mr. Resnick; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Directing your attention to page 195 of the excerpt of *Bust* --

MS. RAY: Can we just have a moment here, please?

MR. STEWART: Yes.

BY MR. STEWART:

Q. -- and specifically to the second to last full paragraph of page 195, I will read from that.

"A short time later I owed Lucky six figures and wrote him a check from my new account, knowing it wouldn't clear. Back in the fall, when I'd lost in the neighborhood of one hundred fifteen thousand dollars to him, I'd charged the large sum at his butcher shop on my American Express card. We had to talk to the fraud department, but it worked. It was also convenient. But he didn't want to do it again. 'It took too long to get the

**23**

cash,' he explained."

Mr. Poeta, Adam Resnick in fact paid you $150,000 using his American Express card; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I'm sorry. The amount is not 150, but rather $115,000. Is your answer the same?

A. Yes.

Q. And that $115,000 was repayment for an illegal wager; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Directing your attention to page 224 of Exhibit 8 --

MS. RAY: One moment, please. 223 or 224?

MR. STEWART: 224.

BY MR. STEWART:

Q. -- beginning with the paragraph, "I thought of the classic scene with Joe Pesci. . ."

Later on in that paragraph, after Adam Resnick describes playing cards and wagering with Lucky, he says, quote, By the time we landed, I'd lost eighty-five thousand dollars, end quote.

Mr. Resnick in fact paid you $85,000;

**24**

isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And that again was payment for an illegal wager; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Directing your attention to pages 218 to 220 of the book *Bust* --

MS. RAY: One moment.

BY MR. STEWART:

Q. -- if you'd like to just review that?

MS. RAY: You can proceed, Counsel.

BY MR. STEWART:

Q. Mr. Resnick correctly describes a trip that you and he took to Las Vegas in or about June of 2002; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. You in fact traveled to Las Vegas with Mr. Poeta in or about June 2002; isn't that correct, Mr. Poeta -- I'm sorry.

You traveled to Las Vegas with Adam Resnick in June of 2002 or about 2002; isn't that correct?

25

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I'd like to direct your attention to page 237 of the excerpts. At the bottom of page -- I'm sorry. That's 237.

MS. RAY: Hang on just one moment.

Oh, okay. It skipped over. Thank you.

BY MR. STEWART:

Q. At the bottom of page 237, Adam Resnick is describing the collapse of Universal Bank and the reports of that collapse in the local news; do you see that?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. In the third to the last paragraph, and I quote, Resnick writes, "I got a call from Lucky saying that the last check I'd written his offshore people had bounced. It was for close to four hundred thousand dollars. But he had heard the news.

"'Don't worry about it,' he says. 'They made so much off of you, who gives a shit? Take care of yourself and your family.'"

Mr. Resnick correctly describes a conversation he had with you at or about the time

26

that the Universal Bank collapsed; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you were aware of the fact that Adam Resnick was paying you on illegal wagers through money he was getting from Universal Bank; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I'd like to go over Exhibits 1 through 7 with you now, sir.

MS. RAY: Are we calling 1 this one here?

MR. STEWART: Yes, it says "1" right at the top.

MS. RAY: There's just no sticker.

BY MR. STEWART:

Q. Now, you had a chance to review Exhibits 1 through 7, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. These exhibits were actually presented to your attorney on or about August 2 of 2007 in preparation for this deposition, were they not?

A. I respectfully refuse to answer based

27

upon my rights under the Fifth Amendment.

Q. I'm going to review Exhibit 1 with you now. Isn't it true that you received Check No. 127 in the amount of $27,000 from Adam Resnick in payment of an illegal wager?

MS. RAY: First of all, I object to the form of the question, that we're doing it this way. If you want to refer to the actual check and which exhibit it's in, then I would have no problem with it.

MR. STEWART: That's a good idea.

MS. RAY: Furthermore, my client is going to answer each and every question the same way, so if we could in the interest of time refer to the exhibits, I think it would expedite matters.

MR. STEWART: Exhibit 1 is a summary sheet that was prepared listing out all the checks that we wish to ask Mr. Poeta questions about.

Exhibit 2 is documents that were produced to the United States pursuant to subpoena from JPMorgan Chase seeking records concerning checks that had been deposited into an account we believe was held there by Domenic Poeta.

Exhibit 3 --

MS. RAY: Counsel, I didn't mean to request

28

that you go through what each exhibit is, but what I was saying was rather than just asking him about Check No. 127, in the interest of time, can we refer to it in its exhibit and do it at the same time?

MR. STEWART: Yes, we can do that.

MS. RAY: So we don't have to go over it twice.

MR. STEWART: In preparation I would just like to go through each of the exhibits to say what their source is.

Exhibit 3 are documents produced to us from First Midwest Bank again pursuant to subpoena issued in this case.

Exhibit 4 are documents produced to us from Lake Forest Bank pursuant to subpoena, as is Exhibit 4-A, are documents produced to us from Lake Forest Bank.

Exhibit 5 is documents that were in the custody of the FDIC who took over Universal Bank. The source documents are checks that were written on Universal Bank accounts, and there are a number of checks in each of these Exhibits 1 through 5.

Exhibit 7 is -- rather Exhibit 6 are documents produced to us from Chicago Community

29

Bank, who eventually would purchase the assets of the collapsed Universal Bank, again pursuant to subpoena, again seeking records of checks that may have been negotiated by both Adam Resnick and Domenic Poeta.

Exhibit No. 7 are documents from Citibank Smith Barney again produced pursuant to subpoena issued in this case for account records of Domenic Poeta seeking to find the source of where certain checks that were negotiated were deposited.

So those are the Exhibits 1 through 7. They will be made a part of this deposition.

Referring then again to the Exhibit 1 and to the first check on line No. 1 of Exhibit 1, Check No. 127 in the amount of $27,400, that is included in Exhibit 2 -- I'm sorry -- in Exhibit 5.

MS. RAY: If you'll hang on one moment, please, so we can pull it. And any idea -- this is a large exhibit packet -- where it is in here? What check number? A few of these are referenced by number in here.

Oh, is it actually 127? Is that what you're referring to?

MR. STEWART: You'll see it in the bottom lower left-hand corner.

30

MS. RAY: Okay. We've got it.

First of all, just so that the record is clear, as to Exhibit 5, we object to every single other check other than those that are endorsed by Adam Poeta and ask that the judge consider not making those a part of this record.

MR. STEWART: It's noted. I think you meant to say Domenic Poeta.

MS. RAY: Did I say Adam?

MR. STEWART: Yes.

MS. RAY: I've got your sickness. Sorry. It's catchy.

BY MR. STEWART:

Q. So I would direct your attention, Mr. Poeta, to Check No. 127, a copy of Check No. 127 that appears on the first page of Exhibit No. 5.

MS. RAY: We can't read ours at all. We can sort of make out Domenic Poeta. Is there a duplicate of this in another exhibit? I think there is, if you can refer to that.

Many of these that I could read I marked where there were duplicates in other exhibits, so if we can refer to that -- we can't read ours.

Exhibit 3?

31

MS. CHIZANA: We only have the one for 127.

MS. RAY: I didn't see any others, and we cannot read this. So maybe your copy is better.

MR. STEWART: I'll give you Exhibit No. 5.

MS. RAY: Just so that the record is clear as to what we can see here, we see that the check is made out to Domenic Poeta.

The back of the check, which would be on the next line up, we see what I assume you're going to say purports to be the signature of Domenic Poeta. We cannot read what bank or any of that.

MR. STEWART: I think if you refer to the top of the second column, you will see the signature of Domenic Poeta?

MS. RAY: Yeah, I said that, what purports to be the signature on the back of the same check, although we don't have any knowledge of that, of Domenic Poeta.

We haven't seen the originals of these checks, but that purports to be the back of that check. And we don't know what bank. We can't read any of the other stuff.

MR. STEWART: Once again, this was a check that was produced to us by the FDIC who was maintaining the records of the collapsed Universal

32

Bank, and these were the records that were found in the Universal Bank records.

BY MR. STEWART:

Q. Mr. Poeta, you in fact received Check No. 127 that is listed on Exhibit 1; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you in fact deposited that check into your account; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I'll refer you to line No. 2 of Exhibit 1.

MS. RAY: Okay.

BY MR. STEWART:

Q. It lists Check No. 213949, in the amount of $27,400, made payable to Dominick Poeta. It is also found in Exhibit 3.

MS. RAY: Hang on one moment, please.

MR. STEWART: You'll find it on the first page of Exhibit 3, and it's the middle check. Exhibit 3 is again documents that were produced by First Midwest Bank.

MS. RAY: Once again, I have an objection to

33

this line of inquiry on these exhibits. There is a second page to this. We don't have the actual checks.

It purports to be the back of this particular middle check if you take things in logical order, but once again, we can't read the specifics. We have no idea. It purports to be a back signed or endorsed by my client, Domenic Poeta, but we would object to this question without seeing the actual.

MR. STEWART: Once again, these were checks that were produced to us by First Midwest Bank. I believe it is the custom and practice of banks not to keep actual checks but rather to keep them on microfilm, and these were the microfilm copies that were produced to us as genuine and correct copies of the documents that were provided by First Midwest Bank.

BY MR. STEWART:

Q. Mr. Poeta, you have an account at First Midwest Bank; isn't that correct.

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Not only did you have a depository account, but you also at one time had a loan

34

account at First Midwest Bank; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you in fact received Check No. 213949 that we've been discussing for the amount of $27,400; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And you in fact deposited that check into your account at First Midwest Bank; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

MR. STEWART: All right. Loraine, again reading from Exhibit 1, line 4, Check No. 247, in the amount of $20,000 --

MS. RAY: So we're skipping line 3?

MR. STEWART: I'm sorry. Let's go back.

Line No. 3, a check dated 1/3/2002, Check No. 214034, in the amount of $15,000, made out to Dominick Poeta, and produced to us both by First Midwest Bank and FDIC.

Going down on line 4, I have Check No. 247, in the amount of $20,000, made out to cash, endorsed on the back by Mr. Poeta and

35

produced to us by the FDIC.

MS. RAY: Which exhibit pack is that in?

MR. STEWART: Exhibit 5.

MS. RAY: Is that a question, or are you saying it's there?

MS. CHIZANA: Yes, Exhibit 5, as well as Exhibit 2.

MS. RAY: Oh, 2 also?

MS. CHIZANA: Exhibit 3 and Exhibit 5.

MS. RAY: Hang on just one moment.

So that we're on 247; is that correct?

MR. STEWART: That's correct, and you will find that on the second page --

MS. RAY: Excuse me. I'll get there. Just one second.

You said it's also in 3?

MS. CHIZANA: Yes.

MS. RAY: 247, I don't see that, and these are sequential I think. Maybe I just flipped through it too fast. The low-numbered checks here start with 258, 264. This is in Exhibit 5 -- 3, I'm sorry, if that's what you were looking at.

MR. STEWART: I see it in Exhibit 5. It's on the second --

MS. RAY: Oh, 3, I was told. We'll go to 5

36

then.

MR. STEWART: It's in Exhibit 5.

MS. RAY: Yeah, but the duplicate though --

MR. STEWART: It's in Exhibit 5 --

MS. RAY: That's what we have to resolve here is some of these duplicates if we can.

MR. STEWART: -- on page 2.

MS. RAY: And then you said it's in Exhibit 3. I'm just not seeing it.

MR. STEWART: No, it's just in Exhibit 5, which once again is the records that were produced to us by the FDIC on behalf of the collapsed Universal Bank.

MS. RAY: Carry on then.

BY MR. STEWART:

Q. Do you see that check, Mr. Poeta, in Exhibit 5?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And that is in fact your signature on the reverse side of Check No. 247, isn't that?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

MR. STEWART: Can we go off the record for a moment?

37

(Discussion off the record.)

MR. STEWART: That is line No. 5 in Exhibit 1, Check No. 258 for $20,000. It appears in both exhibits -- I'm sorry. It appears only in Exhibit 5.

We have Check No. 264 for $20,000, made out to Cash, appearing in both Exhibits 3 and 5. Check No. 273, in the amount of $50,000, made out to Cash, again appearing in Exhibits 3 and 5.

Check No. 294, for $25,000, made out to Cash, again appearing in Exhibit 3 and 5. Check No. 305, for $25,000, made out to Cash, again appearing in Exhibits 3 and 5.

Check No. 339, in the amount of $30,000, again to Cash, appearing in Exhibits 3 and 5. Then Check No. 214822, in the amount of $100,000, made out to Dominick Poeta, appearing in Exhibits 3 and 5.

MS. RAY: I can't read the last numbers on mine. It's 214822, and you're referring to this check, Universal, which I'm holding up right now from Exhibit 5?

MR. STEWART: Yes.

MS. RAY: Okay. And that's just found in Exhibit 5? As I have it, it's a duplicate.

38

MR. STEWART: No, it's found in Exhibits 3 and five --

MS. RAY: Okay.

MR. STEWART: -- I'm sorry. I stand corrected. Check No. 214822 is found in Exhibits 2 and 5.

MS. RAY: Got it.

MR. STEWART: Line No. 12 of Exhibit 1, Check No. 214825, in the amount of $100,000, made out to Dominick Poeta, appears in Exhibits 2 and 5.

Then on line 13 of Exhibit 1, Check 350, in the amount of $55,000, made out to Cash, and appearing in Exhibits 3 and 5.

Line No. 14, Check No. 356, in the amount of $12,300, made out to Cash, and appearing in Exhibits --

MS. CHIZANA: -- 3 and 5.

MR. STEWART: -- and appearing in Exhibits 3 and 5.

On line 15 of Exhibit 1, Check No. 215077, in the amount of $100,000, made out to Dominick Poeta and appearing in Exhibits 2 and 5.

Then on line 16 of Exhibit 1, we have Check No. 215099, for $144,000, made out to Dominick Poeta and appearing in Exhibits 2 and 5.

39

On line 17 of Exhibit 1, we have Check No. 452, in the amount of $72,000. It's made out to Cash, appearing in Exhibit No. 3.

MS. RAY: I'm sorry. Wait one second. I lost you on that one. Which number?

The 452, I've got it. Okay. Which exhibits is that in?

MR. STEWART: It's in Exhibits 3 and 5. I stand corrected.

MS. RAY: Okay. Thank you.

MR. STEWART: And then Check No. 453, in the amount of $48,111.11, that's made out to Cash, and it appears in Exhibits 5 and 7.

MS. RAY: Well, I have it, 5 and 4-A. Maybe I'm wrong. I got a little dizzy trying to figure these out.

That's what I have, is that it's Exhibit 5 and Exhibit 4-A. So is it also in 3 or 4 that you were referring to? What did you say, Counsel?

MR. STEWART: Let's make the record clear.

MS. RAY: You said 5 and 7, so let me just double-check the exhibits.

MS. CHIZANA: It's 5 and 4-A.

MS. RAY: Is there anything in 7?

40

MS. CHIZANA: No.

MR. STEWART: So just to correct the record, we are at line No. 18. It's Check No. 453, in the amount of $48,111.11, made out to Cash, and it appears in Exhibits 5 and 4-A.

MS. RAY: We're good with that.

MR. STEWART: And the remaining two checks listed at lines 19 and 20, our information is that there was an attempt to deposit them but they never cleared.

That is Check No. 215401, and that check was replaced by Check No. 4001317, in the amount of $60,000. Copies of those checks were produced to us and appear in Exhibits 3 --

MS. RAY: -- and 2.

MR. STEWART: -- 2, 5, and 4-A and perhaps four.

MS. RAY: Let's check 4 to make the record clear here because I didn't see it in there.

MR. STEWART: It's in 4.

MS. RAY: And is it in 4-A?

MR. STEWART: It's not in 4-A. It's in 4.

MS. RAY: Let me just look through 4-A, if we can take a moment here?

MR. STEWART: 4-A will be the next check, line

**41**

No. 20.

MS. RAY: I thought we're dealing with both of those.

MR. STEWART: I'm sorry. Wait.

MS. RAY: I thought you did read both of those numbers, and now we want to say that both of them are in Exhibits 3, 2, 5, 4, and 4-A; is that correct?

MR. STEWART: I do not believe that they're in 4-A. It's not in 4-A.

MS. RAY: My 4-A only includes Check 453.

MR. STEWART: Right, which is line 18. All right. That's correct.

MS. RAY: So 3, 2, 5 and 4 are the exhibits where this is.

MR. STEWART: Yes. And then finally line 20 is again Check --

MS. RAY: We did line 20. You did both of them together. You read all the numbers in the record.

MR. STEWART: No, that was line 19. I read two check numbers because --

MS. RAY: No, you read both the check numbers, but that's okay. We can redo it for that. That's fine.

**42**

MR. STEWART: Just to clarify the record, line No. 19 is two check numbers. One is 215401, and the second check number is 4001317.

The second check number replaced the first check at the time that Universal Bank collapsed and Chicago Community Bank took over its assets.

The same holds true on line 20, that Check No. 215402 and Check No. 4001315 are a series of checks. The first one was the Universal check. The second one was a Chicago Community Bank check that replaced the Universal check after Universal Bank collapsed.

And as far as line 19 is concerned, we've already identified the exhibits where that appears in. The check number -- I'm sorry. The checks included in line number 20, they appear in -- what?

MS. CHIZANA: 2, 3, 5 and 4.

MR. STEWART: -- in Exhibits 2, 3, 5, and 4.

MS. RAY: Does that conclude your questioning?

BY MR. STEWART:

Q. The question is, Mr. Poeta, I've asked you for the first couple of checks whether you received those checks.

I had also asked you whether you

**43**

deposited those checks into your account.

And the third question would be whether those checks were in repayment of an illegal gambling debt.

Would your answer be the same if I posed those questions for the remaining checks on Exhibit 1?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. In fact, as indicated in Exhibit 1, you received $891,211.11 from Domenic Poeta, isn't that correct -- I mean from Adam Resnick; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

MS. RAY: So that's your total? I didn't total these up.

Oh, you did it down there. Good. Thank you.

BY MR. STEWART:

Q. And in fact Domenic. -- rather Adam Resnick paid you $891,211.11 in repayment of illegal gambling debts; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based

**44**

upon my rights under the Fifth Amendment.

Q. I just have a few more questions.

And I want to make clear that with respect to each one of the checks that are listed on Exhibit 1, I have asked you that they were in repayment for illegal gambling debts, and your response is that you are asserting the Fifth Amendment privilege; is that correct?

A. Correct.

Q. Thank you. I'm going to refer you to Exhibit 1, line 18, Check No. 453, in the amount of $48,111.11, and I would ask you to look at that and then look at the checks themselves which appear -- in which exhibits?

MS. RAY: They're in 3 and 5. Hang on one moment. I'll pull those.

BY MR. STEWART:

Q. If you would open up to Exhibits 3 and 5?

MS. RAY: Where is it in 5? Can you just tell me? I'm up to 339 there, and then does it skip to -- oh, one of the biggies?

MS. CHIZANA: It's one of the back pages. It's fourth from the back.

MS. RAY: 453, I've got it, and then my note says 4-A.

45

MS. CHIZANA: Yes, 4-A.

MS. RAY: It's toward the back. It's about four pages from the back.

BY MR. STEWART:

Q. Mr. Poeta, have you had an opportunity to look at both Exhibit 5 and Exhibit 4-A?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. You endorsed Check No. 453 over to someone or an entity called Semersky Enterprises; is that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And that's the endorsement that's clearly seen on the copy of the check that's in Exhibit 5; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And $48,111.11 was given to Semersky in exchange for a vehicle; isn't that correct?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I'm going to refer you to line No. 11 of Exhibit 1 --

MS. RAY: One moment, please.

46

BY MR. STEWART:

Q. -- and line 12 of Exhibit 1, and then I'd also like you to take out the checks that appear in Exhibits 5 and 2.

MS. RAY: In 5, where is it? because my numbers get cut off.

MR. STEWART: It's midway.

MS. RAY: It's in the big ones though, right?

MS. CHIZANA: Yes.

MS. RAY: 2 and 4, are we looking at the check that's dated 3/30/02?

MR. STEWART: That's Check No. 214825.

MS. RAY: And then 214822, would that be the check dated also 3/30/02?

MR. STEWART: That's correct, and that's appearing in Exhibit 5.

MS. RAY: And then the other exhibit is Exhibit 2. One moment, please, and I'll pull that.

Okay. We're with you Counsel. Thank you.

MR. STEWART: All right.

BY MR. STEWART:

Q. As to Check No. 214822 and Check No. 214825, both dated March 30, 2002 and written on Universal Federal Savings Bank account, both in

47

the amount of $100,000, you received those checks and directed Chase Bank to apply them to an account that you maintained at Citibank Salomon Smith Barney; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And if you go to Exhibit 7, that is a --

MS. RAY: One moment, please.

Thank you, Counsel. We've got Exhibit 7.

BY MR. STEWART:

Q. And Exhibit 7 is a true and correct copy of an account record for an account that you hold at Citi Smith Barney; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. And that account record shows that in or about April 1 through April 28, 2002, you deposited $200,000 in your Citi Smith Barney account; isn't that correct, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Mr. Poeta, do you wish to add anything concerning the identity or location of Adam Resnick's assets?

48

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Mr. Poeta, do you wish to add anything concerning your receipt of money from Adam Resnick?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. Do you wish to correct any answer you gave today, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I assume then you do not wish to correct any answer you gave today?

MS. RAY: Asked and answered. I object to that question.

BY MR. STEWART:

Q. Do you wish to maintain each and every assertion of your Fifth Amendment privilege against self-incrimination, Mr. Poeta?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

Q. I assume you do wish to maintain each and every --

MS. RAY: What you assume, I think, is not relevant.

49

BY MR. STEWART:

Q. My question is, Do you wish to maintain each and every assertion of your Fifth Amendment privilege?

MS. RAY: My client just answered you.

MR. STEWART: It's either yes or no.

MS. RAY: My client just answered you.

MR. STEWART: I assume that he seeks to rely on the Fifth Amendment privilege.

I am going to conclude the examination portion of the citation with the reservation that if we receive any further documents that we will reserve the right to call Mr. Poeta back and seek to elicit more testimony from him.

We are not terminating this citation proceeding, however, and we reserve the right to seek further relief pursuant to the citation and pursuant to the judgment that we have against Adam Resnick.

BY MR. STEWART:

Q. Do you understand that, sir?

A. I respectfully refuse to answer based upon my rights under the Fifth Amendment.

MR. STEWART: Loraine, I'm just trying to make clear for the record that the ending of this

50

deposition -- with the ending of this deposition we are nonetheless reserving our right to call Mr. Poeta back in case there are other documents that are received that might show that Mr. Poeta has information about the location or identity of Adam Resnick's assets.

MS. RAY: I think you've made that record crystal clear.

MR. STEWART: I just want to make it absolutely clear. Number two, that whatever ajournment of the actual deposition today, that the citation in this case remains pending as well as the transfer prohibitions that are contained in there and our rights to seek further relief.

MS. RAY: We object, just for the record, to these proceedings, to my client being named in this citation to discover assets, that a book by Adam Resnick where he admits to it being replete with lies is used as a pile of questions against my client, Domenic Poeta.

And frankly, we refused to have him come down here to answer these. I had let Counsel know by letter that my client will be taking the Fifth Amendment to each and every question, but we do appreciate getting the exhibits in such a nice

51

order.

MR. STEWART: I will also say for the record that perhaps in the criminal context one can give a blanket assertion of the Fifth Amendment rights.

But in the civil context, it's well-settled law that one must ask each and every question and the deponent must assert their Fifth Amendment in response to specific questions and cannot do so by blanketly applying their privilege against self-incrimination. And we have appropriately done that in this civil context. These are civil proceedings to enforce a judgment.

So with that, I thank you.

MS. RAY: Thank you.

MR. STEWART: I thank you.

(Witness excused.)

MR. STEWART: It is now 11:42. The deposition of Domenic Poeta concluded just moments ago. As the deponent was leaving, I requested a copy of his driver's license and I got a copy of his driver's license and got the permission of Loraine Ray, the deponent's attorney, to reopen the record for purposes of introducing Government Exhibit No. 10, which is a copy of the driver's license of Domenic Poeta. Thank you.

52

CERTIFICATE

I, LISA R. LISIT, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, DOMENIC POETA, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the testimony given by the foregoing witness.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 4th day of September, 2007.

_____

LISA R. LISIT, CSR, RPR
Notary Public, Cook County, Illinois

C.S.R. No. 084-004297