IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,          )    No. 05 CR 9
                                   )
                  Plaintiff,       )    Chicago, Illinois
                                   )    June 6, 2008
                                   )    9:00 o'clock a.m.
     -vs-                          )
                                   )
                                   )
ADAM RESNICK,                      )
                                   )
                  Defendant.       )

TRANSCRIPT OF PROCEEDINGS - HEARING
BEFORE THE HONORABLE WAYNE R. ANDERSEN

APPEARANCES:

For the Plaintiff:          HON. PATRICK J. FITZGERALD
                            United States Attorney, by
                            MR. JOSEPH A. STEWART
                            Assistant United States Attorney
                            (219 S. Dearborn Street
                            Chicago, Illinois 60604)


For the Defendant:          MS. BARBARA O'CONNOR
                            174 Battery Street
                            Third Floor
                            Burlington, Vermont 05401


For the Respondent:         RAVITZ & PALLES, P.C.
                            203 North LaSalle Street
                            Suite 2100
                            Chicago, Illinois 60601
                            BY:   MR. ERIC S. PALLES


Court Reporter:             ROSEMARY SCARPELLI
                            219 South Dearborn Street
                            Room 1412
                            Chicago, Illinois 60604
                            (312) 435-5815

THE COURT:  Okay.  This is United States of America versus Adam Resnick and as third-party citation respondent Dominick Poeta.  It is Case No. 5 CR 9-1.  And the nature of the proceeding is an effort by the United States to collect restitution owed by Mr. Resnick that it claims -- and it claims that Mr. Poeta is actually holding money that belongs to Mr. Resnick that should be used to pay part of the restitution.  So that is why we are here today.

MR. NOVAK:  I am sorry, your Honor.  Do you want him to hear what is going on?

THE COURT:  I have no problem with -- because Mr. Resnick is really a witness in a sense, but he would get credit for anything that is paid.  So I have no problem at all with him -- him listening to what we are saying.  Does anyone?

MR. STEWART:  No, Judge.

THE COURT:  So why don't you put him on and then I will greet him.

Good morning.

MR. NOVAK:  Mr. Resnick and Mrs. O'Connor, the Judge is here and we are ready to begin.  Do you have any questions before we start?

MS. O'CONNOR:  I have one question, which is I couldn't hear when you had the mute button on.  I was -- wanted to be aware of what happened in the courtroom.  And

then, secondly, I was wondering if you could just give me the name of the people that are present.

MR. NOVAK:  Well, the Judge will give all that information to you.  I did mute it while we were setting up and the Judge was getting ready.  So we are all online now and I will let the Judge take over.  Okay?

MS. O'CONNOR:  Okay.  Thank you very much.

THE COURT:  Good morning.  This is Judge Andersen. We -- in order for us to hear one another, we need to allow some time between particular individuals talking so that the sound system works correctly.  Miss O'Connor and Mr. Resnick, if you ever cannot hear, I can actually see you, Mr. Resnick -- just to make sure it is you, why don't you raise your right hand.

That is it.  Thanks.  Okay.  You can put it down.

If -- this -- let me call the case.  And there are several people in the courtroom.  It is obviously a public proceeding.

It is case 5 CR 9, United States of America versus Adam Resnick and versus Dominick Poeta.  And the nature of the proceeding today is to try to determine whether or not the United States of America is entitled to in effect seize or obtain funds that Mr. Resnick allegedly paid to Mr. Poeta which really should be used as part of Mr. Resnick's estate to pay part of the restitution that is owed.  And we are

having this proceeding to determine if -- who owned -- whether money was transferred and, if so, who might actually be entitled to have it so we can determine that.

Why don't we have each of the attorneys who is present here step up to the microphone and state your name, and then that will also enable us to make sure Mr. Resnick and Miss O'Connor can -- can hear each person. Okay?

MR. STEWART: Okay.

MS. O'CONNOR: Thank you, Judge.

MR. STEWART: Joseph Stewart on behalf of the United States.

MR. PALLES: Eric Palles, and with me Gary Ravitz on behalf of Dominick Poeta.

MR. RAVITZ: Good morning, Judge. Just for the record, Mr. Poeta is present in open court as well today.

THE COURT: Also Mr. Duffy is here. Are you here representing anybody?

MR. DUFFY: Judge, I am here on behalf of a witness who has been subpoenaed. His name is Terrence Navarro.

THE COURT: Okay. Thank you for the time.

Really the U.S. Attorney is the moving force in the proceeding since it is claiming -- the United States is claiming money. How would you like to proceed?

MR. STEWART: Well, your Honor, there is a preliminary issue with regard to one of Mr. Poeta's witnesses

that they have subpoenaed here today, and I would like to address that first.

THE COURT:  Is that Mr. Duffy's client?

MR. PALLES:  Yes.

MR. STEWART:  Yes.

THE COURT:  Okay.

MR. STEWART:  Then at that point we would put our case on.

THE COURT:  Can you -- Mr. Resnick and Miss O'Connor, can you hear the the U.S. Attorney?

THE DEFENDANT:  Yes, your Honor.

MS. O'CONNOR:  Yes, your Honor.  Thanks.

MR. STEWART:  Thank you.

We are going to call one witness.  That is Mr. Resnick.  And we have a bit of an argument to make at the end of the hearing.  And that will be our case in chief.

I am not sure what witnesses Mr. Poeta intends on calling.  I do know there is an issue with one of those witnesses.

THE COURT:  Okay.  Even though -- Mr. Duffy is here now and presumably we should resolve that issue --

MR. PALLES:  Yes.

THE COURT:  -- to the convenience of him and his client.  I don't see a reason to wait.  So, Mr. Duffy, why don't you tell us what the issue is.

MR. DUFFY:  Thank you, Judge.  I represent Terrence Navarro who received a subpoena from Mr. Poeta's counsel to appear as a witness.  I have advised both the Government and counsel for Mr. Poeta that if Mr. Navarro was called, he would assert his Fifth Amendment privilege to any subsequent question that -- that he may be asked.  Counsel for Mr. Poeta had submitted to me a list of questions, I think it was yesterday, that he would ask Mr. Navarro, and I informed him that Mr. Navarro would assert his privilege to each and every question.

Mr. Navarro is not present in Court.  Counsel and I had discussed whether it was necessary for him to appear this morning.  Counsel was amenable for me appearing before your Honor to see if we can resolve this and avoid Mr. Navarro making a trip down to Chicago.  He resides in the northern suburbs.

THE COURT:  First of all, he is not here right now, right?

MR. DUFFY:  He is not, your Honor.

THE COURT:  So if we can resolve it now, fine.  Otherwise, obviously, we have gone to a lot of trouble to hook up Mr. Resnick; we can get his testimony and resolve it later.

MR. PALLES:  Of course.

THE COURT:  It is certainly not going to be my goal

to discommode either you, Mr. Duffy, or Mr. Navarro.  Who would like to -- you still want to call him as a witness, even though he has promised not to testify?

MR. PALLES:  Well, yes, your Honor, because certainly if I were to ask questions and he would assert his Fifth Amendment privilege to, then you -- your Honor can make evidentiary inferences from that.  The Government has, of course, argued that Mr. Poeta's assertion of his Fifth Amendment privileges leads to certain adverse inferences.

So the desired way that I would like to proceed is to have Mr. Navarro down here, have me ask his -- ask the questions and him assert his Fifth Amendment privilege.

Now, again, as an alternative, I --

THE COURT:  We could stipulate --

MR. PALLES:  Well --

THE COURT:  -- that he would testify a certain way.

MR. PALLES:  If we were to stipulate, I have -- as Mr. Duffy has indicated, I gave him yesterday a list of the questions to review.  I have given Mr. Stewart a list to review.  And I can certainly pass one up to you.  But if we could lay this on record that -- that Mr. Navarro would plead -- you know, would assert his Fifth Amendment privilege to each and every one of these questions and that it would have whatever evidentiary effect it would have, that I suppose would be a solution.

THE COURT:  From Mr. Duffy's point of view, would you agree to that?

MR. DUFFY:  I would, your Honor.

THE COURT:  What about the U.S. Attorney?

MR. STEWART:  Your Honor, I -- contrary to what Mr. Palles says, I have not seen that list of questions.  I have reviewed it just a moment ago and I barely scanned it.

THE COURT:  Here is what I suggest we do:  I suggest that we begin our examination of Mr. Resnick.  And then -- because these fancy video conference things usually work, but you never know.  So I would say as long as we have it working, we should do that.  We could attend to this later on.

Mr. Duffy, I do not think it is necessary for you to stay in the courtroom.  If you would like to, you -- you are always extremely welcome here.

MR. DUFFY:  No offense, your Honor, but I would gladly be excused.

THE COURT:  But we have your phone number.  And when we finish with the testimony that we know we can get today, then we can let you know.

If -- if either one of the parties wants to insist on your client appearing, then I think I would require that he appear.  And if he ends up responding by asserting his Fifth Amendment rights, fine.

So I would give -- we have a double veto here.

MR. PALLES:  Well, excuse me, your Honor, if I may. If -- if your ruling is to be that if either one of us insists that he come down here, that he assert his Fifth Amendment privilege in person, then given the fact that he is perhaps an hour, hour and a half away, maybe he should start his trip.

THE COURT:  Well, if you would like -- the U.S. Attorney needs to decide if he wants him here because you basically offered -- offered stipulated testimony.

MR. PALLES:  I did.

THE COURT:  But the U.S. Attorney hasn't had a chance to --

MR. PALLES:  Okay.

THE COURT:  -- value that since he hasn't studied the questions, so --

MR. PALLES:  Okay.

MR. STEWART:  And, your Honor, I would take the position that without -- in a criminal proceeding I know that it is quite usual and proper for a defendant to assert a blanket Fifth Amendment privilege against all questions.  But in a civil proceeding it is typical that specific questions must be asked and the privilege asserted to -- as to specific questions for it to have any inferential evidentiary value down the line.

THE COURT: So, Mr. Duffy, if we -- if we set his testimony for, let's say, 11:00 a.m. this morning, would that be -- would you be available then?

MR. DUFFY: I would, your Honor. But as counsel has represented to the Court, he had preside -- prevented -- excuse me, provided me a list of questions, which I reviewed with my -- my client, and his response would be the assertion of the privilege to those questions. But if they want him here, Judge, I will have him here.

THE COURT: What can I say? If you had done this yesterday, then maybe the U.S. Attorney would feel differently now. I have no problem stipulating to this. So we have a choice. We can either ask him to come down or we can hear the testimony we can hear, take a recess and then decide if we need him to come down. If we need him to come down and it is not going to be today, obviously, we could -- frankly, we could do it on Monday morning from my -- we could to it Monday, Tuesday or Friday of next week.

MR. PALLES: Your Honor, I am leaving town tomorrow for a week.

THE COURT: Or we could do it the week after. I mean this has gone for quite awhile.

MR. STEWART: Judge, if you --

THE COURT: What would you like to do?

MR. STEWART: If your provisional ruling would be

that as to these questions you would accept a stipulation and you would accept those questions as asked and answered on the record, then I don't see any value of forcing this witness to come.

MR. PALLES: Okay.

THE COURT: Why don't we do this then: Let's accept the stipulation but subsequent to today's hearing, before the Court rules, the -- the parties can look -- can reflect on that. And if either party says, no, I really would like to cross-examine him or examine him in person, then we will pick a subsequent time to do it.

MR. STEWART: All right.

THE COURT: That would enable us to go forward with Mr. Resnick at this point in time, without people spending half a day driving back and forth unnecessarily. So we just won't terminate the hearing until you get a chance to review that. So I would say we will make that stipulation, but I think we should get Mr. Resnick's testimony in now because so many people are tied up to make it available.

And then, Mr. Duffy, when we enter the stipulation later on, we will give you a call and tell you that we have done it. And if you would like a transcript, you can get it from Miss Scarpelli. Okay?

MR. DUFFY: Thank you, Judge.

THE COURT: Have a great day.

MR. DUFFY: I will, Judge. Thanks. I might chase a white ball someplace.

THE COURT: Good.

(Discussion held off the record.)

THE COURT: Okay, Mr. Resnick. Should we --

THE DEFENDANT: Yes, your Honor.

MR. STEWART: I think there is one other --

THE COURT: All right.

MR. STEWART: I would like to set, if we could, some ground rules for the hearing. And I don't know what ground rules you would set.

THE COURT: I think we should swear Mr. Resnick --

MR. STEWART: Okay.

THE COURT: -- and start asking him questions like you would any other witness.

MR. STEWART: Okay. There was a motion in limine that was made to bar certain evidence regarding the source of funds used to -- for deposits into the NEA account. That really will become germane, I think, when Mr. Poeta starts to make his case. So we could wait on that motion until that point.

THE COURT: Okay. And I will understand the context of it better after hearing Mr. Resnick's explanation.

MR. STEWART: Judge, I just want to make sure you have a copy of our petition and our motion for judgment. I

have them here in a binder, if you would like.

THE COURT: Sure, why don't you hand it up.

MR. PALLES: Your Honor, while we are at it, I would move to exclude all witnesses. I don't know if there are any witnesses in the court.

THE COURT: Is there anyone who anyone intends to call?

Okay. Mr. Poeta is here?

MR. STEWART: Yes.

Judge, on behalf of the United States we have John Lucas from the FDIC and Shari Chizana who is a paralegal with our office who are rebuttal witnesses potentially.

THE COURT: Do you want the FDIC witnesses excluded, potential witnesses?

MR. PALLES: Yes, your Honor.

THE COURT: Any objection?

MR. STEWART: Well, I think that -- that it is important that that witness hear what Mr. Resnick has to say, especially with the mechanics of how deficits were covered in that NEA account. And for him to be of value and -- if he is called on to testify, because I think that Mr. Poeta may make that an issue, whether -- you know, whether the circumstances that Mr. Resnick are describing were true or not.

MR. PALLES: Your Honor, for weeks we have been discussing who the witnesses would be and I disclosed four

witnesses. And I have subpoenaed them all. Mr. Stewart has identified one witness, Mr. Resnick. So for him to identify somebody as a witness I think is, first of all, unfair. But secondly, again, it would seem to me that he needs to be excluded. You know, I think it is a fair motion.

THE COURT: Unless -- unless it is somehow going to -- you know, we don't want to waste time with a witness having to be subsequently briefed on the -- something that is technical in nature. On the other hand, I have always granted motions to exclude. So if you need an FDIC person here to help advise you in understanding the transactions, my suggestion is have one of them here and then the other can either sit outside or go back to your -- go back to an office where we could call you if we need you.

MR. STEWART: I only have the luxury of one FDI witness. The other person, by the way, Judge, is someone from our office who prepared an affidavit in this case. I am not sure it is going to be necessary.

THE COURT: She is not a witness.

MR. PALLES: I believe I stipulated to everything that was in the --

THE COURT: Okay. Since Mr. Poeta is insisting on exclusion, I will grant the motion to exclude.

MR. STEWART: Very good.

THE COURT: Thank you. Sorry.

MR. STEWART: If I can just have a moment with Mr. --

THE COURT: Sure.

(Brief pause.)

MR. PALLES: Your Honor, if I may, let me just say for the record that the witnesses I have subpoenaed, I have never met any one of them. So if -- we have to stop, if anybody walks in the door.

THE COURT: If anybody comes in, I will keep an eye out. Then we will ask --

MR. RAVITZ: I will.

THE COURT: Is there any -- are there any -- is there anyone else other than Mr. Poeta who believes he or she is likely to be a witness in this case here?

Nobody has indicated that.

Okay.

MR. STEWART: Okay.

THE COURT: May I swear in Mr. Resnick?

MR. STEWART: That is fine, your Honor.

THE COURT: Mr. Resnick, would you please -- thank you for your patience with us.

Would you please raise your right hand.

ADAM RESNICK, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT: Okay. You can put your hand down. And

then the U.S. Attorney will begin to question you and then we will see how it goes.  Thank you.

MR. STEWART:  Thank you, Judge.

BY MR. STEWART:

Q.  Good morning, Mr. Resnick.  My name is Joseph Stewart and I am attorney for the United States.

A.  Good morning.

Q.  I am here to ask you a few questions today about your involvement with a person by the name of Dominick Poeta, okay?

A.  Yes.

Q.  In case you didn't hear it before, the Judge's instructions before, because of the particular way in which you are testifying today through the -- this video hookup, only one person can talk at a time to -- for there to be a clear record.  Do you understand that?

A.  I do.

Q.  So I shouldn't cut you off and -- when you are responding to questions and you cannot interrupt me as I am asking questions.

A.  I understand, Mr. Stewart.

Q.  Would you identify yourself for the record, please.

A.  Adam Benjamin Resnick.

Q.  And what is your age, sir?

A.  36.

Q.   And do you have a profession?

A.   At the moment I am an inmate at FCI Englewood.

Q.   Prior to becoming an inmate, did you have a profession?

A.   Yes.

Q.   And what was that profession?

A.   Healthcare entrepreneur.  Historically that was my profession.

Q.   You worked in the healthcare industry?

A.   Yes, Mr. Stewart.

Q.   You are also a gambler, isn't that correct?

A.   Compulsive gambler.

Q.   And you are residing now in Colorado?

A.   Yes.

Q.   At a correctional facility there in Colorado?

A.   Yes.

Q.   What is the name of that facility?

A.   Englewood.

Q.   And before that where did you reside?

A.   Are you asking me on the way here or -- or are you saying -- I mean because I have had several stops along the way here, so I just want clarification.

Q.   Did you live in Chicago, sir?

A.   Yes.

Q.   And where in Chicago did you live?

          THE COURT:  You don't need -- you do not need to

put your address on -- on the record. I don't know that that is relevant to this.

BY THE WITNESS:

A.   Lake County.

BY MR. STEWART:

Q.   Are you married?

A.   I am.

Q.   And you have children?

A.   Yes.

Q.   You are the criminal defendant and the judgment debtor in the case of United States versus Adam Resnick, Case No. 05 CR 9, isn't that correct?

A.   Yes.

Q.   And did you have codefendants in that case?

A.   I did.

Q.   Who were your codefendants?

A.   Terrence Navarro and Antonette Navarro.

Q.   Anyone else?

A.   No, sir.

Q.   You were convicted of -- essentially of stealing money from Universal Bank, isn't that correct?

A.   Correct.

Q.   And it was the theft of that money that led to the collapse of Universal Bank, isn't that correct?

A.   Yes.

Q.   And when the bank collapsed, the Federal Deposit Insurance Corporation took over the bank, isn't that correct?

A.   Yes.

Q.   And the FDIC absorbed about a $10 million loss as a result of your theft, isn't that correct?

A.   Yes.

Q.   Leading up to your conviction you entered a plea agreement with the United States, is that correct?

A.   Yes.

Q.   And you agreed to plead guilty to Count Five of the indictment against you?

A.   Yes.

Q.   And in that plea agreement you agreed to cooperate, did you not, with the Government's efforts?

A.   Yes.

Q.   And you agreed to give complete and truthful testimony if called upon to testify?

A.   Yes.

Q.   So you understand today that -- that you must give complete and truthful testimony?

A.   Yes.

Q.   You knew at the point that you signed that plea agreement that you would be obligated to pay about $10 million in restitution, isn't that correct?

A.   Yes.

Q.   That was set forth in the plea agreement?

A.   Correct.

Q.   And you knew that that included both the FDIC and several individuals, isn't that correct?

A.   Yes.

Q.   And these were people that you -- is that -- both the Universal Bank and the individuals were people that you had defrauded, isn't that correct?

A.   Yes.

Q.   Prior to the conviction that you are currently serving a sentence for, were you ever charged criminally?

A.   No.

Q.   I am going to ask you a few questions about a gentleman by the name of Dominick Poeta.  Do you know a man named Dominick Poeta?

A.   Yes.

Q.   And I am not sure about your ability or what your view is of your video monitor there, but do you see Dominick Poeta in your video screen?

A.   I see Judge Andersen in the bottom right corner of the caption.  I see you, Mr. Stewart, and several people in the gallery, but I don't see Mr. Poeta.

THE COURT:  If -- if it is significant --

MR. PALLES:  Your Honor, Mr. Poeta and I can move over there.

THE COURT: In fact, yes, why don't you sit at that table.

So they are going to change tables, Mr. Resnick. And let us know when they sit down if you can see them.

Good luck, Miss Schroeder.

(Discussion held off the record.)

THE COURT: Can you see Mr. Poeta now, Mr. Resnick?

THE WITNESS: I do see Mr. Poeta.

THE COURT: And is that the same Mr. Poeta that you know?

THE WITNESS: It is.

THE COURT: Okay. Please proceed.

BY MR. STEWART:

Q. When did you meet Dominick Poeta?

A. I am sorry, I didn't hear if you said where or when.

Q. When did you meet Dominick Poeta?

A. I believe approximately December of 2001.

Q. In 2001?

A. Yes.

Q. And how were you introduced to Dominick Poeta; was there a person or persons that introduced you to him?

A. There were also people that referred him -- or me to him, correct.

Q. So was it -- was it one person or a number of people?

A. We had a number of mutual acquaintances.

Q. And what was their relationship to Mr. Poeta?

A. I can only speak to that they placed bets with him. I don't know if they were actually what constitutes a friend or not, but they -- they placed bets with him.

Q. So the one thing these people had in common was they placed bets with Mr. Poeta?

A. Yes.

Q. And where did you meet Mr. Poeta?

A. Well, the first time I met him we were introduced formally over the phone. Subsequently I met him in person.

Q. And did you develop a relationship with Mr. Poeta?

A. Yes.

Q. Was that a social relationship or a business relationship?

A. It was business but very cordial.

Q. I am sorry?

A. It was business but quite cordial. We probably made small talk about social things.

Q. But did you also have a business relationship with Mr. Poeta?

A. Yes.

Q. And what was that business relationship?

A. I was a better and he was a bookmaker.

Q. And did Mr. Poeta work for any lawful gambling establishment like a Horseshoe Casino or something of that

nature?

A.     Not to my knowledge.

Q.     So he was -- he had his own book?

        MR. PALLES:  Objection.

        THE COURT:  Just -- you can answer the questions to the best of your knowledge.  Obviously, you don't have to guess or speculate.  But if you think you know the answer to a question, you may give it.  And then either of the attorneys or the Court, for that matter, might follow-up to understand the basis for an answer.  So I will overrule the objection.  And if you know the answer, you can answer the question, did he have his own book?

BY THE WITNESS:

A.     It appeared that he had his own book.  I am not privy to what his partnership relationships were or not, but it appeared so, yes.

BY MR. STEWART:

Q.     Okay.  Thank you.

        Do -- did you you know Mr. Poeta to have, besides gambling, some profession or business?

        MR. PALLES:  I am sorry?

BY THE WITNESS:

A.     Yes.

        MR. PALLES:  I am sorry, I couldn't hear the question.

BY MR. STEWART:

Q.   Did you -- besides gambling did you know Mr. Poeta to have some business or profession?

A.   Yes.

Q.   And what was that business?

A.   He was a partner -- or is a partner in a -- in a grocery store, meat market.

Q.   And where was that located?

A.   Highwood, Illinois.

Q.   Had you ever been to that butcher shop?

A.   Not prior to meeting him but subsequently after our phone introduction, yes.

Q.   And about how many times had you been to that butcher shop?

A.   Several times.  And I couldn't even begin to give you a real accurate number.

Q.   Could you describe the butcher shop.

A.   It is one-story, although there is a basement.  I have been down in the basement where they do a lot of cooking.  It is -- the retail portion of it can't be more than 1500 square feet, maybe, maybe 2,000 square feet.  And there is a glass case in the back with meats and fish.  And on the right there is a frozen -- probably four or five freezer doors that open -- glass freezer doors with frozen food.

Q.   Was there any signage on the front of the store?

A.   Yes.

Q.   What did that signage read?

A.   Poeta's meat market.  I believe Poeta's meat market, or at least it said Poeta's.

Q.   And when you went there, did you go there to buy produce or meat?

A.   That was not the intention, but I think several times when I was there, I did make purchases or Dominick would give me some, you know, meats to try for the family.

Q.   Your primary purpose in going to Poeta's meat market was to place bets, is that correct?

A.   To place, collect or pay bets, not necessarily always just place bets.  More the latter.  Mostly the placing was done on the phone.

Q.   Let's now turn to Mr. Poeta's other profession.  You knew from friends that Poeta was a bookie, is that correct?

MR. PALLES:  Objection, your Honor.  Hearsay.

THE COURT:  I am going to sustain that.  I mean if -- Mr. Resnick is testifying from his own experience.

BY MR. STEWART:

Q.   At some point in time did you have a discussion with Mr. Poeta about the terms of gambling with him?

A.   Yes.

Q.   And at what point in this conversation -- did this conversation occur in relation to when you met with Mr. Poeta

for the first time?

A.    I believe it was on the first call that terms were played out.

Q.    So the very first time you spoke with Mr. Poeta you had a discussion regarding the terms of gambling with him?

A.    The terms of our relationship of gambling, correct.

Q.    And what kind of business terms did you discuss with Mr. Poeta?

A.    Pay, collect days, limits.

Q.    What kind of limits?

A.    Betting limits per game and limits of what he would cap me at for the week.  You know, there was a certain -- an excess of loss.  Most bookmakers would cap you so that it wouldn't get -- you wouldn't ring up a deficit that you couldn't cover.

Q.    Did you have a specific limit per week with Mr. Poeta?

A.    Initially I did, yes.

Q.    And what was that limit?

A.    It would pay or collect at 20,000 if it happened prior to the week ending.

Q.    So that you cannot -- you could not either lose or win more than $20,000.00 a week at the very beginning?

A.    Just -- you could.  You just had to settle up.

Q.    I see.  And did you discuss lines or spreads with Mr. Poeta?

Resnick - direct

A.   Not -- not -- I mean let me -- I don't -- let me explain.  I mean we -- we -- he explained that night's lines for the bet that night, but I don't --

Q.   Well, I --

A.   -- know if you are clear -- yeah.

Q.   In that -- I am talking about that initial conversation that you had with Mr. Poeta where you were talking about the terms of gambling with him.

A.   I --

Q.   Was one of the matters you discussed that how the line was to be determined or where the line would -- what line would be used in any particular kind of bet?

A.   Both.  No, Mr. Poeta would just read me the lines for that night.  The lines, the term at least, from my gambling -- gambling experience, the lines are just the spreads for that certain game.  So I don't know if there is a confusion as to what the line is.  But that night he would spread me the lines and I would place my bets.  So I guess the answer to your question is yes.

Q.   And in that initial conversation was there any discussion about interest or juice that would be paid?

A.   Just that it was made clear that the standard bookmaker ten percent juice net losses would be paid.  Nothing more, nothing less, nothing out of the ordinary.

Q.   Was there anything discussed about how you would

communicate with him about placing bets?

A.    I just would call him between certain hours.  He -- he gave me hours for the night games and hours for weekends, times they would open up on the weekends, and I would just call him and place the bet.

Q.    And did you have any special name that was used or did you use your own name when you were placing bets with Mr. Poeta?

A.    I used my own name, but also I think that Poeta, he pretty much knowed who I was and there was no number that I recall that I was given or anything like that that I have been used to in the past.

Q.    And what were the payment terms?  Were there pay -- did you discuss payment terms with him about how debts would be settled?

A.    Yes.

Q.    Okay.  And what were those terms?

A.    You would just pay in cash and collected -- you know, he would pay you in cash.

Q.    Now, there came a point in time when you were not using cash any longer to settle up with Mr. Poeta, isn't that correct?

A.    That's correct.

Q.    So you subsequently developed a practice of not dealing in cash but in dealing in checks, isn't that correct?

A.     Well, it wasn't a practice.  It was either out of necessity, but it wasn't all the time.  I mean after I paid him checks, there were times when I also paid in cash.  So it wasn't contractual, if you will.  It was -- there was a time when I started to pay in checks.

THE COURT:  Maybe I missed this:

THE WITNESS:  There were times --

THE COURT:  When you -- when you delivered cash or checks, I assume that you delivered it personally to the meat market.  Is that how you paid?

THE WITNESS:  Yes, your Honor.  Sometimes the meat market.  Sometimes we would meet at his house.  I can't recall if there were any times we met any other -- any other place.  I would say it was mostly his house or the meat market.

THE COURT:  But it was you personally that would hand him the check or the money, generally?

THE WITNESS:  I would say, yes, your Honor, I would say 95 percent of the time.  There may have been a time or two that somebody else paid for me or collected for me because I was either out of town or it was just more convenient, but the answer, your Honor, is the majority of the time.

THE COURT:  Thank you.

BY MR. STEWART:

Q. And if you did have to make out a check to Mr. Poeta, how was that check made out?

A. I believe I made the checks out to cash.

Q. Was there ever a time that you made checks out to him or had checks made out to him that were in his own name?

A. It -- it is possible, but I -- I just don't -- I don't remember that. I remember it being cash.

Q. And what types of games did you play?

A. I bet baseball, football, basketball, horse racing and boxing.

Q. And how often would you -- well, first of all, when did you start gambling with Dominick Poeta?

A. I believe, again, around -- well, it was immediately the time we met, which my best recollection is December of 2001.

Q. And once you started gambling with Mr. Poeta, how often would you gamble with him?

A. I would gamble every day he was open, I was allowed to gamble, or I had access to money.

Q. So did that -- was the frequency every week that you were gambling with him?

A. My -- I would say every day, unless there weren't any games on the board.

Q. How were the accounts kept between you and Mr. Poeta?

A. I would keep my -- my statistics, which I didn't do very well. Mr. Poeta would keep the wins and losses from his

perspective. And then when we would talk about it the next night, we would -- he would read me a number and if I agreed, it was -- we would move on. And if I disagreed, we would rehash or we would go over the bets again and make sure that we were on the same page.

Q. How often would there be these kinds of discussions about wins and losses?

A. Every day.

Q. At what point did you start paying Mr. Poeta with checks?

A. I would say probably December, January -- December '01, January '02, somewhere in that period.

Q. And that was --

A. It is possible that I -- I am sorry. It is possible that I wrote him a check beforehand, but I don't remember it being anything consistent.

Q. But it would have coincided with your getting access to the Navarro-Elisco account at Universal Bank, isn't that correct?

A. I would say that's correct.

Q. Did Mr. Poeta express any concern about accepting checks from you?

A. It would -- it was made clear that it wasn't his preference, but I really didn't have very many options to get that type of cash.

Q.   You mentioned before it became a necessity?

A.   Yes.

Q.   Well, did you have any other source of income at that time?

A.   I -- I wasn't working on a regular basis.  I may have had some residual check that came in at that point from a company I sold prior or a year earlier, but, no, nothing of -- no.

Q.   And did you ever discuss with Mr. Poeta how he used the money that you paid him?

A.   No.  Well, let me -- I mean I think -- yes, I mean at times we had discussions that I had to pay him because he had to pay other people what they won and there was some of that discussion.  But other than that, I don't know what he did for personal use or anything like that.

Q.   Besides settling gambling debts, was there any other transactions between you and Dominick Poeta where one paid the other money?

A.   Just one.

Q.   And what was that?

A.   Well, I had spoke -- spoken to Dominick for about five years from the time -- the day the bank -- or the day after the bank collapsed.  And it was right before I was coming in and my -- I was -- well, about a month or two before I came in, I went to contact him about something else and

subsequently after that I sold him a cash accounting machine that I had purchased on one of my Vegas trips. That was the only other business outside of gambling we ever did.

Q. Did you ever borrow money from Dominick Poeta other than besides gambling?

A. Not -- no.

Q. Did -- did any of your family members borrow money from Mr. Poeta?

A. No.

Q. Did Dominick Poeta ever cash checks for you?

A. Cash checks for me?

Q. Yes. Did you ever -- would you ever have gone into the his store with a check for $100.00 so that he could turn it into cash?

A. No, no.

Q. Same question as to any family member of yours.

A. No.

Q. Was there any gambling transaction between you and Dominick Poeta where you were placing bets for anyone besides yourself?

A. There may have been a time where a friend jumped on because he wanted $100.00, so I can't tell you definitively. But, you know, I may have had a friend with me, he heard me placing a bet for, let's say, $20,000.00 and he said, "I will take $100.00 of it," but nothing significant that I recall,

no.

Q. Was there any gambling transaction between you and Poeta where you paid the gambling debt for anyone besides yourself?

A. Not that I remember, no.

Q. Now, prior to Mr. Poeta had you gambled with any other bookies?

A. Yes.

Q. And how did the practices with Mr. Poeta compare with the practices of other bookies?

A. Very --

MR. PALLES: Objection, your Honor. I don't understand the question and I really question the relevancy.

THE COURT: Well, how about this: When you -- when you -- it might not be relevant, but it might.

So, Mr. Resnick, when you placed bets through other bookies, did you use essentially the same system?

THE WITNESS: Yes.

THE COURT: I have one other question. What -- could you give the Court some idea of the daily volumes of your betting with respect to Mr. Poeta and if it changed over time. I am just interested in the -- the range, as best as you can recall. I realize you don't have documents in front of you and that it would just be estimates.

THE WITNESS: Well, I could tell you that I remember limits, your Honor, as I testified, where the cap --

the cap was 20,000, but there were multiple times where I went over that to settle mid week. But initially it started out as 2,000 a game, per game limit, and then it went to 5,000, then 10,000 and then 20. And then at the very end the bets I was placing, it would -- would -- I had been placing them through an offshore entity that Mr. Poeta had set up for me, although I was paying and collecting through him. So I guess you would -- if that is the question you are asking. At that point my limits went up to 500,000. I mean if you say the very end, in June of '02 I was betting 500,000 on the first half, 500,000 on the second half and 500,000 on the total of the NBA finals, which I believe was Lakers against the Philadelphia 76ers. So at the end my limit was a million and a half a game.

MR. STEWART: Okay.

THE COURT: That is a lot.

MR. STEWART: Thank you.

THE COURT: Thanks.

And then -- and then when did you have to settle up on those bets? We know when it began, there was a weekly reconciliation with the notion that nobody should be owed more than 20,000 to the other by the end of the week. But -- but was there an understanding as to when you would settle up, let's say, during the last month that you did business with one another?

THE WITNESS:  We kind of played by ear because the numbers were so large.  I memorialized one story of that in my book.  But -- you know, he was always honorable and paid, so I wasn't -- I am sure he was more worried with me than I was worried about him.

THE COURT:  So he never failed to pay you what he owed you on a timely basis, is that correct?

THE WITNESS:  Not -- not that I recall, no.  He was always honorable.

THE COURT:  And I am guessing from the numbers that you mentioned for particular games that if you won on a particular day, he might end up having to pay you a million dollars or more for that day, is that true?

THE WITNESS:  That -- that would be correct, although one -- one point I remember the number was 2.2 million.  I am pretty certain.  And he, obviously, wasn't paying that out himself.  There was some -- like I said, I was placing the bets offshore, and I am not privy to the -- how the equities --

THE COURT:  All we know --

THE WITNESS:  -- how the equities --

THE COURT:  -- is he owed you money.  He paid you. Obviously, I assume that you don't have any knowledge as to where -- you know, how he was handling the money that got to him or came to him.

THE WITNESS: Right. But one time we had to go to Las Vegas to pick it up. He didn't have it. The money wasn't there locally, so we had to go to Las Vegas together to pick it up.

THE COURT: Okay. Thank you. I am sorry I interrupted your examination.

MR. STEWART: Nothing.

BY MR. STEWART:

Q. I would like to turn your attention now to the Navarro Elisco & Associates account at Universal Bank. First of all, Navarro Elisco & Associates, what is that?

A. An accounting firm.

Q. And --

A. Now defunct.

Q. I am sorry?

THE COURT: Now defunct.

THE WITNESS: It was an accounting firm.

BY MR. STEWART:

Q. And was that a partnership?

A. I believe so, yes.

Q. And who were the partners in that firm?

A. Terrence Navarro and Lawrence Elisco and, I believe, Daniel O'Connell, but I am not certain if he was actually technically a partner.

Q. And of those three people, who was your first or

principal contact, if any?

A.    Terrence Navarro.

Q.    And he also was a co-defendant with you in this case, was he not?

A.    Yes.

Q.    And how did you meet Mr. Navarro?

A.    At a wedding in June of 1999.

Q.    And if I could just say NEA, Navarro, Elisco & Associates.  They had an account at Universal Bank, is that correct?

A.    I came to learn that, yes.

Q.    And did there come a point in time when you became a signatory to that account?

A.    Yes.

Q.    And how did that occur?

A.    I was having lunch with Mr. Elisco and Mr. Navarro.  And I was lamenting about my banking relationship situation as a result of my gambling addiction and historic bouncing checks, and they had offered to put me on their account as a signatory in exchange for doing tax work.  They wanted me to run my business, taxes -- I mean my business, gambling, personal through the account.  They would sort it out and in turn get my accounting business.

Q.    And was there any understanding on your part of whether they had been using that account at Universal Bank?

A.   They told me the account was dormant at that time.   I believe they said they did a few transactions.   I -- that is my recollection.   April of '01 they made some -- did some transactions, but it had been dormant for a number of months prior.

Q.   And did you have -- besides the NEA account at Universal Bank, did you have any other business relationship with Mr. Navarro?

A.   I had one.

Q.   And what was that?

A.   Mr. Navarro -- and Mr. Elisco had brought me a client of theirs who was bankrupt and had a technology and had me -- asked me to invest in the company about a year earlier, I believe.

Q.   And what was the name of that company?

A.   We renamed it Sinecast.

Q.   Sinecast?

A.   S-I-N-E-C-A-S-T.

Q.   Besides Sinecast did you have any other business relationship with either Mr. Navarro or Mr. Elisco?

A.   Ultimately, yes, with Mr. Elisco, yes.

Q.   He invested some money with you?

A.   Yes.

Q.   Did either one of these gentlemen gamble with you?

A.   Mr. Elisco.

Resnick - direct

Q. And --

A. And if I may finish. And I had gambled just what people call a skins game for a charity. I think two or three years in a row I went to a charity event with both of them and we played golf, you know, skins game for -- I don't think the the numbers were anything significant, but we did gamble.

Q. And was it something where you would settle up immediately?

A. After the skins game?

Q. Yes.

A. Yes.

Q. And what kind of dollars were involved?

A. In the low hundreds. It -- it wasn't anything of the nature we are discussing in court.

Q. And did you ever go to any casinos with Navarro or Elisco?

A. With Elisco.

Q. And -- and where did you go casino gambling with Mr. Elisco?

A. We went to the -- we stayed two nights, three days at the Rio Hotel which is the Harris property in Las Vegas in January of '02.

Q. Besides the gambling in Las Vegas, did Mr. Elisco gamble with -- with you as a part of your relationship with Dominick Poeta?

A.   No.

Q.   Terry Navarro has a sister, is that correct?

A.   Yes.

Q.   And what is her name?

A.   Antonette, but she goes by Toni.

Q.   And she is a co-defendant in this case?

A.   Correct.

Q.   And why was she a co-defendant in this case?

A.   You know, you would have to --

Q.   Well, she --

A.   Yes.  I am sorry.

Q.   She helped you steal $10 million from Universal Bank, isn't that correct?

          MR. PALLES:  Object to the form.

BY THE WITNESS:

A.   Yes, sir.

BY MR. STEWART:

Q.   And how did she help you steal $10 million?

A.   She instructed me on how to cover checks and she unilaterally gave access to the funds available immediately.

Q.   Now, at some point in time you were able to start writing checks off the NEA account at Universal Bank, is that correct?

A.   Yes.

Q.   And did you physically have a checkbook?

A.   I -- I was given a stack of checks.  They were business checks, so they were a larger -- they were larger than a personal checkbook and they had -- they had a perforation on the side.  I didn't have a checkbook per se.

Q.   And did you also obtain cashier's checks from Universal Bank?

A.   Yes.

Q.   So with regard to the NEA checks, you simply had a stack of checks that you could -- you could write checks with, is that correct?

A.   Yes.

Q.   And how would you obtain cashier's checks?

A.   By telephoning Toni.

Q.   Would you write -- would you physically write a check off a Universal account -- or, I am sorry, off the NEA account to Universal Bank to obtain a cashier's check?

A.   No, I would just call her and she would prepare the cashier's check.

Q.   Well, there -- there would have been -- you didn't have any regular income being deposited into the NEA account, is that correct?

A.   Not into the NEA account, no.

Q.   But you were -- well, there were deficits in that account, was there not, in the NEA account?

A.   Yes, increasingly.

Q.   And how were those deficits covered?

A.   By writing new checks that Toni would make available as immediately good funds and it would just continue.

Q.   Well, where would you deposit those NEA checks?

A.   At Bank One and/or any of their affiliated banks, which would have been American National Bank at the time, at any of the branches.

Q.   So Universal -- Universal Bank had a -- had an account at American National Bank?

A.   What I came to learn is that American -- the answer is yes.

Q.   And I think -- and you also mentioned Bank One as well?

A.   Yes.

Q.   American National Bank was a subsidiary at the time of Bank One?

A.   Yes.

MR. PALLES:   Objection.

THE COURT:   Well, that -- that is a matter of common knowledge.

MR. PALLES:   Okay.

THE COURT:   So I will operate on the assumption that that is true, unless it becomes relevant and someone wants to disprove it.

MR. PALLES:   Okay.

BY MR. STEWART:

Q.   So if, for example, you wrote out a check to Mr. Poeta, or anybody else for that matter, and you knew there wasn't sufficient funds in the NEA account, how would you cover that deficit?

A.   By writing another NEA check to Universal's account at American National or Bank One.

Q.   And then what would you do?

A.   Call Mr. Navarro, tell him the amount of the deposits, and she would make the funds available immediately and clear any checks coming in.

Q.   So did you have the same practice, would you always call or -- if you knew that you had to write a check to look like Dominick Poeta or some third party, would you always then deposit a check in advance of that at Bank One or American National Bank, or would you sometimes do it afterwards?

A.   Yeah, it was actually both.  I would either write it in advance.  And that was more so I would have to do that for her to have some sort of cash flow coming through the account so she could with -- make the funds available to withdraw a cashier's check.  But if I would write a check to Mr. Poeta, sometimes it would come through and going to bounce, and she would see it on her system and clear it and then have me cover the deficit with more NEA checks.

Q.   Did the NEA account often have a negative balance?

     MR. PALLES:  Objection.  Lack of foundation.

THE COURT: If -- if -- if you -- if you have an opinion and you can answer that question, you can answer it. But then you have to explain to us how you reached that opinion. So, as I said earlier, you need not guess or speculate. So do you -- do you know --

THE WITNESS: Yes, your Honor.

THE COURT: -- if NEA had a negative balance very often and, if so, how did you know?

THE WITNESS: I know that ultimately the balance was increasingly always a deficit because I was always taking out more than I was putting in and doing it with the NEA checks which, you know, became in my mind an increasing deficit to me.

MR. STEWART: Can we check with Miss O'Connor to see if she can still hear our testimony?

MS. O'CONNOR: I can still hear. I just thought I heard a faint voice a minute ago, but it may have been background.

THE COURT: It probably -- it was probably.

MS. O'CONNOR: I heard that.

THE COURT: Okay. If there is a problem, just pipe up.

All right. Please proceed.

MS. O'CONNOR: Okay. Yes, I heard Mr. Resnick's answer and the Court's questions.

THE COURT: Where are you?

MS. O'CONNOR: I am in Burlington Vermont, if you can imagine that.

THE COURT: Wait. I am -- I am imagining it right now. So go say hi to Peter Langrock, okay?

MS. O'CONNOR: I will. I will.

THE COURT: Okay. Fire away.

BY MR. STEWART:

Q. Mr. Resnick, what -- what types -- you would make deposits into the NEA account, is that correct?

A. Yes.

Q. And what kinds of things were you depositing into the NEA account?

A. Some cash, checks from casino winnings and/or principal, loans from individuals and NEA checks.

Q. And the -- the loans, were those loans that are described in your plea agreement?

A. Yes.

Q. And that was actually money that -- that you admitted were basically the proceeds of a fraud, isn't that correct?

A. That is what I admitted to in my plea agreement, a failed business venture, correct.

Q. And you have been ordered to pay that money back in restitution, isn't that correct?

A. I have.

Q. And it is -- amounts to about how much -- how much in restitution did you owe to individuals besides FDIC?

A. I think close to a half million, although there has been -- I think somebody has withdrawn that claim, but I am not certain on where that stands.

Q. Was there any deposits that made it into the NEA account that came from a nonfraudulent source or a nongambling source?

A. I am sure there was something paltry but nothing I can recall at this time.

Q. And when -- at the time that Universal collapsed, do you recall when that was, when Universal Bank collapsed?

A. I believe it was June 27, 2002.

Q. At that point --

A. Give or take a day.

Q. At that point in time were there -- did you have any checks that you had given to Mr. Poeta that had not cleared?

A. I came to learn that a day or two after when Mr. Poeta called me, correct.

Q. And --

A. I hadn't -- I didn't know at the time if they had cleared or not or was -- I was not paying attention.

Q. Did you come to find out that those checks did not clear, that they had bounced?

A. Yes.

Resnick - direct                                        48

Q.   And did you have a discussion with Mr. Poeta about that?

A.   Yes.

Q.   And was the conversation that you had face-to-face or was it some other way?

A.   It was on the telephone.

Q.   And can you relate the sum and substance of that conversation that you had with Mr. Poeta.

A.   Well, I had one conversation with Mr. Poeta as I left the casino on June 26, 2002.

MR. PALLES:   Objection, your Honor.

THE COURT:   Wait.   Let's let counsel state his objection before we complete the answer.

MR. PALLES:   It appears to me that -- that he is beginning to recite a conversation that is not nonresponsive to the answer.   That is number one.   Number two, if we are talking about checks --

MS. O'CONNOR:   Now, can I interrupt for one second? I could not hear that last statement.

THE COURT:   Sure.   When counsel makes an objection, we will have him come closer to the micropone.

MR. PALLES:   I am sorry.

THE COURT:   Thanks.

MR. PALLES:   Your Honor --

MS. O'CONNOR:   Thank you.

MR. PALLES:   -- it appeared to me from the

beginning of Mr. Resnick's answer that he was not -- that the answer was not responsive in that he seemed to be framing a conversation -- a conversation other than the one that Mr. Stewart asked about. But in addition to that, I question the relevancy of a discussion that has to do with checks that bounced and that are not part of any claim in this case.

THE COURT: Well, okay. Two things. They might not be relevant, but it is a bench hearing --

MR. PALLES: Sure.

THE COURT: -- and rather than have big arguments over -- to find out the answer and then decide formally whether or not it is relevant, I would say if it is on the subject of Mr. Resnick's relationship with Mr. Poeta, and especially the financial and transactional side, I would say we can go forward and I will hear answers. And ultimately, depending upon what they are, both sides can argue as to whether or not they are actually relevant to the determination that I have had to make.

With respect to responsiveness, I think Mr. Resnick has been -- thank you for being direct and responsive so far. Why don't you restate the same question or a different question so that I can track.

And, Mr. Resnick, make sure that your answers to Mr. Stewart's question, not to what you and I might think would be a follow-up question or some other subject. So --

THE WITNESS: Yes, sir. Yes, your Honor.

THE COURT: So I will sustain the objection, confessing that I didn't note the difference, and maybe there isn't one. So why don't you restate your question and then we will carefully listen to the answer.

BY MR. STEWART:

Q. Mr. Resnick, it is your testimony that you recollect that Universal Bank collapsed in June of 2002, is that correct?

A. Yes.

Q. It was further your testimony that -- that at the point when Universal Bank collapsed, there was checks that you had given to -- check or checks that you had given to Mr. Poeta that had not yet cleared, is that correct?

A. Yes.

Q. And that you subsequently had either one or more conversations with Mr. Poeta about the fact that that check or checks did not clear, is that correct?

A. Yes.

Q. Okay. Did you have one or more than one conversation with Mr. Poeta about a check that did not clear subsequent to the collapse of Universal Bank?

A. Two conversations.

Q. Okay. Were those conversations face-to-face or were they -- some otherwise?

A.   On the telephone.

Q.   You had two conversations; they were both on the telephone?

A.   Yes.

Q.   And the first conversation -- well, is there any way that you identify either of those conversations?  You had mentioned a -- coming out of a casino before.  Is that how you identify one of the conversations?

A.   Yeah, I have a distinct recollection of one of them, yeah.

Q.   And you were exiting a casino at the time that you were speaking to Dominick Poeta on the telephone?

A.   Well, I was a little further away.  I was approaching the $2.00 toll booth on the Skyway.

THE COURT:   And how -- approximately what date was that?

BY MR. STEWART:

Q.   Approximately what date is this?

A.   Approximately about 10:00 to 11:00 a.m. on June 26th, 2002.

THE COURT:   So it was about two weeks after Universal closed its doors?

THE WITNESS:   Actually, it was about 12 hours prior to them closing, I believe, your Honor.

THE COURT:   Ah.

BY MR. STEWART:

Q.   And the second conversation, how do you identify that in your own mind?

A.   I just remember, because it was a night conversation, Dominick showing a lot of character.  He had called me back and said that checks -- the last checks that I had written bounced and not to worry about it.

Q.   Stop there, please.  I am first trying to identify when these two conversations occurred.  The first con --

            THE COURT:   Why don't you just go with one and then we will find out what happened.

            MR. STEWART:   Okay.

            THE COURT:   Because I think it is important for me to understand and for opposing counsel to be able to cross-examine to have the -- the conversation clearly identified.

BY MR. STEWART:

Q.   The --

            THE COURT:   So this is the entering the Skyway at about 11:00 p.m. you said, Mr. Resnick?

            MR. STEWART:   Ten or 11:00 a.m.?

            THE WITNESS:   A.m., your Honor.

            THE COURT:   Okay.  And this was the day -- the morning that we think Universal failed, is that correct?

            THE WITNESS:   I think theoretically and then

technically failed later in the day is probably more it, your Honor.

THE COURT: Okay.

BY MR. STEWART:

Q. And what was the sum and substance of that conversation that you had with Mr. Poeta on June 26?

A. I just told him, without going into specific, you know, detail that I don't think I was going to be able to pay whatever I owed. I didn't know what -- I was disoriented. I explained that I had been up for days gambling and I didn't think I was going to be able to cover whatever I owed this week and that I may not be able to talk to him for some time.

Q. Did you have a -- another -- was there any discussion on June 26 about Universal Bank in that conversation you just described?

A. I don't believe so. Not in that conversation.

THE COURT: How -- how much did you owe him at that point in time, if you recall?

THE WITNESS: Your Honor, I -- I don't know exactly what was owed that day from the previous night's bets. All I know is that the subsequent conversation gave me an idea of what was at least owed in arrears from checks that I had written the prior week.

THE COURT: As far as you could tell, when -- Mr. Poeta kept accurate track of things, so that if he said

you owed a certain amount of money, was that always correct?

THE WITNESS:  No, we -- I mean there was a couple discrepancies that we always amicably settled, but more than a majority of the time Mr. Poeta's books were always straight.

BY MR. STEWART:

Q.    And you had a second conversation with Mr. Poeta about these checks that had not cleared?

A.    Yes.

Q.    And how long after the first conversation did the second conversation take place?

A.    It was within a few days of the bank collapsing Mr. Poeta had called me.

Q.    But again in relation to that first conversation that you had on the telephone with Mr. Poeta, when did the next conversation occur; was it hours, days?

A.    It was a day to several days.  That -- that I can't pinpoint like the initial conversation.

Q.    And Mr. Poeta called you?

A.    Yes.

Q.    And what was the sum and substance of that conversation?

A.    That the checks that I had given him that he sent to the offshore sports book had bounced.  And to take care of my family -- he had heard in the -- on the news that Universal had collapsed.  He assumed it had something to do with me.

And that just to take care of my family.  If there is anything we ever need, you know, I had been very good to him and others, that he would be there for me.  He was just, from my perspective, very sincere.

Q.    And when he had heard of the Universal collapse, why did he assume it had something to do with you?

A.    Well, I didn't --

MR. PALLES:  You know, I am going to object to that.  That is --

THE COURT:  I am going to sustain in this sense: You need not guess or speculate or be a mind reader.  If he says something to you or you have a confident basis for why he knew something that was obvious to you, you can testify to that.  But, you know, this is -- the question does presuppose a certain amount of mind reading, so I will sustain the objection.

So, Mr. Stewart, if you want to pursue that line of questioning --

MR. STEWART:  Sure.

THE COURT:  -- I think first you should establish the basis for any information Mr. Resnick might have.

Please proceed.

BY MR. STEWART:

Q.    Do you know why Dominick Poeta assumed there was a connection between you and Universal Bank?

A.    I can only speculate.

Q.    Had you and Dominick Poeta ever talked about Universal Bank prior to this conversation we are discussing right now?

A.    Yes.

Q.    And when did those conversations occur?

A.    Periodically over the course of my relationship with Universal and Mr. Poeta.

Q.    And what did you tell Dominick Poeta about your relationship to Universal Bank?

A.    Just that I was very close -- I don't know if I used the word "unorthodox."  I don't think I would have used that but that they do things for me out of the ordinary.  And I think one of the reasons it came up is because at one point he went there to physically cash a check that I had written him.  And I don't -- I remember Miss Navarro calling me because she may have been out of the bank and asked me why somebody was coming in to cash a check for -- it was 30 or $50,000.00.  I don't remember exact amounts.  And I don't know if she approved it or if it had gotten to her, she had found out after he left the bank.

        I think he ultimately did cash it there.  I am not -- I don't remember, but I think that was the impetus for a conversation about how strong my banking relationship was there, quote, unquote.

Q.    You have received the pleadings that have been filed in

this case, the petition for relief against Dominick Poeta. Did you get that, Mr. --

A.    I have.

Q.    And what about our motion for judgment on that petition?

A.    I did.

Q.    And you have seen the exhibits to that -- to that motion?

A.    I have.

Q.    And you have reviewed the checks that are attached to that -- to that motion?

A.    Yes.

Q.    And those are the checks that we have been describing that -- that you paid Dominick Poeta in repayment of gambling debts?

A.    Yes, Mr. Stewart.

Q.    I would like to briefly just go over a few things about your assets and liabilities at the time you were involved in Universal Bank from about November of 2001 through June of 2002.  At that period of time, from November of 2001 to June of 2002, what assets did you have?

A.    Personally none.  I -- if I had it one day, it was gone the next.

Q.    Besides the NEA account, did you have any bank account at any other place?

A.    From December 2001 to June 2002?

Q.    Approximately.

A.    No.

Q.    You did have a vehicle?

A.    Yes.

Q.    And how did you purchase that vehicle?

A.    With -- it was a wire transfer in March of 2002 from the NEA account.

Q.    Did you have any real estate?

A.    No.

Q.    How about personal property, any -- any one bit of personal property in excess of $5,000.00?

A.    I think I had a couple watches at the time during that period, but that is it.

Q.    How about an insurance policy with a cash surrender value?

A.    No cash surrender value.

Q.    How about inheritance; did you have any expectation of an inheritance at that point?

A.    No.

Q.    Was there any money owed to you?

A.    Other than some bookmakers I -- I could have made a claim, you know, there was -- you know, no.

Q.    Now, as far as liabilities are concerned, and leaving aside the -- whatever was owed to NEA or Universal Bank, what kind of debts did you have?

A.    Just tax and what you see in the plea agreement.

Q.    What kind of tax debts did you owe?

A.    Income.

Q.    And do you know the approximate extent of that liability?

A.    Probably a million over the course of a number of years, yes.

Q.    Did you ever file for bankruptcy protection?

A.    In '97.

Q.    And did you receive a discharge?

A.    Yes.

Q.    And do you recall the approximate amount of debts that were discharged in that bankruptcy petition?

A.    Several hundred thousand, but I am not certain it was --

THE COURT:    Was that in this Court here in Chicago?

THE WITNESS:    Yes.

MR. STEWART:    I have a case number, Judge, if you would like me to make a record of it.

THE COURT:    If they become relevant, obviously, we can get the documentation from the Court.

MR. STEWART:    For the record, Judge, it was 96 B 35 -- I am sorry 34223, bankruptcy filed here in the Northern District of Illinois.

THE COURT:    Okay.    Thank you.

BY MR. STEWART:

Q.   You wrote a book called Bust?

A.   Yes.

Q.   Did you have a chance to -- well, you have, obviously, wrote the book.   And you saw -- did you see the excerpts that were attached to our motion for judgment?

A.   I did.   For clarification, I also had a co-writer.

Q.   Okay.   At pages 186 to -87 of Bust you identify a person as Luciano Petrelli.   Who is Luciano Petrelli?

A.   Mr. Poeta.

Q.   How did you come up with the name Luciano Petrelli?

A.   I didn't.

Q.   Well, how did that -- that pseudonym come to be?

A.   I -- can I give you the genesis of it or just -- I -- I called Mr. Poeta.   And I hadn't spoken to him, as I said.

Q.   Approximately when -- approximately when did you call Mr. Poeta?

A.   It had to be November, December of '06, but within eight weeks of my surrender.

Q.   And you had a conversation with him?

A.   Yes.

Q.   Okay.   Go on.

A.   I called him just to inform him that I was telling some stories in my book.   I asked him if he had any problem with them.   I asked him -- I told him most of the stories.   We laughed about one of the stories on the -- I shouldn't say --

I laughed and cried basically about one of the stories on the airplane of us flying on the Bellagio's plane. And I asked him if -- what name I should use for him in -- in my book.

Q. And what was his response?

A. He didn't have a problem with me using his real name.

Q. Well, then why did -- why did you use a pseudonym in your book?

A. Because I went back when -- I had to go through a whole legal vetting process of general counsel of Harper Collins. And when I went back to them and said I want to use his name -- and I had to list whether it was a real name or pseudonym. And where -- when I told them it was his real name, they said their legal department would not allow that, that they didn't want to be responsible for any legal action taken against Mr. Poeta. So they forced me to change the name.

Q. So what did you do at that point?

A. I called Mr. Poeta back and -- and I said, "Well, what about a name?" And, you know, he said, "What about Luciano? Luciano is a good name. How about Lucky?" And that is how the name came about.

Q. So Mr. Poeta is the one that chose the name Luciano Petrelli?

A. Absolutely.

Q. In your book again at pages, I think, 186 to 187 you describe Petrelli as being a high school athlete, a star high

school athlete, his mid 40s, owned a local deli and took bets, is that correct?

A.   Yes.

Q.   And that describes the real Mr. Dominick Poeta, is that correct?

A.   Yes.

Q.   As you -- as far as you know, Mr. Poeta was a star high school athlete?

A.   The video field is still grainy, but he looks in great shape still.   From what I was told he was star wrestler.   And his son is as well.

Q.   He is in his mid 40s?

A.   I believe almost 50.   At the time he was in his mid 40s.

Q.   And he owned a local deli?

A.   Yes.

Q.   And he took bets?

A.   Yes.

Q.   And you have a very deep understanding of what the term "bookie" is, don't you?

A.   Yes.

Q.   And a book -- a bookie takes bets on illegal gambling debts, is that correct?

A.   Yes.

Q.   And a bookie --

A.   Can I clarify?

Q.   Sure.

A.   I mean we also call the -- I just want to -- for sake of -- well, they -- we also call a book the sports book in Vegas, their lingo, as far as I know.  So I just want to make sure that is clear in answer to your question.

THE COURT:  Wait.  I am -- the -- ultimately if the legality of particular bets becomes an issue, the Court is not going to rely upon Mr. Resnick's opinion as to whether or not a particular bet might have been legal, even though you have had the misfortune to acquire lots of legal knowledge in the last several years.  So regardless of his answer to that, if any -- if that becomes a significant factor, obviously, I am going to listen to what everybody says about that and then I have an obligation to make my own determination.

Okay.  Please proceed.

BY MR. STEWART:

Q.   Mr. Poeta, you have -- or, Mr. Resnick, rather, you have -- you have placed bets in casinos, is that correct?

A.   Yes.

Q.   And you have placed bets with bookies on the street, is that correct?

A.   Yes.

Q.   And in your experience, in your experience only, is there a difference between legal and illegal gambling?

A.   Yes.

Q. And in your experience was Mr. Poeta engaged in legal or illegal gambling?

A. Illegal.

Q. And Mr. Poeta was the bookie you identified as Lucky in your book, is that correct?

A. Yes.

Q. Are you gaining any points or cooperation points for your testimony here today?

A. Not -- not a single thing.

Q. Is your -- so is your sentence going to be shortened somehow by your testimony today?

A. No.

Q. Has anyone made any promises to you about any reward for your testimony today?

A. No.

Q. As far as your -- your gambling was concerned, are you -- are you a professional gambler?

A. No.

Q. Why -- why don't you consider yourself to be a professional gambler?

A. I would -- you know, as a layman -- well, I think anybody could diagnose me as a compulsive gambler. There is a clear distinction between professional gambling and compulsive gambling.

Q. And what is that difference in your mind?

A.    I was a compulsive gambler.  I was gambling in the service of the action and the addiction.  I wasn't in it to win.  I mean clearly somebody who has made the amount of money I have in their life would never -- most people I know who are smart business -- they don't gamble.  They know that is why they billed those big buildings.  But I did it for psychological, you know, reasons, insecurities, and a whole host of other reasons that I think I have memorialized pretty clearly in my book.

Professional gamblers, that is either their occupation or part of their occupation, and they handle it like a business should be handled where they keep accurate books and they are in it for the profit.  They are not in it for other reasons.  They handle it like I would handle one of my healthcare businesses.  I didn't handle my gambling like I handled one of my successful healthcare businesses.

Q.    And your -- you have been gambling since when?

A.    My first recollection of liking gambling was the age of six.

Q.    Given any stretch of time in your life, have you lost more than you have made or have you made more than you lost in gambling?

A.    I have -- I figure a good barometer for that -- I mean the answer is I have lost more than I made.  And a good barometer is the last day, which, you know, anyone could see

on video of me being up, well, north of $8 million and not walking away. Obviously, a compulsion controlled me a lot better than I controlled it.

Q. And when you were a - I will strike that.

When you were taking money from Universal Bank, you were operating as a -- as a compulsive gambler, isn't that correct?

A. Yes.

Q. You had no real expectation that you were going to come away winning many more times what you -- what you bet?

A. Well, you always hope to win more so I could cover the deficit that I owed, but, you know, I don't think I was in a great state of mind at the time, so --

Q. Between --

A. I don't know if I answered your question.

THE COURT: One -- just so that Mr. Stewart can follow-up, although there is no inducement or promise to testify today, paragraph 21 of the plea agreement does obligate you to continue to fulfill your obligations under the plea agreement. And if -- if you were refusing to testify and cooperate, as you did under the plea agreement, you did agree to truthfully cooperate, or if your testimony were not true and the Government contended that you had breached your plea agreement, then the Government could have the plea voided and could recharge you or ask that you be

resentenced. Do you understand that?

THE WITNESS: I -- I understand that.

THE COURT: So that even though there is no positive benefit to testifying today, if you were refusing to do that, or if you didn't tell the truth, you understand that there could be substantial negative consequences to that?

THE WITNESS: Right. I understand, your Honor, and I am not taking a position. I am just here telling the truth. I don't think I am testifying for the prosecution or the defense. I am just -- I was asked to tell the truth. I have always told the Government the truth. And that is what I am here for, so --

THE COURT: Right. I just wanted to make the record complete in case, you know, Mr. Poeta's counsel might not be as familiar with the plea agreement as I am, even though he studied lots of this, and I wanted to make sure that everyone knows the Court is aware of the need to, as I probably said at your -- at our plea meeting, for you to abide by this plea forever.

Okay.

THE WITNESS: Yes, your Honor.

THE COURT: Any other questions?

MR. STEWART: No, your Honor.

THE COURT: Okay. Would you like to cross-examine now or -- I don't -- I don't want to destroy -- this video

system that is working really well, but we have been going almost an hour and a half. If people would like to take a five or ten-minute break to gather their thoughts or go to the washroom or something, that would be fine.

MR. PALLES: Your Honor, I would like to gather my thoughts and go to the washroom.

THE COURT: Okay. So let's -- let's plan to reconvene in about ten minutes. And depending upon the folks in Colorado, Mr. Resnick, please feel free to stretch your legs. And if you need to relieve yourself, that would be fine.

Miss O'Connor?

THE WITNES: Thank you, your Honor.

MS. O'CONNOR: Thank you, your Honor.

THE COURT: We will talk to you before we resume anything on the record, okay?

MS. O'CONNOR: Oh, yes, your Honor. I am just going to keep the line open.

THE COURT: Okay. Thanks. I think you are fine.

(Discussion held off the record.)

THE COURT: Okay. I am going to leave the bench for a second and I will be back, you know, in five minutes or so.

Thanks.

(Brief recess.)

THE COURT: Okay. Miss O'Connor, are you there?

MS. O'CONNOR: I am, your Honor. And thank you for your concern for Mr. Resnick.

THE COURT: Clarify for me, because you were involved before I walked in the room, who are you representing here?

MS. O'CONNOR: I am sorry, your Honor, we are representing Mr. Resnick.

THE COURT: How is it that you you are in Burlington representing him?

MS. O'CONNOR: That is a good question, your Honor. But since Mr. Resnick's location is subject to change, he retained my partner, who is also my husband, Mr. Kirby. And Mr. Kirby is in New York today. And I have been familiar with Mr. Resnick's case as well, so I am filling in.

THE COURT: Okay. Well, thank for doing that. And now another prominent lawyer has wandered into our midst and -- and they -- you know, the rates these guys charge are so great, I don't want to eat up too much of their time. And we only have --

MR. SKLARSKY: You couldn't be referring to me.

THE COURT: Yes, I am.

And we only have about an hour and ten minutes worth of video time before we have to extend. So is there anything else we need to attend to before we begin

cross-examination?

MR. PALLES: Your Honor, my initial thought was this: That I had subpoenaed a Mr. McKinlay who I promised to get on the stand -- I told him to arrive about 10:45 -- between 10:30 and 10:45. He hasn't. Mr. Sklarsky represents Mr. Elisco who is waiting on the second floor. I was initially going to propose --

THE COURT: The Grand Jury floor?

MR. SKLARSKY: I am sorry, the second floor, the cafeteria.

THE COURT: The cafeteria, right.

What would you like to do? Would you like to interrupt testimony to get his testimony or, what --

MR. SKLARSKY: I --

MR. PALLES: Well, no, I don't want to. I was going to initially suggest we send Mr. Elisco away until, say, 1:00 o'clock, but with Mr. McKinlay not here, hopefully we will get to Mr. Elisco fairly soon.

THE COURT: Okay.

MR. PALLES: Because I don't think I will be more than half an hour with Mr. Resnick.

THE COURT: Why don't we move forward. And the Court is honored to have the sure-footed Mr. Sklarsky.

MR. SKLARSKY: We will be on the second floor awaiting a summons.

THE COURT: You will be down there. And do we have like your cell phone or something?

MR. SKLARKSY: Yes. Thank you.

THE COURT: You are still under oath, Mr. Resnick, and Mr. Poeta's counsel is going to have a turn to ask you questions.

CROSS EXAMINATION

BY MR. PALLES:

Q. Hi, Mr. Resnick, Eric Palles. How are you?

A. Fine, sir.

Q. Now, Mr. Resnick, you testified before that you have no understanding with the Government concerning a reduction of your sentence, correct?

A. Zero.

Q. Okay. On the other hand, you are familiar, are you not, with Federal Criminal Rule 35?

A. Vaguely. I mean if you explain it to me, I could tell you more if I -- if I am familiar.

THE COURT: Well, what that means is within a year after you are sentenced the Government can ask the Court to provide a reduction of a sentence based on cooperation during that time period. So if the Government felt cooperation regarding this or something else warranted a further reduction of sentence, they could come to court and -- and ask the Court to do that. It is, obviously, up to the Judge

to decide whether or not he wants to do it.  But that is --
the Government does have that option.

Do you understand that?

THE WITNESS:  Actually, now that it sounds more familiar, your Honor, Mr. Palles, and I think my plea agreement provides for no Rule 35 consideration.  And considering I am out of the Bureau of Prisons custody on February 13th, 2009, I don't see -- I mean -- I guess the answer is it sounds somewhat familiar.

BY MR. PALLES:

Q.   Okay.  Are you saying that you have no hope that your cooperation here will result in your attorney requesting and the Government in turn moving the judge for a reduction of your sentence?

A.   I -- the answer is I have zero intention, zero conversations with my attorneys about it and/or the Government.

Q.   Okay.  You understand, however, that when you get out, you are going to owe the Government something on the nature of $10 million, correct?

A.   Right.  Correct.

Q.   And you under -- and you understand that the purpose of this proceeding would be -- would -- may result in a credit to you of approximately $800,000.00 that you would not have to pay if Mr. Poeta satisfied a portion of your judgment?

You understand that, right?

A.   I understand that now but not at the time that I initially -- the Government asked me if -- you know, if I would come and tell the the truth before the Court.  So that wasn't the impetus for me.

Q.   Okay.  Before you began your association with the Universal Bank, you stated you had been discharged in bankruptcy, correct?

A.   Yes.

Q.   Okay.  And you also, prior to your involvement with Universal, had seven suspicious activity reports that claimed either kiting or money laundering, is that true?

A.   If you are telling me it is true.  I was not made aware of that.

Q.   Okay.  Now, in December of two --

A.   Well, actually, I am sorry.  I am sorry, let me -- let me -- I was made aware of that when I got my presentencing report, that as a result of my gambling and depositing lots of cash and taking out lots of cash, that that is why that was in my presentencing report.  But I didn't -- I wasn't aware of that prior to Universal, to answer your question.

Q.   Okay.  But you knew you were having trouble establishing a banking relationship, correct?

A.   Yes.

Q.   Okay.  And, finally, in December of 2001 Bank One closed

your wife's account because of the large check requests that you were taking out, correct?

A.   That is correct.

Q.   Okay.   And, by the way, let's talk about your wife.   Are you familiar with the terms of your wife's will?

A.   Am I familiar with the terms of my wife's will?

Q.   Yes.

A.   Yes.   Yes, we did our wills together.

Q.   And are you beneficiary under the will?

A.   Actually, my children are, to the best of my knowledge.

Q.   You have no interest in --

A.   I don't -- I believe that she intends on changing that. But if I recall correctly, when we sat down with Gardner Carton & Douglas at the time in '99 when my child was born and I bought term life insurance, that she was concerned about my gambling and at least, I must say, that there are three trustees who are family and/or friends that she wanted in control of the money and not me because of my gambling.

Q.   So your wife has assets?

A.   I can't answer what my wife -- I don't know what my wife has or hasn't.   She has worked.   She went to graduate school at Northwestern and works.   I don't think she has many assets at this time, no.

Q.   Well, Mr. Stewart talked about real estate, you know, whether or not you owned real estate back in 2001.   Did your

wife own real estate at that time?

A.    Yes.

Q.    And what -- can you describe the nature of that real estate.

A.    Hello?

Q.    Yes.

A.    Did we get cut off?

          THE COURT:   What was the -- what was the type of real estate?

BY MR. PALLES:

Q.    What type of real estate?

A.    Oh, I said it was a home.   Residential.

          THE COURT:   For some reason we didn't get the sound.

BY MR. PALLES:

Q.    Okay.   Do you know what the value of that home was?

A.    At the time of purchase I want to say it was $760 or -70,000.00.

Q.    Okay.   Does your wife currently own that home?

A.    No.

Q.    Okay.   The -- well, when did she sell the home?

A.    I -- I want to say October of 2003, give or take a few days, Mr. Palles.

Q.    And do you know how much she realized as a result of the sale?

A.   I don't.  I think it was --

MR. STEWART:  Your Honor, I object.

BY THE WITNESS:

A. -- approximate --

THE COURT:  What -- if you want to explain -- what is the relevance of assets his wife might have?

MR. PALLES:  Well --

THE COURT:  Obviously, if -- if she possesses assets that really belong to him --

MR. PALLES:  Right.

THE COURT:  -- and the Government then could, obviously, seek use of those to pay restitution.  I am not sure, unless -- unless she had enough to pay the whole restitution, obviously, it makes this proceeding then relevant.

MR. PALLES:  I understand.  The question really is -- you know, the tenor of the Government's questions concerning Mr. Resnick's financial status back in 2001 was that he had zero assets, zero real estate, et cetera, et cetera.  But he certainly at that time -- and it was also asked whether or not he had -- he expected any inheritance from his parents, I think.  It seems to me that you are not getting the full picture of what the family assets were at that time.

THE COURT:  Okay.  Well, you know, I don't see how

it hurts.  I -- we don't want to invade anybody's privacy.

We are also under a new regime that just began here in the American federal courts whereby transcripts are being posted online at some point, subject to certain redactions where there is personal information such as home addresses, Social Security numbers, names of children, et cetera.  And so if you want to sort of paint her general picture financially during this point in time, that is all right with me.  But I do want us to make sure that we are not posting on -- we are not including specific reference to anything like that -- obviously if something like that were to be relevant --

MR. PALLES:  Yes.

THE COURT:  -- then we could look at sealing it. And I know --

MR. PALLES:  This is my last question, Judge.

THE COURT:  Okay.  He has got one more question.

MR. STEWART:  I just want to clarify my objection was not as to relevance.  My objection was the characterization of the transactions.  Mr. Palles' question was when you sold the house.  Mr. Resnick's testimony was that his wife owned the house.

THE COURT:  Oh, okay.  All right.

MR. PALLES:  Okay.  Fine.

THE COURT:  Please proceed.

BY MR. PALLES:

Q.   What did your wife realize at the sale of house?

THE COURT:   About.

BY MR. PALLES:

Q.   About.   Approximately.

A.   Are you talking about profit?  Because money was put into it and then money was paid to the FDIC in a settlement agreement.  So are you talking about net net?  Are you talking about gross sale?  Please clarify.

Q.   I am talking about the sales less the payment of the mortgage.

A.   The sale less the payment the mortgage, she probably realized about four or $500,000.00, but the net was actually much less.

Q.   Okay.

A.   Almost nothing.

Q.   All right.  Thank you.

Now, you -- after speaking -- you described speaking with Terry Navarro, Lawrence Elisco and they -- Mr. Navarro told you to go into his -- the Universal Bank and associate yourself with the NEA account, correct?

A.   Correct.

Q.   Okay.  And now so then in December of 2001 you went to the bank, Universal, correct, to meet Terry -- Toni Navarro?

A.   Yes, sir.

Q. Okay. And at that time you autographed a signature card, correct?

MR. STEWART: Objection, your Honor

BY THE WITNESS:

A. Yes, sir.

THE COURT: Why are you objecting?

Overruled. We will let him answer that. Fine. I think we are entitled to know the mechanics, if for no other reason than to verify, in fact, that his testimony that he had had control over the account was true. Plus, we know that -- I think that very signature card is even in the exhibits.

Please proceed.

BY MR. PALLES:

Q. The -- did Toni Navarro ask you to show any identification at that time?

A. No.

Q. Did -- were you asked to provide her with your Social Security number?

A. No.

Q. And you weren't asked to provide your date of birth as well?

A. I don't believe so.

Q. Okay.

A. I can't tell you that.

Q.   Did Miss Navarro provide you with a copy of the signature card?

A.   I don't believe so, sir.

Q.   Did she provide you with any list of rules or regulations contained on the back of the signature card?

A.   No, sir.

THE COURT:   Just a second.  Miss O'Connor, are you still with us?

MS. O'CONNOR:   I am, your Honor.  I am sorry, I lost you for one second there.

THE COURT:   See, you didn't think we were noticing.

MS. O'CONNOR:   Huh?

THE COURT:   You didn't think we were noticing.

MS. O'CONNOR:   I was concerned, though, that I couldn't hear the objections from Mr. Stewart.

THE COURT:   It faded out.  So -- so I -- neither did I.  But I overruled it since the answer was given.  Okay.

MS. O'CONNOR:   I could hear your Honor just fine now.  Thank you.

THE COURT:   You are welcome.

BY MR. PALLES:

Q.   In any event, now then you went to the -- to Terry Navarro, Larry Elisco's office and picked up certain checks for your own use, correct?

A.   Yes.

Q.   And those checks were emblazoned with the name Navarro Elisco & Associates, Limited, correct?

A.   Limited or Inc., yes.

Q.   Okay.  And it contained the Navarro, Elisco & Associates, the NEA address, 952 Skokie Boulevard, Northbrook, correct?

A.   Yes, I believe it was an LLC, just for clarification.

Q.   Okay.  All right.  Now, were you ever a partner or member of NEA?

A.   No.

Q.   Were you ever an employee of NEA?

A.   No.

Q.   Were you ever an officer of NEA?

A.   No.

Q.   The -- now, in addition to -- well, the -- the check -- the checks, the NEA checks, at 952 Skokie Boulevard, did those -- Mr. Navarro and Mr. Elisco also had had access to those checks, correct?

A.   Yes.

Q.   Now, and periodically, as you needed it, you would come in and pick up more checks, correct?

A.   Yes, or they would -- we would meet for lunch and they would bring us a batch or a different way.

Q.   Okay.  Okay.  But when you came in there, you didn't pick up banking statements, did you, checking statements?

A.   There were times where their secretary, Dagmar, would hand me an open bank statement.

Q.   Okay.  Were you able -- did you attempt to reconcile those bank statements?

A.   No.

Q.   Now, the -- have you seen a letter written by a Mr. Robert Parr of the FDIC to Zurich American concerning this case, so-called proof of loss letter?

A.   It sounds familiar.  The name sounds familiar, but the contents you would have to -- I -- the answer, I guess, would be, yes, I think I have seen the letter.

Q.   Okay.  And in that letter Mr. Parr asserts that during the period from December of 2001 to May of 2002 you deposited $2,211,000.00 in checks from the Horseshoe Casino into the NEA account, isn't that correct?

Well, is it correct that you made that deposit -- those deposits?

A.   If that is what he is certifying, I -- I definitely -- I can't state on the record to the penny that is the amount, sir.

Q.   Okay.  Does it sound -- it sounds right to you, right?

A.   Sure.

Q.   That is just the checks, do you understand that?

A.   You are --

     MS. O'CONNOR:  Could I interject here.  Mr. Resnick

is -- actually, it is not clear to me that the question and answer are in sync. Are you asking Mr. Resnick what his recollection is or what is in the letter that he does not specifically recall?

THE COURT: Okay. Let me --

MR. PALLES: Fair.

THE COURT: Let me clarify from the Court's point of view then to see if my understanding is right. Mr. Resnick does recall that there was such a letter. So the answer to that is, yes, I recall there that there was such a letter.

Is that correct, Mr. Resnick?

THE WITNESS: I remember those names, your Honor, but the numbers and citing -- I just -- you know, there is --

THE COURT: Right. Okay. In the absence of an accounting, why don't we put it this way: Would it surprise you if it turned out that you deposited about -- a little over $2 million in checks into the account during the period that counsel set forth? Because we know --

THE WITNESS: No, it would not.

THE COURT: We know you don't have the books and records right there.

THE WITNESS: Right.

THE COURT: So no one is expecting you to come up with exact amounts. But the numbers --

THE WITNESS:  I just want to be accurate.

THE COURT:  Correct.

THE WITNESS:  I just want to be accurate.  The answer to your question is, no, it would not surprise me, your Honor.

MS. O'CONNOR:  Thank you, your Honor.

BY MR. PALLES:

Q.  Would it surprise you to know you deposited in excess of a million dollars in checks from the Bellagio casino?

A.  No, it would not.

Q.  And would -- well, let me ask you, specifically do you recall depositing a $100,000.00 Bellagio check on January 14th, 2002, on or about?

A.  I do not recall.

Q.  Okay.

A.  I do not recall.

Q.  Do you recall depositing a $335,000.00 Bellagio check on or about February 1st, 2002?

A.  I don't.  I am not disputing it, but, again, those aren't things I recall.

Q.  Okay.  Do you recall depositing a $500,000.00 Bellagio check in the NEA account on or about February 25th, 2002?

A.  Again, I would have to give the same answer, I am sure it happened, but I just can't tell you I remember making that deposit specifically.

Q.   Okay.  All right.  Do you recall depositing a $5,000.00 Bellagio check on or about April 22nd, 2002?

A.   It be would the same answer, sir.

Q.   Okay.  And, lastly, do you recall depositing a Bellagio check in the amount of $42.07 on or about June 10th, 2002?

A.   Same answer, sir.

Q.   Again, none of that would surprise you, however?

A.   That is correct.

Q.   Okay.  Now, in addition to that, do you recall depositing a check from the Rio casino in the amount of $26,207.00?

A.   Again the same answer, sir.

Q.   Okay.  In your book you discuss an incident where you won $800,000.00 in Vegas and deposited most of it in the NEA account.  Do you recall that reference in your book?

A.   I do.

Q.   Okay.  And at the time I believe you said in your book now that -- hold on, let me get the precise cite.  At -- in Bust at 200 -- at pages 208 to 209 you said, "If I wanted to get rich, I would have withdrawn millions, set up an account in Switzerland and left the country.  But I was honest, deluded, sick."  And then you say, "But I -- I put back millions of cash in casino checks.  I felt like a businessman."  Do you recall making that statement in your book?

Case: 1:05-cr-00009 Document #: 137 Filed: 06/20/08 Page 86 of 198 PageID #:633

A.   Absolutely.

Q.   Okay.   And do you stand by those statements today under oath?

A.   Yes.

Q.   Okay.   Now, in addition there is a record of a deposit made into the -- the corresponding bank account for Universal in the amount of $70,000.00 from the Orco Bank, and that is a check that it was made payable to Dominick Poeta.   Do you recall depositing that check in the American National Bank account?

A.   Mr. Palles, if I can just ask you a question --

Q.   Yes - --

A.   -- just for clarification.   I would ask you to repeat this one, but going back to the prior question a thought crossed my mind.   You were asking me about all those individual checks.

Q.   Yes.

A.   And the reason I recalled the big check is because it was a big check from the Bellagio.   It was the biggest one day check that they ever gave me.   And that is why I memorialized it in the book.   So the other checks you -- they didn't strike a cord, but that check did.   And, again, I stand by that.

Q.   Okay.

A.   And if you could repeat the question.

Q.    Okay.

A.    I just wanted to clarify that -- I just wanted to clarify that I did remember that check and that is why it was memorialized.  And I didn't -- I don't recall, but I am not disputing the other checks.

Q.    All right.  And I am asking you now whether or not you remember making a deposit in the NEA account through the correspondent bank, the so -- the American National due-from account of a check in the amount of $70,000.00 pay -- from the Orco Bank and payable to Dominick Poeta.  Do you recall depositing that in the NEA account?

A.    I don't recall it, but I assume it happened.  I am not the one who made the deposits.

Q.    Okay.  Isn't it a fact that that represents winnings that you obtained from the offshore affiliate that was made payable to Dominick Poeta and transferred to you?

A.    Not necessarily.

Q.    Okay.  Well, how do you explain a check made for 70,000 -- 70,000 -- you deposited a check payable to Dominick Poeta for $70,000.00.  How do you explain that?

A.    Because there were many times, Mr. Palles, that I would overpay or they would have me post up money if I was less the week before.  And that could very easily have been just principal return, no different than when I would go to a casino and some of the deposits you are seeing are checks

back from the Horseshoe. I could have deposited $500,000.00 but only lost 20,000, and they could have given $480,000.00 to deposit back. And if they had not accepted the $500,000.00 check that I brought in in the first place.

Q. Okay.

A. But I can't tell for certain that that was winnings.

Q. But a check payable to Dominick Poeta in the amount of 70,000 you deposited in the NEA account, correct?

A. If you are -- if you are looking at a document, I would not dispute that, sir.

Q. Now, Mr. Stewart asked you, I believe, whether or not when you -- what your mindset was when you went to gamble. Now, when you gambled, put money down on a game of blackjack or roulette or baseball game, you planned to win that bet, did you not?

A. I certainly hoped. Planning -- I think I used the word "hope."

Q. Okay. All right. Well, let me ask you --

A. I certainly -- I certainly didn't expect to, no, if that is your -- if that is your answer. You can't -- you can't expect to win.

Q. All right.

A. Although some --

Q. I am sorry?

A. Compulsive gamblers have illusions of expecting --

THE COURT:  You know, that has come up several times.  My understanding is that every time you made a bet, you hoped you would win and you were making the bet with the intention to win the bet?

THE WITNESS:  Correct, your Honor.

THE COURT:  And I mean you had a lot of experience.  It proved that you might not win it.  And you are smart, so you knew that the odds were stacked against you.  Nevertheless, you weren't -- you didn't -- it wasn't the placing of the bet that you thought you were buying the thrill of just placing the bet, you were also buying the excitement and risk, in the hope that you would win each time.  Right?

THE WITNESS:  The rush of it as well, your Honor, you are correct.

THE COURT:  Okay.

BY MR. PALLES:

Q.   You have described yourself as a compulsive and, I think in your book, a pathological gambler, correct?

A.   Yes, sir.

Q.   All right.  And you know Dr. Valerie Lorenz, correct?

A.   Yes, sir.

Q.   Okay.  And she treat -- she treated you for your gambling addiction?

A.   Yes, sir.

Q. Okay. And she wrote a letter to Judge Andersen, correct, on your behalf?

A. She did.

Q. And in that --

A. She did.

Q. Okay. And that is published in your book as well, correct?

A. Correct.

Q. Okay. And in that you -- well, would you agree with Dr. Valerie Lorenz' statement where she says that this kind of out-of-control gambling is marked by an increasingly unrealistic and magical beliefs and conviction that the next bet will be the winning one that will replace all losses. Do you agree with that statement?

A. I would say that is synonymous with hope.

Q. Okay. I am asking you, do you agree with that statement?

A. Could you read it to me again.

Q. "This kind of out-of-control gambling is marked by increasingly unrealistic magical beliefs and a conviction that the next bet will be winning one that will replace all losses."

A. I would say that is pretty fair. I mean that wouldn't be my way of articulating, but she is the doctor.

Q. Okay. Now, Mr. Resnick, on December 27, 2001 Terry

Navarro wrote a check to Peter Burdi for $245,000.00.  Were you aware of that transaction at or about the time it took place?

A.    I recall transactions between the two of them.  I am not necessarily sure about that specific one.  Again, we are getting -- you know, that doesn't send off a light of a -- you know, of any significance.

Q.    Well, what -- let me ask you this:  When Terry Navarro -- well, first of all, when Terry Navarro -- were you aware that Terry Navarro was using the NEA account for withdrawals?

A.    I think there were some -- I think I told you about some on Monday.  There were a few times where I either asked him to write a check for me, and that could have been one of them, or there were -- you know, there were some -- a time or two that he wrote a check for me, but I certainly don't know if he wrote anything outside of -- you know, as far as at the time I didn't know if he had written anything that I didn't ask for, but I believe, you know, that is possible, yes.

Q.    Okay.  Were you aware that Terry Navarro between -- well let me -- strike that a second.

Were you aware -- you weren't aware that Terry Navarro wrote himself or asked that a cashier's check in the amount of $35,000.00 payable to him on January 30th of 2002?

A.    Again, I can't tell you, but there were, I mentioned, a few instances where -- where I asked him to, but I can't tell

you that one specifically, sir. I just -- I -- it is just not -- it just doesn't ring a bell with me.

Q. Well, were you aware that he took in April and May -- I am sorry, in April of 2002 that he requested cashier's checks on his behalf in the amount of $260,000.00 payable to Ticor Title?

A. Ticor Title doesn't sound familiar, but, again, it could have been. I can't say for certain that he mentioned something to me. And I didn't really care because it was -- it was his account, you know, and -- as well. If -- well, technically I don't -- bottom line I can't tell you for certain, sir, that he did not pay to me for that check, but it is very possible he took it up unilaterally and didn't mention a word to me.

Q. Okay. Let me ask you this: It -- you -- it was his account. You didn't place any restrictions on him in terms of how he could use his account, did you?

A. No, sir.

Q. Okay. You understood that he and Larry Elisco were the owners of the account?

A. Yes, I was a signatory.

Q. All right. Now, the -- were you aware between December of 2001 and June of 2002 Larry Elisco took out checks in the amount of $280,000.00 -- $280,400.00 from the account?

A. I would say that anything that Mr. Elisco took out would

have been checks that I asked him to or repayment of loans and interest he was making on loans to me vis-a-vis the account. So I can't -- for Mr. Navarro I can't speak for, but Mr. Elisco I am very certain that he didn't -- there was certainly nothing nefarious going on. And moreover, he would have -- they would have been per my instruction. But, again, it is possible that he did something I didn't see because I didn't reconcile the account, as I testified.

Q. The -- in your book you state that Lucky was using an offshore affiliate to handle your action because the amounts were too large. Do you recall making that statement?

A. Yes, sir.

Q. And, by the way, every -- you have stated that every anecdote that refers to Lucky Petrelli in the book is absolutely true as relates to Dominick Poeta, correct?

A. I believe the answer is yes. But if you look at how I explained the book at the beginning, I think the book is prefaced something -- I am not looking at it -- that everything is true but minor details and names have been changed. And that was relevant for Mr. Poeta for -- in regards to him. So there may have been some minor details.

Q. Well --

A. Places and dates.

Q. I am not talking about the book now, Mr. Resnick. I am talking about a letter that you wrote to Mr. Joe Stewart on

August 7, 2007 where you said every anecdote in Bust that referenced Mr. Poeta is absolutely true. You made that statement, correct?

A. Yes, I made that statement, yes.

Q. Okay. And so you state in the book that Lucky was using an offshore affiliate to handle your action because the amounts were too large, correct?

MR. STEWART: I have an objection.

THE COURT: You have to stay -- Miss --

MR. STEWART: There is a relevance issue at this point.

MS. O'CONNOR: I am sorry, I don't have Mr. Resnick's books on my book shelf.

MR. STEWART: I have a relevance objection at this point. The Government is making a claim on 16 checks worth $650,000.00 that were given to Mr. Poeta, deposited into his bank, applied to his debts. We are not making any claim to any money that has gone offshore.

And as far as this cross-examination is concerned, I am not sure what they are going to try to do in the way of proving it up. Certainly the indication is that Dominick Poeta is not going to get on the stand to say that he is entitled to some offsets for money that was paid to offshore affiliates. And, as far as I know, there has been no witness that has been subpoenaed from offshore affiliates that is

going to claim that the money that was paid to Poeta is in some way -- a payment to Poeta was a payment for some other debt to some offshore affiliate.

THE COURT:  Well --

MR. STEWART:  So it has no relevance at this point.

THE COURT:  Okay.  Counsel, if the Government is claiming they are not going to make any claims to or through offshore affiliates, do you want to discontinue that line of questioning.

MR. PALLES:  No, I don't, your Honor.  I think that Mr. Resnick will admit that certain of these monies were earmarked for the offshore affiliate.

THE COURT:  Well, it is all so tangled up that I will overrule the objection, but -- but, in fact, you know, it might turn out that I don't think anything that happened with that affects the Court's decision with respect to the 16 checks.  But I am willing to --

MR. PALLES:  Okay, fine.

THE COURT:  Also, this is -- in terms of six or $700,000.00, it is a fairly substantial lawsuit.  And we -- we have not had the normal two years of discovery and depositions whereby all this clearly would have been part of it.  So Mr. Poeta's counsel is laboring under a little bit of a disadvantage in that this is probably the first chance he had had to question Mr. Resnick.

MR. STEWART: And, your Honor, by the same token the Government has been highly disadvantaged by Mr. Poeta's refusal to produce any documents in this case, not one, and refusal to give no substantive testimony whatsoever, except asserting his Fifth Amendment.

THE COURT: Okay. Well, we will see if that works to your prejudice or not because ultimately, as Mr. Poeta knows, the Court is going to have to weigh the evidence.

MR. STEWART: Okay.

MR. PALLES: All right.

BY MR. PALLES:

Q. Now, isn't it a fact that the -- that as early as January of 2002 you were aware that -- that the bets that you were placing with Dominick Poeta were going to an offshore affiliate?

A. I was thinking it was more March or April, but if you say that, I -- I don't know -- my recollection, sir, is in the springtime. I don't recall in January, no. I don't recall that.

Q. Okay.

MS. O'CONNOR: Could I ask -- excuse me. Can I ask to clarify the question to Mr. Resnick, whether you are talking about all bets or are you asking him that at least some bets were going that way?

MR. STEWART: I would like to -- on behalf of the

Government I would like to -- I would like to echo that objection because it is very unclear the way it was posed --

THE COURT: Okay.

MR. STEWART: -- you know, what this money is intended for.

MR. PALLES: Fine.

THE COURT: Fine. We will strike the answer. Why don't you re-ask the question to clarify whether or not there were some bets at some period of time or all bets at another period of time, et cetera.

BY MR. PALLES:

Q. Okay. Well, I am interested specifically in the bets that are reflected by checks that you paid Dominick Poeta. And, in fact, those bets -- many of those checks reflect payments that -- excuse me -- yeah, reflect payments either to place bets with an offshore affiliate or to pay debts to the offshore affiliate --

MR. STEWART: Objection, your Honor.

BY MR. PALLES:

Q. Correct?

MR. STEWART: There is no testimony to that effect.

MR. PALLES: I am asking the quest -- that is the question.

MR. STEWART: Oh.

THE COURT: The --

MS. O'CONNOR:  I am sorry, that sounded like a statement and not a question.  Could I also ask to clarify the --

THE COURT:  There was a lot of statement in that, but -- as I have heard lawyers do several times over the years -- but there was a question at the end.  So -- so that we are all on the same page, I will overrule the objection.

But, counsel, why don't you state just the question form of your statement and then we will -- if Mr. Resnick has an answer, we can hear his answer.

MR. PALLES:  Fine.

BY MR. PALLES:

Q.  Mr. Resnick, the -- at least -- according to your previous answer, at least some of those checks dated March -- dated from March of 2000 -- March or April of 2002 reflect payments that -- excuse me, reflect payments given to Mr. Poeta either to -- either to place bets with the offshore affiliate or to pay debts to the offshore affiliate, correct?

MR. STEWART:  I object.

THE COURT:  Well, let's hear what he says.  And you can follow-up for clarification.

Mr. Resnick, is that -- is it your recollection that that is true?

THE WITNESS:  Well, my recollection, your Honor, was the wires for sure.  There were three wire transfers.  I

believe either 2.4 or 3.2 million. I can't be -- again, I am not looking at documents. That number strikes me. I can't tell you that -- I mean I certainly know the checks that bounced that we have talked about in my direct testimony were going to the offshore per what Mr. Poeta told me -- but I -- I never sent a check, to the best of my recollection. I gave them to Poeta.

At some point is it possible that those checks went offshore? I am just trying to think. I remember wires going offshore. I just can't tell you if the cashier's checks he is discussing or any others went to the sports -- there may have been. I just -- again, I am not looking at documents. I only had limited discovery in my case, so I am just not -- I -- I can't tell -- under oath I want to be very careful and give you guys the specific answers.

THE COURT: Okay. Next question.

BY MR. PALLES:

Q. Now, Mr. Resnick, you -- between April 14th and --

THE COURT: Miss O'Connor, are you still with us?

MS. O'CONNOR: I am, your Honor.

THE COURT: Okay. Go on.

BY MR. PALLES:

Q. Between April 14th and March 28th of 2002 you wrote a total of seven checks to Dominick -- checks to cash that the Government is alleging were given to Dominick Poeta. Now,

on --

A.    I am not clear on the dates, sir.

Q.    Okay.

A.    There -- you said April 14 and March -- I am just trying to make the chronology here.  What is the question or the statement?

Q.    Yes, I am sorry.  This was just to set up my actual question.  Now, what I am saying is you had -- well, I will give you the -- the name -- the dates and amounts of the following checks.  February 14th $2,000.00 to cash, February 25th $20,000.00 to cash, March 4th $20,000.00 to cash, March 8th $50,000.00 to cash, March 22nd $25,000.00 to cash, March 25th $25,000.00 to cash, and March 28th $30,000.00 to cash.

         Now, after that you then provided Mr. Poeta with -- you began providing Mr. Poeta with cashier's checks, and the first one was for $100,000.00.  Now, is it not a fact that the purpose of that check was to --

         THE COURT:  The --

BY MR. PALLES:

Q.    -- was to obtain cash to gamble at the local casino boats?

A.    I would --

         MR. STEWART:  Objection your Honor.

         THE COURT:  He can answer.  In other words --

well --

MR. STEWART: I must object, though. The question really mischaracterizes the chronology. There were two cashier's checks that were written before -- before the --

THE COURT: The only question -- the only question I heard in that -- that niagra of numbers was whether or not the $100,000.00 cashier's check drawn on what date --

MR. PALLES: March 30th.

THE COURT: Whether or not that was paid to Mr. Poeta to obtain cash from him which you intended to use to bet elsewhere. Is that true?

THE WITNESS: The reason -- am I okay to answer, your Honor? I can't hear if there is an objection.

THE COURT: You can answer my questions.

THE WITNESS: The -- the only reason -- I think there was two parts to the answer. One is I think that if you look at those checks, that is consistent.

To answer Mr. Palles's first question about the days starting in January, those checks were supposed to go offshore. They are consistent with my earlier testimony that the settlement was $20,000.00 and started to increase. He mentioned a lot of checks that were 20,000. And I think that would be consistent with those checks going to Mr. Poeta.

In regards to his next question, I don't know why in the world I would borrow $100,000.00 in cash when I had access to an unlimited checking account and I was bringing

cashier's checks on numerous occasions, whether every day or biweekly or weekly. Why I would borrow cash from Mr. Poeta to --

THE COURT: He is not --

THE WITNESS: I would answer no.

THE COURT: He is not contending that you are borrowing the cash. What he is contending is you bought $100,000.00 in cash with the $100,000.00 cashier's check. Do you recall whether or not you did that?

THE WITNESS: I -- I do not recall that at all. I don't know why in world I would have done that.

BY MR. PALLES:

Q. Do you recall -- Do you recall sending your brother Josh to Mr. Poeta's home to collect on two separate occasions $100,000.00 in cash?

A. I don't -- I recall something at some point of my brother, but to go collect cash, but it was -- it was the winnings. Why would -- I just don't understand why -- to answer to your question, I never wrote a check for him for $1,000.00 to get cash to go to a casino. The answer is absolutely not.

Q. Okay. The -- in your book on page 210 you discuss flying to Vegas in May of 2002 with a check from Horseshoe worth $1.2 million and a $150,000.00 in cash. Where did you get that $150,000 in cash?

A.    From either Mr. Poeta or, if you had access to the casino records, probably from cash winnings at the casino. It would have been from cash winnings from Mr. Poeta or the casino.

Q.    Okay.  In your book you refer to an incident where having received a nice payment from Lucky, you had lunch with Toni Navarro and you gave her $50,000.00 in cash to deposit in Universal.  Do you recall that anecdote?

A,    I actually do, yes.

Q.    Okay.  And my question is this:  Approximately how much was the nice payment that you received from Lucky?

A.    I assume it was $50,000.00.

Q.    Right.  Could you read what I wrote.

Q.    "After re --

          MS. O'CONNOR:  Can I have a page reference?

          MR. PALLES:  I am sorry, you want the page reference?  Page --

          MS. O'CONNOR:  Yes.

          MR. PALLES:  Hold on.  Page 209.

          MS. O'CONNOR:  Thank you.

BY MR. PALLES:

Q.    It says after receiving a nice payment from Lucky you had lunch with Toni and gave her 50,000 in cash to deposit. What -- what is the -- do you recall the approximate amount of the nice payment you received from Lucky?

A.   I don't.  I don't, sir.  I assume it was just one of those days I won.  And the only thing I recall is the $50,000.00.  I don't know if there was anything in excess or not.

Q.   All right.  And you stated, did you not, that on several occasions with -- you received more than a million dollars in cash from Mr. Poeta?

A.   Mr. Poeta and -- and also in other instances his -- I don't want to say another word -- his associates in Vegas in reference to the time we went there and picked up 2.2 million in cash.

Q.   Okay.  But that was not the only occasion you received in excess of a million dollars cash through -- through your bets through Mr. Poeta, was it?

A.   No.

Q.   Okay.  And you recite in your book this occasion where you went to Vegas and received, as a result of your betting with -- through Mr. Poeta, $2.2 million in cash, correct?

            MR. STEWART:  Objection.

BY THE WITNESS:

A.   Yes, I did receive it.

            MR. PALLES:  Okay.

            MR. STEWART:  Can we have a page reference to the book pages because I am not sure that is exactly what is said.

THE COURT: So if any of us is going to refer to anything in the book, let's first make a page reference.

MR. PALLES: All right. I am sorry, I will --

THE COURT: No, that is okay. Not everybody in the courtroom has actually purchased his own copy.

MR. PALLES: Your Honor, it would be page 219.

THE COURT: Okay.

MR. STEWART: I am sorry?

MR. PALLES: 219.

THE WITNESS: Your Honor, can I just stand for a minute. These Bureau of Prison chairs are a little uncomfortable. Just for a moment to stretch?

THE COURT: Definitely.

We can see you fine when you are standing. So, frankly, as long as they don't mind if you want to answer questions for awhile standing up, do whatever you prefer.

THE WITNESS: Yeah, just for a minute to get my blood circulating. Thank you.

THE COURT: That is fine. Thanks for asking.

Okay. What is the next question?

And how much longer do you think this questioning will go.

He says five minutes. I am just getting hungry.

BY MR. PALLES:

Q. Now, Mr. -- Mr. Resnick, after Universal failed, I think

you indicated five years after Universal failed, you came to Dominick and you sold him an accounting machine, is that correct?

A.    This wasn't the first thing that happened, but, yes, at some point, yes.

Q.    Well, let me ask you a question.  At any time after -- at any time after the failure of Universal Bank did Mr. Poeta give you any money as a gift?

A.    Well, I think he -- we comingled the $5,000.00 from the cash accounting machine as a gift, correct.

Q.    All right.

A.    I mean I think he said -- first let me clarify.  He didn't feel it was worth $5,000.00, he was paying a premium and felt that he was being generous.

Q.    Okay.  Had you determined what you thought the value of -- you are saying your asking price for the accounting machine was five grand?

A.    No, I don't think I really had an asking price.  He asked me if I still had it.  I had forgotten about it.  A friend of mine had had it.  I forgot it existed.  It certainly wasn't a priority for me.  And when he mentioned it, I said, oh, I will get it for you.  And it certainly wasn't worth that.  So I think that, you know, the excess was him, you know, knowing I was going to prison and trying to do something nice for my family.

Q.   Okay.  So he gave you five grand and you gave him the theaccountingmachine?

A.   Right, yes.

Q.   Okay.

A.   He said he could use it.

Q.   Now, at any -- isn't it a fact that early on in your relationship Mr. Poeta tried to get you to stop gambling?

A.   I certainly wouldn't say he tried   get me to stop.  I think he was always -- he was unlike other bookmakers with a respect that he genuinely showed a caring side and didn't want to see me -- I had a couple friends -- I say "friends" -- people I gambled with who were on the other side making money off me who definitely showed caring and just didn't want to see me get beat down.

      A good bookie, to answer your question, wants you to lose consistently but not -- not bankrupt because you are not   long-term customer.  Mr. Poeta definitely showed caring at times to me and my family.

Q.   The  - Mr. Stewart asked you certain questions about how Dominick Poeta might have known that you were involved in the failure of Universal.  Let me ask you,     conversation you referred to took place several days after the bank      , correct?

A.   Correct.

Q.   And     that interim period were there newspaper reports

of the Universal Bank?

A.   I believe there was certainly -- there was news, something on NBC, that my wife and I saw.  That was painful, obviously.  But I don't -- I am sure there was a blurb in the Sun-Times and Tribune.  I think they have covered this from the beginning.

Q.   And was your name mentioned in there?

A.   No, not to -- my name was not mentioned until, I want to say, September 12, it was a Sunday, of 2004, was the first article that was written with my name on it by the Tribune.

Q.   Okay.

        MR. PALLES:   One second.

BY MR. PALLES:

Q.   Mr. Resnick, you didn't receive NEA account statements on any regular basis, did you?

A.   I mean there was no -- there was no rhyme or reason.  I certainly got -- received any bank statements at times. There may be months I didn't get, but I know I had, when the bank collapsed, at least one in my possession that I turned over.

Q.   Okay.  And that was open?

A.   Yes.

Q.   Now, Mr. Poeta -- I am sorry, Mr. Resnick you didn't take any -- you didn't have an opportunity to take any cash from the NEA account, did you?

A. There were certain -- there were a few instances where I would meet Toni for lunch and she would bring me cash. If -- there was one time it was 9,000 and maybe a few other times a coupe thousand, but nothing -- well, that is a significant amount of money, but in terms of what we are talking about nothing significant.

Q. Well, nothing to trigger a cash transaction report, correct?

A. Well, I guess you have to say it has to be $10,000.00 or more, from my understanding. CTR is the acronym that they use. And that's correct.

Q. Okay. And so --

A. It is possible.

Q. So but -- excuse me, excuse me. Let me ask a question. How much cash would you typically take to the Hammond casino to bet.

A. Cash?

Q. Cash. It depends on what time.

Q. Let's say in April -- let's say in April -- March, April and May of -- of 2002.

A. I would have taken any cash -- I would have taken cash at times that I had either won with Dominick or won the previous day from the casino. Typically when I cashed out there, if I had been on the positive side of a day, they would give me my check back that they would hold it in the

cage. And that is what I was referring to earlier when you said I made deposits in the Horseshoe, which would have been the principal check coming back. And I would have -- and if I won, I would have taken cash at times and then brought it back the next day and put it back on deposit.

BY MR. STEWART:

Q. But there were many times that you lost, correct?

A. Absolutely.

Q. Okay. And then what would you do for cash? Did you go to a --

A. Cash I would --

Q. Yeah. How would you -- what would you do, go to a 7-11 for cash? How did you get that?

A. For cash?

Q. Cash.

A. I used -- I don't know. I used my credit card probably. If you looked at my credit card statements, I put everything on a credit card. And if I had cash from winning at a casino or winning from Mr. Poeta, I would use it to spend for expenses, for gambling, and that would be it. I wasn't really in a position that I was writing checks for my own personal cash. When I wrote a check to cash, it would be to pay a bookie or a casino.

MR. PALLES: Okay. One second.

THE COURT: Sure.

(Brief pause.)

MR. PALLES: No further questions, Judge.

THE COURT: Okay, Mr. Stewart.

Now, two things: First of all, my body needs nourishing fairly soon if you want me to pay attention. Secondly, I see Mr. Sklarsky pacing back and forth. So, you know, I don't want to discommode anybody unduly. But my ability to focus is dwindling. So fire away.

Do you want to do cross -- re-cross first or do you want to get Mr. Sklarsky's client on and off? What would you like to do?

MR. STEWART: Well, I only have a few minutes of redirect.

THE COURT: Okay, fine. But I am not going to last more than, say, ten more minutes before we have to recess.

Well, what can I tell you?

MR. STEWART: You will not expire by the end of my examination.

MR. NOVAK: Your Honor, I am sorry to interrupt. Are you telling me you are going to take a lunch break, come back, because then we have to --

THE COURT: I don't know. When we finish with Mr. Resnick -- I mean he is not actually a party to this citation proceeding. And I know he is interested. So I don't know whether or not we will need him as part of the video once we

finish questioning him. And he too is actually a witness who maybe should be excluded when others testify.

But let's ask your questions and then we will decide that. But if you could do it quick -- if you can't do it quickly, that is fine, let's just recess and we will get together again later.

MR. STEWART: I think I could do it.

THE WITNESS: Your Honor --

THE COURT: Yes?

THE WITNESS: Just -- you know, I also have my counselor, the representative from the Bureau of Prisons, who have their own time limitations and issues. I don't know where that stands.

THE COURT: Yeah, I don't blame them. You know, we are all -- they are Government employees just like me, so we have to get the inexpensive sandwich.

Okay.

MR. STEWART: I think we --

THE COURT: Just ask the questions. Thanks.

MR. STEWART: Okay.

REDIRECT EXAMINATION

BY MR. STEWART:

Q. The house that you said your wife owned that was worth $750,000.00, was there a mortgage on that house?

A. Yes.

Q.   And was that house owned in 2001?

A.   I believe it was purchased in October of 2001.

Q.   I am sorry, you cut out.

A.   I believe --

Q.   What year?

A.   I believe it was purchased in October of 2001.

Q.   And you mentioned a -- it was mentioned in the cross-examination a withdrawal by Mr. Elisco.  Mr. Elisco -- you owe money to Mr. Elisco, is that correct?

A.   Yes.

Q.   And he actually is one of the victims in this case, isn't that correct?

A.   Yes.

Q.   As far as -- there was questions raised about the owner of that account.  You had the right to write checks on that NEA account, did you not?

A.   I did.

Q.   And so for whatever balance was in that account, you could write a check and withdraw whatever balance was on that account, is that correct?

A.   Yes.

Q.   And as far as cash to pay bookies, during the period of November of 2001 through December -- June of 2002 did you have any other bookie, that is, an illegal bookie, except for Dominick Poeta?

A.   Let's say December 1st, just to be safe, so I don't -- you know, there may have been somebody in November that crossed over in the time line.  But the answer is during the entire time of the NEA account, the answer is no.

Q.   And, again, when your wife sold the house, she really didn't recover any -- any money from the sale of that house, is that correct?  Was that your testimony?

A.   Well, I can't speak what she recovered because I wasn't -- by advice of counsel I wasn't involved in that and she made her own settlement.  I guess to answer your question, I -- it was negligible, if anything, if there was a payment made to the FDIC in the settlement.

Q.   In 2001 what do you think your wife's net worth was?

A.   Couldn't even estimate.  It wasn't very high.

Q.   More than 100,000?  More than 100,000?

A.   In 2001 she owned a house, so somewhere around there. That is about it.

Q.   About $100,000.00?

A.   Sure.

          MR. STEWART:  Okay.  Thank you, your Honor?

          THE COURT:  Any recross?

          MR. PALLES:  Just one thing.

                    RECROSS EXAMINATION

BY MR. PALLES:

Q.   Mr. Stewart asked you, Mr. Resnick, whether or not you

had a right to write checks on that account.  That right would only pertain as long as Mr. Elisco or Mr. Navarro gave you permission to do so, correct?

A.     Well, I guess technically they could have stopped it.  I mean permission -- there was never -- they gave me permission -- I think the answer to your question would be had they shut it down, since they were the ones that opened the account, I probably wouldn't have to -- you know, be able to take a position on that account.

Q.     And when you first went in -- or when you first went in to open the account, you indicated to Toni Navarro that you wouldn't clear check systems, correct, because of your past history?

A.     Yes.

Q.     Okay.  And so --

A.     Yes.

Q.     And so your ability to write checks was dependent upon Toni Navarro not entering your Social Security number and date of birth into the database concerning this account, correct?

                 MR. STEWART:  Your Honor --

                 THE COURT:  If you know.

                 MR. STEWART:  I am going to object right now.

                 THE COURT:  You know, if you know that it was a requirement, it is -- if you don't, fine.

BY THE WITNESS:

A.    I don't know what that bank's protocol.

THE COURT:   No, if --

BY THE WITNESS:

A.    I know most banks' protocol.

THE COURT:   Okay.

BY MR. PALLES:

Q.    You know most banks' protocol.  And what is that?

A.    Most banks honor checks.  I don't know what Universal's protocols were.  I can't tell you for certain what they were.

THE COURT:   Okay.  Any other questions?

MR. PALLES:   No.

MR. STEWART:   No.

THE COURT:   Now, we know if we have Mr. Sklarsky's client waiting, do we need Mr. Resnick's participation in the balance of this hearing?  I don't -- for now the questioning of him is concluded.  If for some reason we needed to do it again some other time, we, obviously, could see if we could set it up again.

From the U.S. -- from Government's standpoint his testimony is concluded.

MR. STEWART:   That's correct.

THE COURT:   Mr. Poeta is that as well?

MR. PALLES:   Yes, your Honor.

(Witness excused.)

THE COURT:  Miss O'Connor, do you have any objection to us shutting off our video service with Mr. Resnick?  If you would like to continue to participate when we reconvene by telephone, as far as I am concerned, you know, we could set that up.  What is your preference?

MS. O'CONNOR:  Thank you, your Honor.  Perhaps I could confer with Mr. Resnick while you are on the lunch break.

THE COURT:  Well, I --

MS. O'CONNOR:  And then --

THE COURT:  Do you have a way to do that?

MS. O'CONNOR:  I think I might be able to get a telephone call with Mr. Resnick.  Then I could call -- I have the prosecution's technical advisor's number and I think I can call him.

THE COURT:  Right.  Or let me give you my chambers number too.  Are you ready?  312 --

MS. O'CONNOR:  Thank you, your Honor.  Yes.

THE COURT:  312 -- 435 --

MS. O'CONNOR:  Yes.

THE COURT:  -- 7619.

MS. O'CONNOR:  Yes.  Okay.  I will call one way or the other.

THE DEFENDANT:  Miss O'Connor -- Barbara?

MS. O'CONNOR:  Yes.

THE DEFENDANT: My counselor is waiting. I have to call you right now because I have no other way to make a legal call the rest of -- until Monday. So I will have to call you right now when we shut off.

MS. O'CONNOR: Sounds good.

THE DEFENDANT: And thank you, your Honor.

THE COURT: Okay.

MS. O'CONNOR: Okay. Thank you, your Honor.

THE COURT: Bye.

MS. O'CONNOR: Bye-bye.

THE COURT: Now I would vote for us reconvening at about 12:45 or 12:50. It is a short time, but -- and then maybe that won't impose too much on Chuck.

MR. PALLES: Okay.

THE COURT: How long will his witness' testimony take?

MR. PALLES: Ten, 20 minutes, maybe.

THE COURT: So I would rather recess because I am really -- I really need to. So I will see you all -- let's shoot for 12:50, okay?

How long would you guess the rest of the hearing will last?

MR. STEWART: Judge, we have -- this was our -- that was our case in chief.

THE COURT: Right. I know. What do you think?

MR. PALLES:  I am going to have --

THE COURT:  Just give me a time, roughly.

MR. PALLES:  Two and a half hours, two hours.

THE COURT:  Okay.  We -- you know, let's -- we better get going then.  I would like to be able to leave by say 3:30 or so.

MR. PALLES:  Good.

THE COURT:  But if we fail, you know, and I -- if -- we can always reconvene.  But let's try to get finished,

Thanks.  Okay.

And then you can -- Miss Childs.  You can let him know how he did at lunch, okay?

MS. CHILDS:  Will do.

(Proceedings recessed at 12:00 o'clock p.m.)

IN THE UNITED STATES DISTRICT COURT.
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,           )    No.  05 CR 9
                                    )
                    Plaintiff,      )    Chicago, Illinois
                                    )    June 6, 2008
                                    )    12:50 o'clock p.m.
        -vs-                        )
                                    )
                                    )
ADAM RESNICK,                       )
                                    )
                    Defendant.      )

TRANSCRIPT OF PROCEEDINGS - HEARING
BEFORE THE HONORABLE WAYNE R. ANDERSEN

APPEARANCES:

For the Plaintiff:          HON.  PATRICK J.  FITZGERALD
                            United States Attorney,  by
                            MR.  JOSEPH A.  STEWART
                            Assistant United States Attorney
                            (219 S.  Dearborn Street
                            Chicago,  Illinois 60604)


For the Defendant:          MS.  BARBARA O'CONNOR
                             174 Battery Street
                            Third Floor
                            Burlington, Vermont 05401


For the Respondent:         RAVITZ & PALLES, P.C.
                            203 North LaSalle Street
                            Suite 2100
                            Chicago,  Illinois 60601
                            BY:   MR.  ERIC S.  PALLES



Court Reporter:             ROSEMARY SCARPELLI
                            219 South Dearborn Street
                            Room 1412
                            Chicago,  Illinois 60604
                            (312) 435-5815

THE COURT: Okay. What are we going to do next?

MR. STEWART: Okay.

MR. PALLES: Are you rest -- you have done your case? Are there exhibits?

MR. STEWART: I think at this point in time it would be good at least to raise a motion in limine which seeks to bar certain evidence of the source of funds in the NEA account.

THE COURT: Wait. Let me just -- I have it in front of me.

MR. STEWART: It is Document No. 132.

THE COURT: Yeah, I have got it.

Did you read it, Frank?

THE CLERK: Yes.

THE COURT: Okay.

MR. PALLES: Judge, before you get too -- too far in, let me -- let me just respond briefly to some things that don't exactly hit the merits of this, and that is this: I had a horrendous computer meltdown yesterday, so I was kind of unable -- I didn't get it until Mr. Stewart faxed it around noon and was not able to do a lot of Lexis research, which I would normally do as I was trying to -- to look at it.

In addition to that, though, it seems to me that the question on a motion in limine -- a motion in limine

seems more appropriate, certainly in the context of a jury trial, because were you to grant the motion in limine, I would ask to make an offer of proof. And it seems that the -- you know, as with some of the other questions that came up today, it would seem to me that it would make more sense to hear what these witnesses have to say to the ---

And, by the way, let me say this: I don't adopt in any sense the characterization of my theories and what they are, but I think you will see some facts today. And then afterwards I would ask an opportunity to get a transcript and look at it and -- and then file something in writing and address that issue as well as a lot of the other issues.

MR. STEWART: Just addressing those practical things because --

THE COURT: Right.

MR. STEWART: -- I agree that, you know, in these circumstances a motion in limine is probably not the best vehicle in the whole world. But, in any event, I thought it was --

THE COURT: Well, it highlights.

MR. STEWART: -- the best thing to do to make a record that we have legal objections to the introduction of any kind of evidence or argument, testimony, what have you, about the source of funds in this NEA account. To us it is -- once the money went into the account, it belonged to Adam

Resnick. And it is not incumbent on us as the claimant here --

THE COURT: So --

MR. STEWART: -- to try to source out the payments that went to Dominick Poeta and say, well, was it money that Adam Resnick got from the Horseshoe Casino, was it money defrauded from somebody, you know, was it Universal credits that were applied to that account? I mean --

THE COURT: Well, if your theory is correct that in effect Adam Resnick made a gift to Mr. Poeta because there wasn't lawful consideration for it at a time when he was insolvent and, therefore, diminished the estate, that gift then -- the estate is entitled to have it regurgitated and in this case pay it for restitution. That is your theory, right?

So if that money, let's say, had been -- if Mr. Resnick had earned legitimately all the money in that account, your analysis would still be the same. If he -- you can't make a preference or a gift to one creditor at a time when you are insolvent and then -- or not a -- maybe not even a creditor -- a gift while creditors go unpaid, that is the theory of what we are doing, right?

MR. STEWART: Right. A secondary theory as backup would be that if the money wasn't owned by Resnick in a very strict legal sense, at the very -- at the very least it was

owned by Universal Bank as the victim in this case and that, you know, on --

THE COURT: That is a tricky one.

MR. STEWART: -- on theories of restitution, that Universal Bank should be able to recover from a bookie --

THE COURT: But, for example --

MR. STEWART: -- money that was stolen from him.

THE COURT: If some of it was legitimate accounting income from the company or, let's say, one of the accountants had his own thing going or was dumping it in, that -- you are saying as long as Resnick owned it at the time he transferred it, then it is subject to payment back to creditors, namely, you? Well.

MR. STEWART: Yes.

THE COURT: Okay. So let's do this: I will keep that in mind, but I do think, as long as it doesn't take a lot of time --

MR. PALLES: Yeah.

THE COURT: -- it is -- I would have to listen to it anyhow.

MR. PALLES: Sure.

THE COURT: I agree with counsel that as long as we don't continue this process for months and months, I -- you know, it has gone for awhile and I want to be able to reflect and give everyone a fair chance, but we ought to keep moving

forward. So my strong concern today is to get in the testimony we are going to get in.

MR. PALLES: Yes.

THE COURT: Then if we can complete that, then we can figure out how you are going to present closing argument to the Court. Now, it might be an ambitious timetable, but I think I am in pretty good shape next Friday as well, Friday, the 13th. So if we don't -- if we don't finish testimony today --

MR. PALLES: Yeah.

THE COURT: -- that is our kind of fallback date.

MR. PALLES: Okay.

THE COURT: Because Monday and Tuesday we have a bench trial.

MR. PALLES: Okay.

THE COURT: And -- but I -- if we could possibly recess like in two hours and 15 minutes or so, on a personal level, since little kids are dependent on me, that would be helpful.

MR. PALLES: Okay. All right.

THE COURT: All right. So --

MR. PALLES: Let's get moving then.

THE COURT: Now --

MR. PALLES: Yeah.

THE COURT: -- on exhibits we -- is there any

objection to the admission of the exhibits that the Government has included in the notebook that it has given us?

MR. PALLES: You know, I will be honest with you, I hadn't really had an opportunity to look at it.

THE COURT: Okay. Well, I am going to assume they are in. But if by some chance he has got a technical objection, then you could make it up later.

MR. STEWART: Just, for the record, everything that is in this book is an -- the exhibits that are attached to our motion for judgment. So everybody has already seen them. It was just for convenience sake.

MR. PALLES: Well, then the answer is no, Judge. This is fine.

THE COURT: So what testimony do you have?

MR. PALLES: Well, I have three witnesses. And --

THE COURT: I am ready.

MR. PALLES: Let's -- I am going to call them. I am going to go get them.

THE CORT: Sir, why don't you come on up here.

MR. PALLES: Your Honor, for the record, I am calling to the stand Mr. Richard McKinlay.

THE COURT: Okay. Thank you for your patience. I am sorry to have held you up so long.

RICHARD MCKINLAY, RESPONDENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT: Have a seat. If -- you will see that is a malleable microphone. If you would state your name and spell it for the record, that would be helful.

THE WITNESS: My name is Richard J. McKinlay, M-C, capital K-I-N-L-A-Y.

THE COURT: Thank you.

Okay. Please proceed.

BY MR. PALLES:

Q. Mr. McKinlay, can you please tell me what your employment position was during the first half of the year 2002.

A. During that period I was president of compliance assistance partners for -- resources group consulting firm. I had no employment with Universal Federal.

Q. Okay. I am sorry. Did you hold a position with the Universal Savings Bank --

A. Yes, I did.

Q. -- in the first half -- I am sorry, you got to let me finish the question -- in the first half of June 2000 -- in the first half of the year 2002?

A. Yes, I did.

Q. Okay. And what was your position with Universal Savings Bank?

A. I was both a director and the Chairman of the Board of Directors.

Q.   Okay.   Now, was Maureen Navarro the president of Universal?

A.   Yes, she was.

Q.   Was she also the chief security officer?

A.   I believe she held that title.   She was, yes.

Q.   And did she also hold the title of chief compliance officer?

A.   Yes, she did.

Q.   Now, in 2002 did Universal maintain between five and 600 checking accounts?

A.   Yes, that is my recollection.

Q.   And the activity from those checking accounts, were they proximate -- approximately $2 million?

A.   That sounds about right.   I can't say definitely, but it sounds about right.

Q.   Now, Mr. McKinlay, based on your experience and your exposure to the banking industry as chairman of Universal, can you tell me whether or not all banks are required to maintain a consumer identification program -- I am sorry, a customer identification program?

A.   Yes, they are.

Q.   Okay.   And did Universal maintain such a customer identification program?

A.   To the best of my knowledge it did.

Q.   Okay.   And this is required, is it not, by a federal law

that we usually refer to as the Patriot Act?

A.    Yes, or pre-existing that the Bank Secrecy Act, right.

Q.    Okay.   And it is in order that the bank is fully aware of the -- of who their customers are, is that correct?

A.    That's correct.

Q.    Okay.   Now, when a customer establishes an account at your bank, under the customer identification program there are certain federal requirements, are there not?

A.    There were.

Q.    There were.   Okay.   And one of the requirements was that you would be required to obtain the name of the customer, is that correct?

A.    Correct.

Q.    And you would have -- have to obtain the date of birth of the customer, correct?

A.    Correct.

Q.    And the address of the customer, correct?

A.    Correct.

Q.    And then finally you would have to obtain an ID number for the customer that is either a social security number for an individual or a tax ID number for a -- another type of business entity, correct?

A.    That's correct.

Q.    Okay.   Now, did you ultimately become aware that this bank protocol was ignored in the case of the account -- the

account of Navarro Elisco & Associates, Limited?

A.   Not during the -- not during the course of the operation of the bank, prior to its failure.

Q.   I see.

THE COURT:   So you didn't know until after it failed?

THE WITNESS:   That -- that there was a violation of this account?

THE COURT:   Right.   But you -- now, once it failed and you looked at it, you would agree that there was a violation of those requirements?

THE WITNESS:   Yes, absolutely from what I understand, yes.

BY MR. PALLES:

Q.   Okay.   And do you have an understanding as to why those requirements were ignored?

A.   I -- I have a personal understanding, but I have no knowledge as to why they were ignored.

Q.   Well, let me ask you, is it a fact that those -- that that understanding was ignored as a courtesy to one of the owners of Navarro Elisco & Associates?

A.   Absolutely.

Q.   Okay.   And that would be Terrence Navarro?

A.   Yes.

Q.   And his mother was the president, Maureen Navarro?

A.    Correct.

Q.    His sister was an operations officer for the company at that time?

A.    Correct.

Q.    Now let's talk about another aspect of banking, and that is the cashier's check, which sometimes -- the cashier's check is sometimes known as a bank check or a teller's check or a treasurer's check or an official check, is that right?

A.    That's correct.

Q.    Okay.  But it is -- and let me ask, a cashier's check is usually considered more acceptable because it provides the bank's guarantee behind the check, is that correct?

A.    That's correct.

Q.    Okay.  Would you agree with this definition of a cashier's check:  That it is a check issued by a bank on its own account for the amount paid to the bank by the purchaser with a named payee and stating the name of the party purchasing the check, that is, the remitter.  The check is received as cash since it is guaranteed by the bank and does not depend on the account of a private individual or business.  Would you agree with that?

A.    Yes.

Q.    Okay.  And would you agree also that one of the unique aspects of the cashier's check is that the funds are not drawn from a personal account but rather from the bank funds?

A.    Absolutely.

Q.    Okay.   Let me ask you another aspect of banking procedures, and that is this:   Did Universal have a procedure for notifying customers of returned checks?

A.    Yes, I believe it did.   I am not -- yes.

Q.    Okay.   And so in the case where there was a -- a notification -- a -- if a check was returned on an account, it would have been -- the notice would have been sent to the customer at its last known residence or business address, is that correct?

A.    Yes, that's correct.

Q.    All right.   Do you know whether or not there were any returned checks involving the Navarro Elisco account during the period from December of 2001, say, through May of 2002?

A.    I subsequently learned of those, yes.

Q.    Okay.   And, in fact, those returns began as early as January, is that correct?

A.    That is what I now understand, correct.

Q.    Fine.   And then lastly, sir, again here is another aspect of banking.   Are you familiar with the term SAR?

A.    Yes, I am.

Q.    And is -- SAR stands for Suspicious Activity Report?

A.    Yes, it does.

Q.    Okay.   Do you know what type of activity triggers a Suspicious Activity Report?

A.   Yes, any kind of large movements of cash or -- or funds that cannot be explained on the basis of prudent business practice.

Q.   Okay.  Now, you previously acknowledged that Universal's check -- 535 checking accounts amounted to approximately $2 million per year --

A.   Yes.

Q.   -- is that correct?

     Now, during the first half of 2002 there was the Navarro Elisco account, and that one had activity, did it not, that were many, many multiples of 2 million, is that correct?

A.   Yes, the Board subsequently, through its inquiries, determined that that was, in fact, the case and that the unexpectedly large movements of cash through the bank were traced specifically to that account.

Q.   Okay.  All right.  Now, did you tell Maureen Navarro that she would have to report the extreme volume in the NEA account?

A.   No, I did not tell her that she had to specifically report that.  The Board was aware of the activity at that point and was --

Q.   Okay.  Let me ask you this:  Let me -- did you inquire of Maureen Navarro about the activity in the account?

A.   Yes.

Q. I am sorry, you said an outstanding?

A. Outstand -- outstanding report.

Q. Okay. And at the same time, being the first half of 2002, did you -- did the bank undergo an audit by the auditing firm -- what is it, O'Fennessey (sic)?

A. Cobitz, VandenBerg & Fennessy.

Q. I am sorry, what is the name?

A. Cobitz -- Cobitz VandenBerg & Fennessy.

Q. Yes. Okay. And did you have an occasion to discuss that audit with Mr. Fennessy?

A. Yes, that --

Q. Approximately when was that?

A. I believe that was at the May Board meeting.

Q. Okay. And in connection with Mr. Fennessy's report, did you ask Mr. Fennessy specifically about the NEA account?

A. As I recall, not during that Board meeting.

Q. I see.

A. It did not come up during that Board meeting. As a matter of fact, it was after he made his presentation at the very front of the Board meeting before the Board's activity -- normal activity commenced that we received that report of audit. And it was during the Board meeting itself that the Board became apprised that the volume of deposit and withdrawal activity had escalated even far beyond what had been noticed the prior month, and that occasioned further

discussion of the NEA account.

Q.    Okay.

A.    Mr. Fennessy was contacted, I believe, during the -- later that week at the Board's annual meeting or special Board meeting on the topic of the NEA account.  I specifically asked him after that meeting concluded whether his audit had focused -- had included that account.  And he indicated that -- that there had been no specific -- I can't recall his wordings -- no specific testing of the legitimacy, or something, of the account, but that he -- he was not particularly concerned because the account always seemed to be in balance and there was nothing particularly of concern to him.

He referred me to one of his audit staff who he thought might have greater familiarity, a person by the name of Doug, who I subsequently did contact.  And, likewise, I was told that basically the account seemed to be in relatively good standing.

Q.    On further inquiry into the situation with the NEA account, do you recall requesting information concerning the nature of business being transacted by a Mr. Adam Resnick?

A.    Yes, I do.

Q.    And do you recall receiving on or about January 20th, 2002 a fax transmission from a Mr. Lawrence Elisco on behalf of Adam Resnick?

A.    You said January.

Q.    I am sorry?

A.    You said January.

Q.    Did I say January?

A.    Yeah.

Q.    I am sorry, I meant June 20th.

A.    Yes.

        MR. PALLES:  And if I may -- you know, I had some -- I had used some defendant stamps.  I am wondering, do you have anything, Miss Reporter?

        Plain.  This is even better.

        Judge, I pre-marked some exhibits.  So to make sure I don't duplicate, I am going to mark this as Defendant's Exhibit No. 10, if I can --

        THE COURT:  Get it out.

        MR. PALLES:  Yes.

        THE COURT:  You can just put a Delta ten.

        MR. PALLES:  Okay.

BY MR. PALLES:

Q.    Mr. McKinlay?

        MR. STEWART:  What exhibit number?

        MR. PALLES:  I am sorry?

        MR. STEWART:  What is the exhibit number?

        MR. PALLES:  No. 10.  You know, this is the -- yeah.

Judge, would you --

THE COURT: Sure.

MR. PALLES: -- like a --

THE COURT: Oh, you want me to have a copy?

MR. PALLES: If you would.

THE COURT: No, I would like them.

MR. PALLES: Okay.

BY MR. PALLES:

Q. Let me ask you, Mr. McKinlay, is this a true and accurate copy of the fax that you received at that time?

A. Certainly appears to be, yes. I am sorry, yes.

MR. PALLES: Thank you. No further questions.

THE COURT: Any cross?

MR. STEWART: Just a few.

CROSS EXAMINATION

BY MR. STEWART:

Q. Mr. McKinlay, I am Joe Stewart. I am with the U.S. Attorney's Office. I am with the plaintiff in this claim that is being brought against Mr. Poeta.

You and I have never spoken before, is that correct?

A. That's correct.

Q. With regard to this request for information that was marked as -- I guess the response to that request was marked as Exhibit No. 10 that you just saw?

A. Correct.

Q. Who did you make that request of?

A. I made that request through Toni Navarro to the ownership -- I believe basically to Terry Navarro, although I am not sure I directed it to him, to identify -- or perhaps -- let me, let me think. This is on June 20th. It was perhaps directed to Adam Resnick at that point because the companies were identified at that point. Our investigation was -- or the activity was certainly Adam Resnick's activity on that account and I directed her to establish -- to get information on each of the companies that was having any activity run through the NEA account with -- with specific know your customer information on each one that would establish account ownership and all the rest on each of those accounts.

Q. So but that request was made through Toni Navarro?

A. Yes, it was.

Q. And you requested that she request that Adam Resnick supply some information?

A. For the Board's information, correct.

Q. And why did you do that?

A. Well, at the main meeting I was instructed by the Board to pursue the activity in this account and particularly the activity of the corporations that may be -- we were told were involved in -- in this relationship through the NEA account

being run by companies owned by or associated with Adam Resnick.

Q.    And you spoke before about the regulations that require the bank to identify who their customers are with certain information?

A.    Yes.

Q.    Social Security number, you mentioned, and the date of birth?

A.    Yes.

Q.    Is that what establishes the relationship that the bank has with the customer, though?

A.    I am not sure I understand.  Is that what establish -- is that what establishes the relationship?

Q.    I am saying -- well, let me ask more directly.  What does establish a relationship with your bank customer?

A.    Well, that establishes the ownership of the account. That is what the intention of those regulations are.

Q.    What does --

A.    The know your customer procedures.  I mean the identification procedures, rather, associated with account ownership.

Q.    Well, what is the relationship between a customer and a bank?

A.    Presumably having an account at the bank.

Q.    It is a debtor-creditor relationship, isn't it?

A.    That is correct.

Q.    Yes.

A.    It is a compilation of debit or credit.

Q.    It is a contractual relationship?

A.    Exactly so.

Q.    Is it those regulations that create that contract between that customer and the bank?

A.    No, that is contract itself.

Q.    Okay.  And pursuant to your -- the Bank's contract with its customer, if it is one of the signatories to an account and the bank is presented with a check with that signature on it, it is going to honor that check, is that correct?

A.    That's correct?  Thank you.

            THE COURT:  Any redirect?

            MR. PALLES:  No, your Honor.

            THE COURT:  Thank you.  If you came down this morning, I hope you at least got a good lunch.

            THE WITNESS:  McDonalds is a good lunch, yes.

            THE COURT:  We went to Pot Belly's.  That is better, so --

            MR. PALLES:  Thank you, Mr. McKinlay.

            THE WITNESS:  I hadn't been to McDonald's in two years prior to that, so that was a treat.

            THE COURT:  Thank you for your patience, but we just -- I needed to take a break.  So thanks.  Have a great

weekend.

THE WITNESS:  Is this yours?

THE COURT:  You can actually give it to me.  It is his.  But thanks a lot.

(Witness excused.)

THE COURT:  Come on up.  And I apologize for over the lunch delay, but I felt a duty to be able to follow the the testimony and I had to nourish my body.

LAWRENCE M. ELISCO, RESPONDENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT:  Okay.  Have a seat.  If you state your name and spell if for the record, then counsel can begin questioning you.

THE WITNESS:  Lawrence M. Elisco. L-A-W-R-E-N-C-E, M., E-L-I-S-C-O.

MR. PALLES:  Judge, you know, if you give me a minute, I will be able to zip right through.

THE COURT:  Oh, take your time.  Mr. Sklarsky probably worked through lunch so he can bill other clients.

(Discussion held off the record.)

MR. PALLES:  I am sorry.  Have you stated your name for the record?

THE COURT:  Yes, and he spelled it too.  It is a name that rings a bell.

BY MR. PALLES:

Q.   Mr. Elisco, will you please state your current employment.

A.   I work with Weltman and Burnfield LLC.

Q.   Okay.   Now, previous -- previously were you at some point associated with a firm of Navarro Elisco & Associates?

A.   Yes.

Q.   Okay.   And what period of time were you associated with Navarro Elisco & Associates?

A.   1999 to 2001.

Q.   Okay.   And what was your position with Navarro Elisco & Associates?

A.   I was a partner, shareholder.

Q.   Okay.   And how many partners were there?

A.   Two.

Q.   The other being Terrence Navarro?

A.   Yes.

Q.   Okay.   And then did you become associated with a firm Navarro Elisco O'Connell?

A.   Yes.

Q.   And when was that company formed?

A.   I don't recall specifically.

Q.   Okay.   And what was the nature of the corporate entity in which Navarro Elisco -- and I am going to call it NEA a lot from now, if that is all right -- did business?

A.   It was a CPA firm.

Q.    I am sorry, it was a CPA firm?

A.    CPA firm, yes.

Q.    I was actually going to ask, was it a partnership, limited partnership, corporation?

A.    It was a corporation.

Q.    Okay.   Now, but as you pointed out, it was a CPA firm?

A.    Correct.

Q.    And both you and Mr. Navarro were or are certified public accountants, correct?

A.    Yes.

Q.    Okay.   Let me show you Defendant's Exhibit No. 1.

          MR. STEWART:   Judge.

          THE COURT:   Yes?

          MR. STEWART:   I have an objection.   The document is incomplete.

          THE COURT:   Do you have the whatever would complete it with you?

          MR. STEWART:   It is attached to our motion in limine, but this -- this is the signature card from the NEA agreement.   It should be a two-page contract.

          THE COURT:   Okay.   Well, with that -- with the --

          MR. PALLES:   Right.

          THE COURT:   The witness is then alerted to that. Let's see what the question is.

          MR. PALLES:   Yeah.   Judge, I have no questions

about the second portion of it. As I understood -- is that actually the back side of it?

MR. STEWART: I don't know.

MR. PALLES: We don't even know. We don't even know. In any event, my questions have to do with the signature.

THE COURT: I am going to overrule the objection for now. As long as we have the other part, if we need it, we can refer to it.

MR. PALLES: Judge, and let me say I have no objection to supplementing it and attaching it to this.

THE COURT: Okay.

BY MR. PALLES:

Q. The question is: Is this a true and correct copy of the signature card for an account that you and Mr. Navarro opened at the Universal Federal Savings Bank?

A. That we opened when we opened the account?

Q. Yes.

A. I don't believe this was the original one that was opened.

Q. Okay. All right. And that is because when you originally opened the account, Mr. Resnick's name did not appear?

A. Yes.

Q. Is that your hesitation?

A.   Yes.

Q.   Okay, fine.  But it -- well, let me ask you this:  Does your signature appear on this document?

A.   Yes.

Q.   Above your name?

A.   I believe that is myself.

Q.   And does it accurately reflect your Social Security number?

THE COURT:   You don't have to -- and don't read it into the record, okay.  I am assume it is a social security number below your name.

THE WITNESS:   It looks like.

THE COURT:   Don't read it.

THE WITNESS:   Don't read it.

THE COURT:   Does it look like it is your number?

THE WITNESS:   It does.

THE COURT:   Now all these transcripts are going to be put out on the Internet and we don't want your -- enough trouble has occurred here without putting your Social Security number out on the Internet, right?

THE WITNESS:   Yes.

THE COURT:   I am sorry for the trouble.

THE WITNESS:   That is all right.

BY MR. PALLES:

Q.   And the -- and the card accurately reflects your date of

of birth, doesn't it?

A.     It does.

Q.     And it also reflects the ownership of the account as Navarro Elisco & Associate?

A.     It does.  I can add one -- it doesn't look like my handwriting is -- was -- my Social Security number and my date, but I don't know if that matters.

Q.     Okay.  All right.

THE COURT:  The signature looks like your handwriting?

THE WITNESS:  The signature looks like mine.

THE COURT:  But none of the other penmanship looks like yours anywhere on the card, right?

THE WITNESS:  Correct.

BY MR. PALLES:

Q.     Now, the date opened is March 22nd, 2001.  Do you have reason to doubt that that is the approximate date that you opened this account?

A.     I don't.

Q.     And the -- there is a tax ID number listed under the block that says Backup Withholding Certifications.  Is that the tax ID number of Navarro Elisco & Associates?

A.     I don't recall.

Q.     Okay.  The business phone number, eight -- I won't say it.  But the business phone number, is that accurate -- does

that accurately reflect the phone number of Navarro Elisco
Associates back in 2002?

A.   Yes.

Q.   Okay.   Now, you say that NEA was a corporation, is that
right?

A.   Yes.

Q.   Okay.   Was Adam Resnick ever an officer of the
corporation?

A.   Not that I know of.

Q.   Was Adam Resnick ever a director of the corporation?

A.   Not that I know of.

Q.   Was Adam Resnick ever an employee of the corporation?

A.   Not that I know of.

Q.   Was Adam Resnick ever a shareholder of the corporation?

A.   Not that I know of, no.

Q.   Was Adam Resnick a client of NEA?

A.   I don't believe he was.

Q.   Was Adam Resnick a client of NEO?

A.   I don't recall if he was ever directly a client, but I
---

Q.   All right.

A.   I don't recall if he was ever specifically a client.

Q.   I am going to show you what is -- what I have marked as
Defendant's Exhibit No. 7 for identification.   Now,
Mr. Elisco, I previously made this available to your

Ll Fisco - direct

attorney. Have you had -- have you ever had a chance to see this before?

A.    Yes.

Q.    Okay. Now, I direct your attention to the bottom of the first page of the exhibit --

Your Honor, did I give you a courtesy copy?

THE COURT: No, you didn't.

MR. PALLES: Sorry. I apologize.

THE COURT: That is all right. Thanks.

BY MR. PALLES:

Q.    Now, at the bottom of that page is a Check No. 132 in the amount of $95,000.00 made out to a Dan O'Connell. Does your signature appear on that check?

A.    Yes.

Q.    Okay. Now, is it true that you wrote that check for your personal or business benefit?

A.    For my personal or business benefit?

Q.    Yes.

A.    No.

Q.    On whose behalf did you write that check?

A.    I wrote that check on behalf of Adam Resnick.

Q.    And how were you able to ascertain that there were sufficient funds in the account to write the check?

A.    I didn't.

Q.    Now --

A.   Or I should say I don't recall ascertaining it.

Q.   Now, the second page contains Check No. 168, check in the amount of $5,000.00 payable to you.  And it appears to be signed by you, is that your signature?

A.   Yes.

Q.   Was this check made to you for your personal or business benefit?

A.   I don't recall the nature of this check.

Q.   Okay.  And did you make any attempt to ascertain the -- whether or not there was adequate funds in the account to make that payment?

A.   I don't recall that I did.

Q.   Okay.  The next page is Check No. 186 payable to the Internal Revenue Service in the amount of $5,000.00.  It says here, "Lawrence" -- and I cannot read your wife's name.

A.   Deborah.

Q.   -- "Deborah Elisco fourth quarter estimated payment," signed by Lawrence Elisco.  That is a -- this is your signature again?

A.   Yes.

Q.   Okay.  Now, this was -- payment was made to pay your fourth quarter taxes, correct?

A.   Correct.

Q.   And what, if anything, did you do to determine whether or not there were adequate funds in the account?

A.   I would have -- well, I can't project.  I don't recall at that time.

Q.   Now, on the next page, it is numbered page 16, on the top left corner is Check No. 211.  That is a check made out to you in the amount of $225,000.00, correct?

A.   Yes.

Q.   Your signature?

A.   Yes.

Q.   What did you do to ascertain whether or not funds were adequate to make that payment?

A.   I would have been directed to write this check by Adam Resnick.

Q.   I see.  And is this supposedly in repayment of a loan?

A.   Correct.

Q.   How much was the loan?

A.   I don't recall the specific amount.

Q.   Was it somewhat less than $225,000.00?

A.   Yes.

Q.   Okay.  And how long was the loan outstanding?

A.   I -- I don't recall specifically.

Q.   Okay.  Would it have been a period of weeks or months?

A.   It would have been months.

Q.   Okay.

        THE COURT:  Who was the loan to?

        THE WITNESS:  It would have been made to Adam

Resnick.

BY MR. PALLES:

Q.    Now -- and in what form would that loan have been made?

A.    I would have written him a check personally for it.

Q.    I see.  Do you know what he did with that check?

A.    Do I specifically know what he did with the money?

Q.    Yeah.

A.    No, I do not know.

Q.    Do you know whether it was put into this account?

A.    I do not know.

Q.    Okay.  And then finally there are two other checks that follow on two pages to Marble Granite Supply for $30,000.00 and $13,000.00.  Are those your signatures contained on those checks?

A.    Those are not my -- that is not my signature.  I authorized my assistant to sign my name to that, though.

Q.    Okay.  And, by the way, these checks during the first half of 2002 were maintained in your offices, in 952 Skokie Boulevard, correct?

A.    I believe so.

Q.    And at all times you had access to this checkbook, correct?

A.    I believe so, yes.

Q.    And Adam Resnick, during this period of time, we learned was permitted to make deposits and write checks with this

account, correct?

A.    I believe so, yes.

Q.    Okay.   And the reason that he was allowed to do this is because you and Mr. Navarro wanted to obtain his accounting business, correct?

A.    We wanted -- he was a business associate of ours and we wanted to help him and gain favor with him.

Q.    All right.   Now, at that time you knew he was a heavy gambler, correct?

A.    No, I did not.

Q.    Okay.   Well, certainly by January of 2002 you knew he was a heavy gambling?

A.    I knew he had a propensity for it and --

Q.    Well, you traveled to Las Vegas with him --

A.    Right.

Q.    -- on January 11th, 2002?

A.    Correct.

Q.    And you witnessed in one weekend he lost something between three and $400,000.00 that weekend, correct?

A.    I am not sure that -- of the amount, but I remember him losing a lot of money.

Q.    All right.

        THE COURT:   Were you stunned by the amount that he bet?

        THE WITNESS:   Yes.

THE COURT:  I mean those amounts stun me.

THE WITNESS:  Yes, I was stunned.

BY MR. PALLES:

Q.  Okay.  Now, you knew, did you not, that he was, in December of 2001, unable to obtain -- to develop a banking relationship in the Chicago area, correct?

A.  I didn't.  I wasn't aware of that.

Q.  Did he not represent that to you at lunch, that he was unable to obtain a banking relationship.

A.  You know, I really don't recall.

Q.  Okay.  Let me --

THE COURT:  Why did you think he wanted to be on your account?  I mean it is extremely odd.

THE WITNESS:  Right.

THE COURT:  In fact, I can't recall in my decades of life seeing a similar situation.  And I assume as an accountant you would even be more meticulous than I.

THE WITNESS:  He asked us -- he said he had an issue with a noncompete with one of his businesses.  And he had had some money that was coming in and he wanted to put the money into an account that wasn't his.

THE COURT:  So -- but why give him signatory?  He could deposit -- anybody could deposit into your account, right?  So why did you guys let him take money out?

THE WITNESS:  We hadn't really thought about it, to

be honest with you. It was -- in retrospect it was --

THE COURT: Well.

MR. PALLES: I am sorry, I would like to hear this answer.

THE WITNESS: No, I had -- I don't -- I mean it was something where we wanted -- we wanted to help him and -- and maintain our relationship with him and --

THE COURT: So that is what he asked for and it was within your power, so you did it?

THE WITNESS: Yes.

THE COURT: And, obviously, at that time you didn't think it was going to hurt you in any way; you thought it would probably help, if anything.

THE WITNESS: That's correct.

BY MR. PALLES:

Q. All right. Well, let me ask you this: In Adam's book Bust at 192 he states, "As it happened, after leaving the Bank I had lunch plans with Terry Navarro and his partner Larry Elisco. We met at Once Upon A Bagel. Navarro and I had developed a relationship since I had run off the golf course in the morning Ariel was born. My comfort level with them is such that as soon as I sat down I lamented what had happened at the bank. There is no way I can open an account anywhere in the City, I said.

Now, does that refresh your recollection?

A.    Not at all.

Q.    Okay, fine.  Let me ask you this:  He said -- according to this, Adam continues.  "What is the problem," Larry asked?  He goes on to describe his mental processes, which I will skip.  And then he says, "I have so many issues, I don't know what to do, I said.  An old bankruptcy.  I can't get a checking account anyplace.  This crap is endless."

      Do you recall -- does that reresh your recollection?

A.    I honestly don't.

Q.    Okay.  Now, I will represent to you that at his sentencing hearing Terry Navarro stated in this courtroom that he acquiesced in allowing Adam to get on the bank account because it was something that you wanted to do, is that true?

A.    I agreed to it.

Q.    Okay.  Were you the initiating force, the moving force behind putting him on that bank account?

A.    I honestly -- I don't recall.

Q.    Okay.

A.    I -- I agreed to it.

Q.    Now, at some point he had invested -- or he testified this morning that he testified in a company, a -- or purchased a -- strike that.  Let me start over.

      I believe he testified this morning -- and I hope

maybe Mr. Stewart or the Judge could correct me if I am wrong -- that he purchased an asset from a defunct client of yours named Sinecast, do you recall that?

A.   I do.   I don't recall them being defunct, yes.

Q.   Do you recall obtaining -- is Sinecast defunct right now?

A.   I don't know.

Q.   How do you spell Sinecast?

A.   S-I-N-E-C-A-S-T.

Q.   Okay.   Do you recall making any money for yourself or for your firm on that transaction?

A.   I don't recall.

Q.   Now, during the first half of 2002 you received statements from the Universal Federal Savings Bank on a monthly basis, correct?

A.   I believe so.

Q.   Okay.   Let me show you what has been marked as Defendant's Exhibit No. 2.   I see at least one page.   It is upside down.   But let me ask you whether or not this appears to be the types of statements that you received from Universal Bank during this period.

A.   I don't recall seeing statements from the bank.   I didn't review statements from the bank.

Q.   Who did?

A.   Mr. Navarro, I believe.   I wasn't involved in the

administration of our firm --

Q.    Okay.

A.    -- really in any significant sense.

Q.    Okay.

        THE COURT:  So if you had seen that, for example, in January you had deposited $11,700,000.00, that would have grabbed your attention?

        THE WITNESS:  I would have found it to be very unusual, yes.

        THE COURT:  Did you ever have that much come in in a month?

        THE WITNESS:  No, we didn't.

        THE COURT:  So "very unusual" really understates it.

        THE WITNESS:  Yes.  It would have certainly grabbed my attention, yes.

        THE COURT:  And there is no way as an accountant you could look at that without following up.  I mean you just couldn't -- you go to bed at night --

        THE WITNESS:  Right.

        THE COURT:   -- saying this is my bank account.

        THE WITNESS:  I knew Mr. Resnick was using the account.  And I also knew him to be -- he had a Medicare receivables business and he had a number of things going on that could have been a lot -- resulted in a high volume of --

THE COURT: So in the light of his representations to you for his alleged business, this doesn't seem shocking? I mean if he would have explained it to you that way, then there is a chance you would have accepted that explanation?

THE WITNESS: Yes, yes.

BY MR. PALLES:

Q. And during this period of time you were Mr. Resnick's accountant, correct?

A. I represented Mr. Resnick on -- in two different businesses. I was not -- he would refer to me as his accountant when he would introduce me to people, but I never did a tax return for him and I wasn't familiar with his personal financial affairs other than the two businesses that I was involved with.

MR. STEWART: Excuse me, Judge. The witness --

THE COURT: I appreciate you telling me, but Mr. Stewart needs --

THE WITNESS: Okay.

THE COURT: So he called you his accountant, but you never did tax returns for him and you just handled these two businesses, right?

THE WITNESS: Correct, correct.

BY MR. PALLES:

Q. So -- so I understand this, you are a certified public accountant, correct?

A.    Yes.

Q.    Okay.   And you allowed a -- an individual to use your account, is that correct?

A.    Yes.

Q.    And statements come into the account and -- correct?

A.    Yes.

Q.    And you are the accountant for this individual, correct?

A.    I am -- I was -- you wouldn't say I was his accountant in the sense that I was familiar with his financial affairs or prepared his tax returns.

Q.    Okay.   Did you have any money in this account?

A.    In -- in this specific account?

Q.    Yeah.

A.    I did not.

Q.    Did -- when I say "you," did NEA have any money in that account?

A.    Well, when it first started, the account had -- was opened in order to generate a -- in order to hold the proceeds of the sale of a condo that Terry Navarro and I had purchased.   So there was money in the account from that, but my understanding was the account was dormant.

Q.    Dormant but money --

A.    There was money in it at one point, but the money was taken out.

Q.    Okay.   Well, in fact, as of -- if we look at that

exhibit that we were just looking at, Exhibit No. 2, it indicates that as of 12/7/2001, which I think other evidence would show is prior to Mr. Resnick's involvement in the account, there is a balance of $4,314.25. Is that -- you see that there, right?

A. I do.

Q. Is it -- do you think that $4,314.25 was, in fact, Navarro Elisco funds?

A. I honestly don't recall.

Q. Do you belong to any professional organizations?

A. AICPA.

Q. AICPA?

A. Yes.

Q. Are you familiar with the International Federation of Accountants?

A. No -- well, I think I have heard of it, but I don't belong to it.

Q. Okay. Well, I -- I am a little curious. What would -- in the course of your business what -- what would occasion an accounting firm to run client funds through one of its own accounts?

A. I have heard of certain organizations having custodial relationships. I know law firms do it.

Q. But that is not -- I am sorry?

A. I know law firms have custodial relationships.

Q.   Of course, yeah.  And I understand law firms do.  But I have never heard of an accounting firm, have you?

A.   I haven't, sir.

Q.   So it is a little hard to get some guidance on this, but let me read you something from the International Federation of Accounting Ethics Committee.  It says that, "The holding of client assets creates threats to compliance with the fundamental principles.  For example, there is a self-interest threat to professional behavior and may be a self-interest threat to objectivity arising from holding client assets."

Would you agree with that?

A.   I -- yes, it would -- it would seem reasonable.  I don't have a --

Q.   Okay.

A.   I am not familiar with what you have read.

THE COURT:   The -- you know, it is -- obviously, having spent the time I have spent on it, I am curious as well.  However, I am not -- if there is funds that were transferred out of the account that belonged to somebody other than Mr. Resnick such as this $4300.00, that -- that might have a bearing on whether or not the funds that were there should be used to pay restitution owed to the FDIC.  But I don't know that you need to persuade the witness.

But, obviously, I am persuaded, sadly, on an

enhanced basis after Mr. Navarro's sentencing of the unethical improper behavior that he exercised in the use of this account. You know, and I have said before and I will say it again now, I don't think I began to fully appreciate it, unfortunately, until after his sentencing was over. But a lot of the problems that existed here could have been avoided had this not been done. And I -- I don't think there is a justification for it.

And the witness here has given us a reason, but I don't think even the witness would say that that justified this unethical behavior. So -- but he is -- but it is not his -- you know, that is not the issue in court today.

MR. PALLES: Okay. Your Honor, let me make a confession. I am extremely paper challenged. I don't handle paper very well. Consequently, I seem to have misplaced my Defendant's Exhibit No. 10 which was introduced through Mr. McKinlay.

THE COURT: Wait. I have it. Maybe you gave it to me, or he did.

MR. PALLES: I gave you a courtesy copy. I am wondering if we could show it to the witness.

THE CLERK: He gave it to you, McKinlay did.

MR. PALLES: He had it. It is a two-page fax.

THE COURT: Is it this one?

MR. PALLES: Yes.

THE COURT:   There you go.

MR. PALLES:   Thank you.

BY MR. PALLES:

Q.    Let me show you Defendant's Exhibit No. 10, Mr. Elisco. Let me ask you, you prepared that document?

A.    I typed it.

Q.    Okay.  And you also transmitted it to Mr. McKinlay, is that right?

A.    I don't recall specifically transmitting it.

Q.    If we look at the first page, it appears to have been sent.  Is the information there concerning your contact information accurate?

A.    Yes, I believe so.

Q.    Now, let me ask you, first of all, it appears, according to Mr. Navarro's plea agreement, that around the same time of this fax he and his sister and Mr. Resnick were fabricating the back sides of certain checks from the NEA account.  Were you aware of that activity?

A.    No.

Q.    Did -- at any time within the week prior to this fax did you have discussions with Mr. Navarro related to his concerns about Adam Resnick and the NEA account?

A.    I don't believe so.

Q.    All right.  Now, at that point you represented to Mr. McKinlay the nature of Mr. Resnick's businesses to -- for

-- in order that Mr. McKinlay, the Chairman of the Bank, would understand the nature of activity going on in the NEA account, correct?

A.    I was directed to do this by Mr. Resnick.

Q.    I see.  So is Mr. Resnick the source of this information?

A.    Yes.

Q.    Okay.

A.    For the -- for the most part.  Some -- some of the information, such as Sinecast, the Marble Granite Supply, where I was the accountant I was familiar with -- with the accounting records, but --

Q.    Okay.

A.    Mr. Resnick was the source for all of this.

Q.    Okay.  So just so I understand this, you, a certified public accountant, represented to the Chairman of the Universal Bank that Mr. Resnick was involved in these legitimate business activities without any independent assessment, any investigation of your own, is that correct?

A.    That's correct, and based on his representation basically dictating this.

Q.    Okay.  So if, as we now know, Mr. Resnick was lying, you were simply accepting that lie and transmitting it as if you, a certified public accountant, had that knowledge to the bank -- the Chairman of the Universal Bank, is that right?

A.   Well, I didn't think he was lying.  I believed he was telling the truth.

Q.   But you knew for four or five months prior to that time that he was a heavy, heavy gambler?

A.   I knew from one instance, but I did not know that he was gambling.

Q.   Okay.  Last question, Mr. Elisco.  In Mr. Navarro's plea agreement he stipulated with the Government that he -- and I am quoting now, "and others at NEA allowed Resnick access to the NEA account."  Now, my question to you is, are you aware of any others at NEA other than yourself who allowed Resnick access to that account?

THE COURT:   No.

MR. PALLES:   Thank you.   No further questions.

THE COURT:   Cross, if any.

MR. STEWART:   A few questions, Judge.

CROSS EXAMINATION

BY MR. STEWART:

Q.   Good afternoon, Mr. Elisco.

A.   Good afternoon.

Q.   My name is Joe Stewart.  I am with the U.S. Attorney's Office.  We had a chance to speak a little while ago?

A.   Yes.

Q.   I am sorry that you have to be here appearing.  I understand that you are a victim in this case, that you are

one of the main victims. And as a result of the judgment in this case, how much is Mr. Resnick supposed to be paying you?

A. I believe it is in the area of $60,000.00.

Q. Do you know the specific number that was entered into the judgment?

A. From our discussion you said it was 35,000, but I believe it is around -- I think in the 60,000, but I don't have a specific number.

Q. You trusted Adam Resnick, isn't that correct?

A. Absolutely.

Q. And he obtained quite a bit of money from you?

A. Very much, yes.

Q. You were answering some questions before about access to this NEA account at Universal. And you were shown some checks that you signed on that account?

A. Correct.

Q. You signed those checks. And you signed those checks because Adam Resnick told you to sign those checks?

A. That's correct.

Q. You didn't feel like you owned the money in that account?

A. That's correct.

Q. Whatever money was in that account you believed was owned by Adam Resnick?

A. Yes.

Q. And when you sent this fax to Mr. McKinlay, you had no idea that Universal Bank was about to implode with debt, do you?

A. That is -- I had no idea.

Q. Had you known --

THE COURT: Did you have any idea that that implosion would be partly due to the account that you authorized Mr. Resnick to set up?

THE WITNESS: No, your Honor, but I -- your Honor, I didn't know that there was going to be -- it was imploding.

THE COURT: I accept that. I assume that you didn't intend to lose $60,000.00 in all of this. But just -- you know, you -- you agreed to let him do something that you knew was dishonest. And you thought he was being honest with you, but you knew that no honest, legitimate purpose could be served by CPAs putting a third person on their account and using their account for the cover on anything.

Your profession exists to assure financial integrity, not to trick people. You knew that then and I am sure you know it now, I am sorry to have to say. I am -- it is just really troubling. And, obviously, I am very troubled at Mr. Navarro as well. But from what I have learned today, he may be more culpable than you, but you knew what you were doing was dishonest when you put him on that account.

THE WITNESS: Your Honor --

THE COURT: If I were you, I wouldn't even say anything because if you are telling something that is not the truth, it would be perjury. And I am just expressing my opinion. You have got your lawyer here. If he wants to advise you to offer some statement to add to the record later on, fine. But I am not insisting upon it. I just can't sit here and observe these things, since we have not been part of the same proceeding together, without me expressing my feelings as a citizen as to how they look to me.

All right.

MR. STEWART: All right. Judge, I have no further questions.

THE COURT: Okay. Any redirect?

MR. PALLES: Yeah.

RECROSS EXAMINATION

BY MR. PALLES:

Q. Did you view that check you wrote to the IRS on behalf of your -- for your quarterly payments for your wife and yourself, did you view that as Mr. Resnick's funds as well?

A. Yes, that was part of the interest that was to be paid to me on the loan. Absolutely.

MR. PALLES: Okay. No further questions.

THE COURT: Okay. Any re -- recross?

MR. STEWART: No, thank you.

THE COURT: Thanks. Thanks for your patience

today.

THE WITNESS:  Yes.

THE COURT:  Okay.  You have another witness today?

MR. PALLES:  Last one.

THE WITNESS:  Do I just leave this up here?

THE COURT:  Sure.

(Witness excused.)

MR. PALLES:  Your Honor, this woman is Maureen Navarro.

THE COURT:  As this case goes on I am going to get to meet everybody.

MR. PALLES:  Thanks to me, I might add.

THE COURT:  Come on up.

MAUREEN NAVARRO, RESPONDENT'S WITNESS, SWORN

DIRECT EXAMINATION

THE COURT:  Okay.  Have a seat.

BY MR. PALLES:

Q.  Miss Navarro, is it true that in the first half of the year 2002 you were the president of the Universal Federal Savings Bank?

A.  Yes.

Q.  You were also a director of that bank?

A.  Yes.

Q.  Also the chief security officer?

A.  Yes.

Q.   And also the chief compliance officer, correct?

A.   Yes.

THE COURT:   What does the chief security officer mean?  What is that job?

THE WITNESS:   Basically just a title.  I, you know, have to enforce certain security rules.

THE COURT:   But does that mean the physical security or some other kind of security?

THE WITNESS:   Of the building, yes.

THE COURT:   Okay.  Well, I don't know.

BY MR. PALLES:

Q.   Does it also include security of accounts?

A.   Yes.

Q.   Okay.  So while you may protect it from fire, rob -- armed robbery, et cetera, your mandate would also require that you protect it from forgery, embezzlement and the like, correct?

A.   Right.

Q.   Okay.  And your duties and responsibility included oversight of all the banking operation, correct?

A.   Yes.

Q.   Okay.  And in addition to that you helped to prepare and oversee quarterly accounting audits provided to the Office of Thrift Supervision, correct?

A.   Yes.

Q. Now, in 2002 is it true that Universal had approximately -- well, I believe 535 checking accounts, is that right?

A. I -- I don't know.

Q. But between five and 600?

A. If you say so, it has to be. It has been awhile.

Q. Okay. And the activity of those checking accounts was approximately $2 million a year?

A. Could be. I --

Q. Okay.

A. Like I say, I have no records to --

Q. You know, I -- I have a document. I honestly don't even know what it is. I see I marked it as 10, so I have got to change that.

THE COURT: When you were president of the bank, do you know approximately what the bank's assets and liabilities were?

THE WITNESS: Maybe 40 million.

THE COURT: About 40 million or so. So that means that, presumably, most of the -- that means you had about 40 million in monies on deposit in various accounts at a -- at any given time, roughly, right?

THE WITNESS: Probably, yes.

THE COURT: Okay.

MR. PALLES: Judge, I have now marked this -- I didn't realize I had gone past 10. I had originally marked

it as 10, but I am marking it now as Defendant's Exhibit No. 12.

BY MR. PALLES:

Q.   And, I am sorry, did I -- I am sorry.  I gave you a copy --

A.   Yes.

Q.   -- ma'am.  Let me give you the original, so --

A.   All right.

Q.   -- we will keep the originals in one place.  And let me ask you, if you look through this, can you tell me what this is or how it came to be?

A.   It looks like something from an audit.

Q.   I see.  Other than that, you can't identify it?

A.   No.

Q.   Okay.  Referring you to the last page, the third page, really the second column has checking accounts of -- as of December 31st, 2001 of 535 and deposits in those accounts of 1.872309.  That is where I am getting my numbers.

A.   Okay.

Q.   Let me ask you -- again we don't know what this document is.  Independently does this refresh your recollection that the -- that the -- you know, that the scope of the deposits in the checking accounts were somewhere in the area of about, you know, between 1.8 and 2 million?

A.   Yes.  This could be something issued by one of our

regulators, I would assume.

Q.    I see.  Okay.  Now -- and, of course, this is except for the NEA account as it -- and this would be true of -- the same level would pertain in the year 2002 generally, is that correct?

A.    Yes.

Q.    Except for the NEA account, correct?

      I am sorry, let's define our terms.  When I say the "NEA account," I am referring to an account that was in the name of Navarro Elisco & Associates.

A.    Oh, okay.

Q.    Okay.

A.    Yes.

Q.    And you know who the Navarro is in Navarro Elisco?

A.    Right.

Q.    That is your son?

A.    Right.

Q.    So NEA -- so other than the NEA account, would you say that the level of bank activity was pretty much the same in the first half of two -- of 2002?

A.    Yes.

Q.    Okay.  Except for the approximately $200 million that went through your son's account, correct?

A.    Okay.  I don't know how much went through his account.

Q.    Okay.  All right.  Now -- you were aware that your son

had an account in the bank, right?

A.   Yes.

Q.   And you were aware that he was a CPA?

A.   Yes.

Q.   And that he had an accounting firm with Lawrence Elisco?

A.   Yes.

Q.   Okay.   And you were aware that together those two individuals opened up the account at your bank?

A.   Right.

Q.   Okay.   Are you aware that that took place in approximately March of 2001?

A.   I don't know the date.

Q.   Okay, okay.   Now, we spoke briefly with Mr. McKinlay, so I am not going to belabor the point, but you would agree that the bank is required to set up a customer identification program, correct?

A.   Right.

Q.   And Mr. McKinlay stated, and you would agree, would you not, that it is necessary to obtain the name, date of birth, address and identification number of each owner of the account?

A.   Right.   And --

Q.   Okay.

A.   -- after 911 it became more specific to be done.

Q.   Okay, fine.   But, of course, now -- so but -- again we

are talking -- you know, I -- well, I will show you Exhibit No. 1 which has already been marked into evidence. Do you recognize that as a signature card, right, for the NEA account?

A. Yes, I do.

Q. Okay. And you will notice, of course, that Adam Resnick's identifying information is not contained on that signature card, correct?

A. Right.

Q. Okay. And but -- but you are required that all customers of your bank provide that identifying information, is that right?

A. Right.

Q. Okay. But Adam Resnick wasn't really a customer of your bank, was he?

A. That I don't know. I think he might have been added to this account later.

Q. Do you have an opinion as to whether or not Adam Resnick was a customer of your bank?

A. Thought so.

Q. Okay. And then -- and then in that case the -- the customer identification program was violated in this circumstance?

A. Yes.

Q. You have to answer verbally for --

A.    Yes.

Q.    Okay.  And is it your understand -- never mind.

Let me show you what I have marked as Exhibit No. -- Defendant's Exhibit No. 8.  And you notice it is a group exhibit with various cashier's check, am I -- cashier's checks, am I correct?

A.    Well, our equivalent, a savings bank's equivalent of a cashier's check, it is called an official check.  We can't call them cashier's checks because we weren't a commercial bank.

Q.    Okay.  But whether it is cashier's check or an official check, the fact of the matter is that it is -- it is a check that is issued by a bank on its own account and guaranteed by the bank, correct --

A.    Correct.

Q.    Now, with respect to the NEA account -- by the way, I don't know if I just asked it, but let me -- I think I did, but let me make sure.  This is your signature on these checks?

A.    Yes, this is a facsimile signature that goes with a check writing machine that inserts the date and protected amount and my signature automatically.

Q.    I see.  You will note the first several of these checks appear to be requested by Terrence Navarro, your son, correct?

A.    That is what it says on here.

Q.    Do you know that independently?

A.    No.

Q.    Okay.

A.    No.

Q.    How -- how would Terrence Navarro's name have come to appear on this check then?

A.    What I am saying is I did not prepare these checks personally.

Q.    I see.  Do you know who did?

A.    No.

Q.    Okay.  Similarly with -- with respect to, say, as we go several pages in and it says -- here is an official check for $100,000.00 made to Dominick Poeta on 3/30/02.  Do you see that check?

A.    Yes.

Q.    Okay.  And this also says, "Requested by A. Resnick." You wouldn't have any independent knowledge of that either, would you?

A.    No.

Q.    Nor, going to the next page, do you have independent knowledge that Adam Resnick requested that April 24th check for $100,000.00, is that right?

A.    No.

Q.    You don't have any information that he requested the one

that is on the next page for 144,000?

A.    No.

Q.    Is that correct?

A.    No, I did not prepare this.

Q.    Okay.   Well, I asked you -- and I want the record to be clear because I asked at the end is it correct.   So the -- your answer is that you do not know whether or not Adam Resnick, in fact, requested this check, correct?

A.    No, I mean --

Q.    I keep on messing it up.

A.    I am sorry.   His name is on here, but --

Q.    I can't help myself.

A.    -- that doesn't mean I know for certain.

Q.    You have no knowledge?

A.    Correct, correct.

Q.    Concerning Adam Resnick?

A.    Right, right.

Q.    And the same thing would be true of the last one which has Government Exhibit No. 5 on it, you don't know whether or not Adam Resnick, in fact, requested the check for $15,000.00 to Dominick Poeta?

A.    No, I don't.

Q.    Okay.   Thank you.

        THE COURT:   See, now -- you know, obviously, in my position I get to hear this a lot.   And for the -- for the --

I think there is at least one or two or three nonlawyers here. Lawyers, somehow their training is to, whenever possible, state something in the negative like "you don't know." And then it is usually coupled with another negative along the way. And when it is followed by a "correct," which is a positive, it makes the answer literally nonsensible. I mean a lot of times we understand because we could feel it in the context. But my only thought is if you say things in a positive fashion like, do you know if Adam Resnick actually authorized this check to be issued, then the witness isn't confused and the record is unambiguous.

But if you deal with lawyers enough, you are never going to get that, you are always going to get the negative, double, triple negative, which can be confusing. And I am only wasting your time on the chance there is some really young lawyers here and they might have a couple decades of simpler life as a result.

MR. PALLES: You mean you can't teach an old dog new tricks?

THE COURT: It is hard. I can't teach myself new tricks.

MR. PALLES: All right.

BY MR. PALLES:

Q. Now, you were also aware, were you not, that your bank had a correspondent relationship with American National Bank,

correct?

A.    Right.

Q.    Okay.    And there is a -- there was a correspondent account or to-from account, what -- what would be the way to describe that account at American National?

A.    Basically it was our checking account with them.

Q.    Okay.

A.    Much like a saver's checking account with us.

Q.    Okay.    Now, you -- you were aware, were you not, that direct deposits were being made at American National Bank and credited to the NEA account, correct?

A.    Yes.

Q.    Okay.    And you also became aware that Adam Resnick was making those deposits, correct?

A.    That is what I was told.

Q.    How did you find out, by the way?

A.    I was told by my daughter.

Q.    Okay.    And you would agree that no other customers of your bank had that privilege, correct?

A.    Right.

Q.    Now, but this was a privilege that was extended to Adam Resnick because of his relationship with your son, is that correct?

A.    Well, that and the fact that I was told that he had an account at the bank wherever he was making these deposits.

He also had a bank -- a banking relationship.

Q. At Bank One?

A. Yes. Now, whether that was true or not, I don't know.

Q. These checks that were being -- or the deposits that were being made, did Universal maintain computerized copies of deposits, the checks, et cetera, as they were written?

A. No, I don't think so.

Q. Okay. When Adam Resnick wrote a check, any check from the NEA account, what record -- when it came -- when it cleared your bank, what record, if any, was kept of that check?

A. We would have it on statements. We have copies of statements that he would have gotten.

Q. But I guess what I am asking is -- I mean we are flooded with all sorts of checking ledgers in this case. I am just trying to find one for demonstrative purposes. But as I am already -- as I have already confessed, I am paper challenged.

Well, I am going to give you what I am going to mark as Defendant's Exhibit No. 9 and essentially ask you, how do we come to have these images of these checks today?

A. I don't understand what -- the question.

Q. Well, these records -- these are, obviously, not the checks themselves, they are photocopied versions of the checks?

A.   Correct.

Q.   Right?

A.   Correct.

Q.   Now, were these something that -- did Universal Savings Bank -- by the way, I note that there seems to be Bates numbers on the bottom of these which indicate UN, and I have assumed that that is Universal.  But my question is, did Universal Savings Bank make photocopies of checks that came through the bank before sending out statements to the clients?

A.   Well, we didn't send the statements out.  It was done by our data service and the checks went to the data service and were imaged and the statement sent to the customers.

Q.   Okay.

A.   Not by us but by them.

Q.   By a contractor?

A.   Yes.

Q.   Okay.  Let me ask you this:  During that period of time that the bank is operating, were you able to obtain access of photographic images of any check that you wanted to see by going to a computer and somehow or another communicating with your contractor?

A.   Right.

Q.   That information was available to you?

A.   Yes.

Q.   Okay.   Now, in March of -- do you know a Robert Regnerus at --

A.   Yes, he was our correspondent banker.

Q.   Okay.

THE COURT:   And who was it --

BY MR. PALLES:

Q.   In March of 2002 --

THE COURT:   Just a second.

THE WITNESS:   Robert Regnerus.

THE COURT:   And he was at American National?

THE WITNESS:   Well, I think it was -- it might have been Bank One at that time.

THE COURT:   Okay.

BY MR. PALLES:

Q.   In March of 2002 isn't it true that Mr. Regnerus told you you should stop NEA or anyone on its behalf for making direct deposits from American National?

A.   Yes, he did.

Q.   Okay.   At that time you told Mr. Regnerus that you are aware of the deposits being made?

A.   Yes, because of the amounts.

Q.   Okay.   And you told Mr. Regnerus that you had authorized those deposits?

A.   I -- maybe.   I don't remember.

Q.   Now, in discussions with Mr. Regnerus you referred to

this account as your son's account, is that correct?

A.    Yes.

Q.    You are familiar with the term SAR?

A.    Yes.

Q.    Suspicious Activity Report?

A.    Yes.

Q.    And as security officer at Universal do you know what triggers a Suspicious Activity Report?

A.    It has been awhile.

Q.    Okay.

A.    I don't -- I don't want to say for sure because I might be wrong.

Q.    Okay.    Would $200 million of activity in a -- from one account in a bank that otherwise has $2 million in checking deposits be suspicious in your opinion?

A.    Probably, yes.

Q.    Okay.    And what about -- are you aware that during the first six months of 2002 you caused to be transferred to -- in excess of $6 million to casinos around the country?

A.    I did not know that.

Q.    During the period of time your daughter Toni appeared one day with a BMW automobile, correct?

A.    Yes.

Q.    Okay.    Can you tell me what Toni's salary was at the bank in 2002, approximately?

A.    Maybe 30,000.  I am not sure.

          MR. PALLES:  No further questions.

          THE COURT:  Any cross.

          MR. STEWART:  Just briefly, Judge.

                    CROSS EXAMINATION

BY MR. STEWART:

Q.    Miss Navarro, my name is Joseph Stewart.  I am with the U.S. Attorney's Office for the plaintiff in this case.

A.    What?

Q.    For the plaintiff in this case.

A.    Okay.

Q.    And I will ask you a few questions.  Mr. Palles showed you something he identified as an Exhibit 1 which looked like this?

A.    Yes.

Q.    Yeah.  Are you familiar with that document, that kind of document?

A.    Yes, it is a signature card.

Q.    Okay.

A.    Well, it is not a card, it is a paper, but it is --

Q.    Okay.

A.    -- created on the computer.

Q.    What you are looking at, is that the full document?  Is there a second page to that typically?

A.    It might be on the back, but it is one page.

Q.    Okay.    And you know that the -- is -- what is the significance of the signature card for banking purposes?

A.    Well, it is a contract between us and the customer.

Q.    Okay.

A.    Mr. Palles also showed you some cashier's checks, and you corrected him and said they are really official checks --

A.    Correct.

Q.    -- because of the kind of institution Universal was.

A.    Correct.

Q.    And I noted in there, and I think he went over this with you this as well, that the pay-to line on all those checks identified the name of an individual, is that correct?

A.    Yes.

Q.    What if I wanted to come in and say make it out to cash?

A.    Can't do it.

Q.    But I just want the cash.

A.    No.

Q.    I can't do that?

A.    No.

Q.    Why not?

A.    Because it has to be -- we don't know who it is going to go to then.

Q.    Okay.    Okay.    Finally, Mr. Palles asked you if you knew of several million dollars going to casinos throughout the country.    Did you know that?

A.   No.

Q.   You didn't know that.

Did you know some of Universal Bank's money, $650,000.00, went to that man sitting right there, Dominick Poeta, who is a bookie?

A.   I --

Q.   Did you know that?

A.   Well, I see the checks, but I don't know what he does.

MR. STEWART:   All right.   Thank you.

THE COURT:   What a lawyer says isn't evidence.

MR. PALLES:   Sorry?

THE COURT:   What is the -- any redirect?

MR. PALLES:   No, your Honor.

THE COURT:   Thank you for coming in.

THE WITNESS:   Okay.

(Witness excused.)

THE COURT:   All right.   Any other witnesses?

MR. PALLES:   No, your Honor.

THE COURT:   Okay.   So how would you like to -- to wrap this up?

MR. PALLES:   Your Honor, I have maybe one or two additional exhibits that I wanted to put in that I have identified previously in e-mails to Mr. Stewart.   One is portions of Mr. Regnerus' -- it looks like it was -- and I have never seen this before -- deposition on written

questions that was done --

THE COURT:  Okay.

MR. PALLES:  -- this was done in the FDIC case, Bank One versus FDIC, in front of Judge Lindberg which went over some of the same terrain we have gone over today.

I think that is about it.  I would just move in, you know, the intro of my exhibits.

THE COURT:  Any objection to these exhibits?

MR. STEWART:  I just have to see it.  That is all.

MR. PALLES:  Okay.  And then what I would like to do is ask for a transcript, have time to look at the transcript and either present something in the nature of trial brief --

THE COURT:  Okay.  Let's find out, when do you think they could have a transcript?

(Discussion held off the record.)

THE COURT:  For what do you need a transcript?

MR. PALLES:  Judge, I would like to put the evidence we have gotten in the framework of what my legal defenses are.  I am not particularly spontaneous.

THE COURT:  How long of an argument do you have?

MR. STEWART:  Ten, fifteen minutes.

THE COURT:  Well, here is what we could do, if you would like:  If you would like, the U.S. Attorney could state his argument now, and we will listen.  Then we will know --

you and I will both know very clearly what his case is. And then we can order a transcript. And after the transcript is ready -- and Rosemary could tell us approximately when it will be ready -- then we can let you respond. And if you want to respond in writing or if you want to respond orally after you read it, either way would be welcome.

MR. PALLES: That would be great.

THE COURT: Okay. But I do think it is important to -- to make sure that when I revisit this to make a decision, that the Government's position is clear in my mind. I think it is. All right?

MR. STEWART: Okay.

THE COURT: But it is not my case. Mr. Stewart spent a lot of time arranging today's hearing and working on this, so let's hear -- why don't we hear what he has to say. And then you and Tresa can work -- or not -- Rosemary can work out a time that you think is convenient to have the transcript. And then we can have a status or something right after that.

MR. PALLES: That would be great.

THE COURT: You can either make an argument after you have read the transcript which then will include the U.S. Attorney's argument.

MR. PALLES: Okay.

THE COURT: And/or you can submit something in

writing if you would like.

MR. PALLES: Okay. Thank you.

MR. STEWART: One thing very quickly, though. I am not quite sure about the exhibits that were presented by Mr. Poeta. Have they been admitted -- or I mean some of them might have already been numbered.

THE COURT: What he wants to do is he wants to catalog -- catalog his exhibits and then -- I think you have numbered 12 different exhibits.

MR. PALLES: Right.

THE COURT: Do you want each of them admitted?

MR. PALLES: I do.

THE COURT: So any objection to admitting them?

MR. STEWART: Well, with regard to the Universal Bank statements and this accounting form, I don't know if there is anybody that really presented that as -- as a, you know, authentic record of the bank?

THE COURT: What is -- what is the purpose of those?

MR. STEWART: And also too there is a relevance issue and then there is --

THE COURT: Okay. Let's do this: The -- you know, I don't know what -- how he is going to find that some -- what his argument is. And some of them are relevant. I mean, obviously, the monthly bank statements, for example,

were used to refresh witnesses' recollections as to how the humongously large amount of activity there was in the account so that the three of us could question witnesses as to, whoa, what did you think about this level of activity? So I don't see why that needs to be in.

MR. PALLES: Well, you know, Judge, that reminds me, there is one other thing that is out here, and that is this: That Mr. Elisco has stated Mr. Navarro ran everything administratively. We still have Mr. Navarro sitting out there a little bit. He is going to take the Fifth Amendment. The question, of course, is whether or not he is to come in to take the Fifth Amendment or whether or not we can use my question sheet as -- you know, let me submit that and then, again, I am going to argue from that.

THE COURT: Also, just to complete it, it -- the hearing begins as a citation proceeding in effect with the U.S. Attorney calling your client just to find out whose money this is. And your client, Mr. Poeta, takes the Fifth. And, therefore, since he is not answering questions, the U.S. Attorney calls Mr. Resnick to try to explain to the U.S. Attorney and to the Court whose money it is.

So you agree that had the U.S. Attorney called your client to testify or, if he wanted him to now, which clearly he could do, your client would assert his Fifth Amendment right to not testify, correct?

MR. PALLES: Absolutely.

MR. STEWART: Also, Judge, we have done -- there is a transcript in there, the citation examination, which Mr. Poeta did just that.

MR. PALLES: To which I have no objection.

THE COURT: Right.

MR. STEWART: So --

THE COURT: Well, I think the thing to do is for us to have a -- today is June 6th. I think we should have a status 9:00 o'clock June 12. Then counsel can step up and say, these are exhibits I want admitted into evidence.

MR. STEWART: Okay.

THE COURT: And maybe if there is any that need to be supplemented, you can review that stipulation. And at that point we should be -- you won't have forgotten your closing argument, especially, you know, Miss Childs will -- can have a little time to --

MR. STEWART: She has a gun to my back.

THE COURT: -- can coach you in the meantime. And then if you want to make it that day, that would be fine, or if you would like to wait, that would be fine. But I think in order to make sure that this moves forward in an orderly fashion, I want to make sure Mr. Poeta's lawyer gets to put his entire argument in order. So --

MR. PALLES: Thank you.

THE COURT: -- if you can by June 12.

MR. PALLES: I can't, your Honor. As I indicated, I will be gone next week. I am coming back the 13th.

THE COURT: How about --

MR. PALLES: If we want to do it on an off day, I can do Monday or Tuesday.

THE COURT: If I am -- how about -- I -- it appears that my life is not going to work out the way I would like and that, therefore, I should be here at nine -- 9:30 on June 16th. And at that point in time you can supplement the record with anything you would like to supplement the record with. And if the U.S. Attorney in the meantime decides you do not want to accept the stipulation regarding Mr. Navarro but you would like to have him come in, then let -- let everybody know that in advance and tell him to come in then. And he can come in and we will see if he wants to testify.

MR. STEWART: And the date you are --

THE COURT: I am thinking of June 16th rather, Monday, the 16th, because counsel will be back.

MR. PALLES: Right.

THE COURT: Right now I know that I have nothing scheduled for that day. Or, actually, you are going to get back that weekend. Why don't we say June 17?

MR. PALLES: I will actually be back Friday, so the 16th is okay, but the 17th --

MR. STEWART: For me --

THE COURT: On the off chance I can recover my 16th, let's say the 17th at 9:30.

MR. STEWART: No, I am not good on the 17th, though. I have a course, CLE course.

THE COURT: All day?

If I talked for awhile, would that do?

MR. STEWART: First thing in the morning.

MR. PALLES: How about ethics, can you give me my four hours of ethics right now?

THE COURT: We can -- what time is your course?

MR. STEWART: Starts at 8:00.

MR. PALLES: So I can be here on the 16th.

THE COURT: Let's say -- let's say 9:00 on the 16th, but call before you come because there is a chance that I may have a -- be out of the office event on the 16th. But I have already scheduled some things in conflict with it, so I probably should throw in the towel.

MR. STEWART: With regard to a stipulation as to evidence, do you want that in writing or is it just a matter --

THE COURT: We can put it on the record then and then we could have the questions and answers. Okay. And you are not going to forget your argument between now and then.

Okay. But for now --

MR. PALLES:  We will polish that bullet extra fine.

THE COURT:  Right.  Okay.

See you, Mr. Poeta.

MR. POETA:  See you.  Have a nice weekend.

MR. STEWART:  Your Honor, would you like a copy of this?

THE COURT:  Of what?

MR. STEWART:  The book.

THE COURT:  Oh, I suppose at some point -- but now there is two books, right?

MR. STEWART:  I didn't hear about that.

THE COURT:  The biography.

MR. STEWART:  Oh.

THE COURT:  Do you know about that, Mr. Poeta?

MR. POETA:  I have no idea.

MR. PALLES:  What, there is another book that he wrote?

THE COURT:  Didn't he do the biography too?

MR. ANDERSON:  Your Honor, I don't know, but, trust me, I will know real soon.  I mean I know he plans two books and a movie.  That is my understanding, he plans two books and a movie.

THE COURT:  So we will see.  But he -- you know, at Mr. Resnick's sentencing the issue of who had the rights to write his biography came up and I thought I heard that a book

actually was produced, but I could be wrong.

MR. ANDERSON: I will run it down as fast as I --

THE COURT: Well, whatever. If it has been published, it can't be unpublished very easily. So eventually we will find out.

Yeah, we will say status at 9:30 on the 16th. But then Friday why don't you check in with me, all right, the 13th?

MR. STEWART: All right.

(Discussion held off the record.)

MR. ANDERSON: Your Honor, I am more interested in the proceeds of the book.

THE COURT: You are not the only one.

Check that out. He -- he -- remember, he sold the rights to produce a biography. And then remember he wanted -- maybe you guys weren't involved, but then he wanted to get them back from the person he sold them to because he had somebody else to sell them to and basically threatened the first person he sold them to so that he would release his rights. So my -- I thought I heard that he actually -- one or the other of them -- I think the second person -- actually did produce something, but I could be wrong. And it could be in the works.

MR. STEWART: Well, we will be on top of it, Judge.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/Rosemary Scarpelli        Date:    June 18, 2008