IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) No. 05 CR 9-1 |
| v. | ) |
| | ) Hon. Wayne Andersen |
| | ) |
| ADAM B. RESNICK | ) |
| | ) |

**RESPONDENT DOMENIC POETA'S OBJECTIONS TO GOVERNMENT'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ALTERNATIVE
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respondent, DOMENIC POETA ("Poeta"), by ERIC S. PALLES, and RAVITZ & PALLES,

P.C., his attorneys, objects to the government's Proposed Findings of Fact and Conclusions of Law

on the Petition for Relief Against Dominic Poeta ("Exhibit A") as follows:

I.      OBJECTIONS

   A.      General Objection

   Poeta objects generally to both the style and substance of the government's submission. Given

the task of submitting factual findings and the appropriate legal conclusions to be drawn therefrom,

the government has instead crafted a work of advocacy that lacks support for critical facts and proffers

questionable conclusions of law. The government's proposed findings demonstrate that the factual

underpinnings of the government's pleaded claim to void the transfers of money to Poeta as

fraudulent, notably whether Resnick transferred his property, is lacking. The restitution theory is time-

barred as to transactions before March 30, 2002[1] by the five-year statute of limitations. Finally, the

government calculations are incorrect because they fail to account for at least $125,000 in monies that

---

[1] These total $259,800.

Poeta gave to Adam Resnick (see Tr. 83-85, 105-06) and because they seek to impose $201,000 in prejudgment interest, which is inappropriate to the circumstances of this case.

      B.      <u>Government's Proposed Findings of Fact</u>

1.      Poeta objects to the proposed finding in paragraph 2, "Resnick gambled away a substantial portion of this money in legal gambling establishments and through use of an illegal bookie,"citing Petition ¶ 7. In fact, the petition alleges that Resnick gambled "in legal gambling establishments and *through use of illegal bookies*." The evidence supports also that Resnick was gambling regularly for substantial sums of money with an off-shore sports book. Transcript of Proceedings, June 6, 2008 ("Tr.") 35, 96; Govt. Ex. D at 210.[2]

2.      Poeta objects to the proposed finding in paragraph 7, "Also in December 2001, Resnick began paying Poeta money, *the source of which was check-kiting scheme proceeds*. Petition, ¶ 11; Hrg. Tr. 21, 41-47, 56-57."(emphasis added). The citation to the Petition is inappropriate and has no evidentiary value. Resnick's cited testimony demonstrates that he deposited also "some cash, checks from casino winnings and/or principal, loans from individuals and NEA checks."Tr. 46. Resnick also deposited millions of dollars in cash and casino checks into the NEA account. Tr. 85, referring to *Bust* at 208-09;Defendant's Ex.5 at 4 ($2,211,000 from the Horsehoe casino); Tr. 83-85 (over $1,000,000 from the Bellagio casino).

3.      Poeta objects to the proposed finding in paragraph 8, "and which Poeta negotiated to

---

[2] Resnick testified that every anecdote contained in his book, *Bust*, co-authored with Todd Gold, is absolutely true as it relates to Domenic Poeta, referred to as "Lucky Petrelli" in the book. Tr. 93.

his own benefit." The evidence is that, around March 2002, the level of Resnick's betting was too large for Poeta and Poeta began operating as an intermediary between Resnick and an off-shore book. Tr.35, 96; Govt. Ex. D at 210.

4.      Poeta objects to the proposed finding in paragraph 10, "The money is directly traceable to the proceeds of Resnick's check-kiting scheme. Hrg. Tr. 41-47, 56-57." See paragraph 2, *supra.*

5.      Poeta objects to the proposed finding in paragraph 12, "The $647,211 Resnick transferred to Poeta was entirely the result of illegal gambling and made either to place illegal wagers or in payment of lost illegal wagers. Hrg. Tr. 56-57." Stated more accurately, "Resnick testified that the $647,211 he transferred to Poeta was entirely the result of illegal gambling and made either to place illegal wagers or in payment of lost illegal wagers."

6.      Poeta objects to the proposed finding in paragraph 13, "At the time of each transfer detailed above (paragraph 8), Resnick was rendered insolvent and increasingly so. Resnick had few assets of his own. Hrg. Tr. 57-60. With each withdrawal in which he siphoned money from Universal Bank, Resnick became indebted to Universal for the amount of fraud proceeds he obtained. His debt to Universal alone (and not including the several individuals to whom he would later be ordered to pay restitution for separate fraud schemes) — which would later be reduced to a restitution judgment for over $9 million —greatly exceeded his assets from the very first transaction in which he obtained illegal fraud proceeds and then transferred them to Poeta to pay his unlawful gambling debts." The government's assertion that Resnick was in a downward spiral is without foundation, and the complete lack of record citations is telling. In fact, the evidence supports the conclusions that Resnick's fortunes fluctuated wildly. Tr. 64-66; 104-05; Govt. Ex. D at 219.

7.      Poeta objects to all the proposed findings in paragraph 15. A counter-statement of

Resnick's testimony, absent the government's rhapsodizing on Resnick's credibility or its cursory conclusions, is at pp. 8-12, *infra*.

8.      Poeta notes that the government attempts to summarize the testimony of his four witnesses in two paragraphs: ¶¶ 16-17. A factual summary of the testimony of these witnesses is at pp. 12-15, *infra*.

9.      Poeta objects to the proposed findings in paragraph 18, "Resnick knew or should have known at the time of each of the transfers to Poeta that he would face civil and criminal restitution claims in excess of the amounts transferred." Again, the government's lack of citation to the record is telling. There is no evidence that Resnick knew he would face civil and criminal restitution claims. Whether or not Resnick "should have known" is a legal conclusion.

10.     Poeta objects to the proposed findings in paragraph 21 after the first sentence. It would be more consistent with the Court's statements on this matter to eliminate the remainder of the paragraph and add, simply, from the government's footnote 5: "The court declines to draw negative inferences from Poeta's assertion of his Fifth Amendment privilege to the specific question asked in his deposition and in his Answer to the Petition."

11.     Poeta objects to the proposed findings in paragraph 22 for the reasons stated in paragraph 10, *supra*.

C.      Government's Proposed Conclusions of Law

12.     Poeta objects to the conclusions of law in paragraph 25 and 27, as presented.  First, it is self-serving for the government to identify its fraudulent transfer claim as its "second theory of liability." The FDCPA claim was the only one alleged in the Petition. More fundamentally, the "first theory" is inaccurately described as "restitution." Poeta is a third-party to the criminal action and

cases involving criminal restitution, e.g, *United States v. Shepard,* are inapposite. In truth, the government's theory must be based on the equitable theory of unjust enrichment, under which restitution is the measure of damages. *Greenbrier Leasing Company LLC v. Carroll*, Case No. 07 C 2884, 2008 U.S. Dist. LEXIS 46854 (N.D. Ill. June 17, 2008) (Kennelly, J.)

13. Poeta objects to the conclusions of law in footnote 8. If the government is urging the Court to dismiss Count I as moot, this Court may do so. The remaining conclusions, that the government has made its case under Count I is thus gratuitous dicta. If the Court concludes that the government has proven actual fraud, its conclusion should be supported by record citations, not merely the government allegations.

14. Poeta objects to the conclusions of law in paragraph 29 to the extent that the following statutory language is included: "but value does not include an unperformed promise made otherwise than in the ordinary course of the promissor's business to furnish support to the debtor or another person." The cited language is irrelevant to any issues made by this case.

15. Poeta objects to the conclusions of law in paragraph 34, "When, as in this case, a defendant's predominant occupation is operating fraudulent schemes, and his income is solely the result of fraud, the court "may find as a matter of law that the debtor intended to incur debts beyond its ability to repay." *In re Canyon Systems Corp.*, 343 B.R. 615, 650 (Bkrtcy. S.D. Ohio 2006). *See also In re National Liquidators, Inc.*, 232 B.R. 915, 919 (Bkrtcy. S.D. Ohio,1998) (same); *In re Tubman*, 160 B.R. 964, 986-87 (Bkrtcy. S.D. Ohio 1993) (same). First, the evidence is not that Resnick's income was "solely the result of fraud;" on the contrary, he lived on both fraud proceeds and gambling proceeds, Tr. 47, the latter of which was substantial. If Resnick's testimony is to be credited, his predominant occupation was gambling, legal and illegal. Tr. 38, 85. Secondly, each of

5

the Ohio bankruptcy cases cited by the government involved a Ponzi scheme, which, by its nature, relies upon money from new investors to pay off earlier investors. In a Ponzi scheme, there are little or no underlying earnings from the money received by the promoter. Here, the evidence is that Resnick infused millions of dollars in cash and casino checks. Tr. 85.

16.     Poeta objects the conclusions of law in paragraph 35.  First, the government asserts, "Resnick's conduct in fleecing Universal Bank of over $10 million in a matter of months and using the money to gamble shows an unmistakable intent to incur debts beyond his ability to pay." This conclusion relates to the claim of actual intent, which the government did not urge and seems to have abandoned (Government Proposed Findings at 11, fn. 8) and which the Court did not rely upon in its oral ruling.  Indeed, the Court remarked upon the substantial evidence that Resnick bet to win (see Tr. 89-900, but opined that he reasonably should have known that he would not meet his obligations. Regarding the remainder of the paragraph, ("He certainly reasonably should have believed — because of a long, downward spiral of indebtedness to his fraud victims — that he was not going to be able to meet his obligations as they became due") the conclusion is based upon the "long, downward spiral" which makes for a good story but for which there is no record evidence.  Poeta requests that the Court supply its own view of the evidence that supports this conclusion.

17.     Poeta objects the conclusions of law in paragraph 36, " In sum, Resnick transferred $647,211 to Poeta without receiving reasonably equivalent value in exchange, because, as a matter of law, the opportunity to illegally gamble provides no consideration for an enforceable contract, and Resnick intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay, because it was unreasonable to believe he could win back the massive amount of money he was stealing — and simultaneously losing from Poeta and others — from

Universal Bank. Poeta is thus liable to the     United States under 28 U.S.C. § 3304(b)(1)(B)(ii)." First, it is more consistent with this Court's oral ruling to say, simply, "Resnick  reasonably should have believed that he would incur, debts beyond his ability to pay . . . ." Secondly, there is a dearth of evidence that Resnick was losing to Poeta, indeed the evidence was to the contrary.  See, e.g, Tr. 103-05.  Finally, Poeta is not liable under under 28 U.S.C. § 3304(b)(1)(B)(ii), for the reasons set forth in paragraph 18, *infra.*

18.     Poeta objects the conclusions of law in paragraph 37. Most critical is the following passage: "Poeta was paid from either *Universal's* money — in which case the United States can recover on a restitution theory— or *Resnick's* money — in which case the United States can recover on a fraudulent transfer theory. But in either case, plumbing the precise ownership of the money used or the precise source of the money used would not change the result." Despite the government's attempts to gloss over a central weakness in its case, the source of the money may significantly affect the result of this case.  For example, the FDCPA claim allows the government to reach back six years to void a transfer (28 USC § 3306(b)(2);  the state restitution/unjust enrichment claim has a five-year statute of limitation. *Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.*, 135 F.3d 526, 527-28 (7th Cir. 1998).  Certain of the payments to Poeta, dating back to 2001 and early 2002, would be time-barred under this theory.  Additionally, prejudgment interest, and other elements of damages, are not recoverable under the unjust enrichment claim.  This Court has already opined in open court that "it [the NEA account] wasn't his [Resnick's ] money." The FDCPA must, therefore, as a matter of law, fail.

19.     Poeta objects the conclusions of law in paragraph 38.  The cases that the government cites supporting an award of prejudgment are inapposite, involving cases at admiralty.

Damages in unjust enrichment cases are measured by the defendant's gains, not plaintiff's losses. See *Greenbrier Leasing Co. v. Carroll*, No. 07 C 2884, 2008 U.S. Dist. LEXIS 46854 (N.D. Ill., June 17, 2008) (Kennelly, J.); *Ellis v. Allstate Ins. Co.*, 479 F. Supp. 2d 782 (N.D. Ill.2006) (Bucklo, J.); *Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 248, 257-58, 807 N.E.2d 439, 444-45 (2004). Consequently, prejudgment interest is inappropriate under the unjust enrichment claim.

POETA'S ALTERNATIVE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Citation-Respondent DOMENIC POETA, by his attorneys, ERIC S. PALLES and RAVITZ & PALLES, P.C., submits his proposed findings of fact and conclusions of law as follows:

I.      Proposed Findings of Fact

A.      Adam Resnick

1.      Adam Resnick testified by videoconference from FCI Englewood, Colorado where he is an inmate. Tr.17. He described himself as a former healthcare entrepreneur and compulsive gambler, id., and identified himself as the defendant and judgment debtor. Tr.18.

2.      Resnick admitted that his conduct led to the collapse of Unversal Savings Bank and a loss of approximately $10,000,000 to the FDIC. Tr.18-19. He pleaded guilty to Count V of the indictment. Tr. 19.

3.      Resnick met Domenic Poeta in December 2001. He described their business relationship as one between bettor and bookmaker. Tr.21-22. Poeta did not, to Resnick's knowledge, work for a gambling establishment and appeared, to Resnick, to operate his own book. Tr. 22-23. Poeta operated a meat market in Highwood, Illinois, which Resnick frequented to place, collect or pay bets. Tr. 24-25.

8

4.    The terms of Resnick's relationship with Poeta included betting limits. Initially, the limit required that Resnick pay in any week that he owed $20,000. Tr. 26. Resnick was also required to pay "standard bookmaker ten percent juice." Tr. 27.

5.    Eventually, out of necessity, Resnick began paying Poeta in checks. Tr. 29. He wasn't working on a regular basis and didn't have many options to obtain that type of cash. Tr. 31-32. Resnick paid or collected on his bets personally 95% of the time, but there may have been a time or two when somebody else paid or collected for him. Tr. 29.

6.    Resnick denied that Poeta ever cashed checks for him. Tr. 33.

7.    During the course of the Resnick-Poeta relationship, Resnick's per game limit on bets increased from $ 2000 to $5000, to $10,000, then $20,000, until around March-April 2002, when Poeta set him up with an off-shore entity where Resnick bet up to $1,500,000 on a basketball game. Resnick continued to pay and collect through Poeta. Tr. 35, 96.

8.    Domenic Poeta was always honorable, never failing to pay monies he owed Resnick on a timely basis. Tr. 36. Resnick recited an instance, on June 9, 2002, when Poeta paid him $2.2 million in cash. Tr. 36, 104-05; Govt. Exh. D at 219. This was not the only occasion that Resnick received from Poeta in excess of $1,000,000 in cash through bets he placed with him. TR. 105.

9.    Resnick met Terrence Navarro in June 1999. Navarro and Lawrence Elisco were principals in Navarro Elisco & Associates ("NEA"), certified public accountants. Resnick described how, in December 2001, he came to be a signer on NEA's bank account at Universal Bank. After Resnick lamented at a lunch with Terry Navarro and Ellisco about his inability to obtain a banking relationship because of his gambling addiction and history of bounced checks, they offered to put him on the account as a signatory in exchange for doing his tax work. Resnick testified , "They wanted

me to run my business, gambling, through the account and in turn get my accounting business." Tr.38, 73.

10. Elisco gambled with Resnick and ultimately invested some money with him Tr. 39. Resnick and Elisco went to Las Vegas in January 2002, where Resnick lost substantial sums of money. Tr. 40, 153; Govt. Ex. D, p.197.

11. Resnick met Toni Navarro, who was instrumental to the check kite. She told Resnick how to cover checks and made Universal Bank funds immediately available to him. Tr. 41. Resnick described how he deposited NEA checks at American National Bank, Universal Bank's correspondent bank, and call in the deposit to Toni for immediate credit. Tr. 43-44.

12. NEA gave Resnick a stack of business checks. Tr. 42. Periodically, he would come for lunch and pick up more. Tr. 81. He did not pick up bank statements, except on one occasion, when a secretary gave him an open envelope. He made no attempt to reconcile the account. Tr. 81-82, 93.

13. If Resnick wanted a cashier's check, he would phone Toni, who would prepare one.

14. The NEA account often had a negative balance. Ultimately, Resnick believed, the NEA account had an always increasing deficit. Tr. 44-45.

15. Resnick testified that deposits in the NEA account included "some cash, checks from casino winnings and/or principal, loans from individuals and NEA checks."Tr. 46; see also 83-85, Defendant's Exhibit 5.

16. Resnick testified that he bounced two checks payable to Poeta and had two phone conversations with him, one immediately before the collapse of Universal Bank and one several days after. In the first conversation, Resnick told Poeta that he had been gambling for several days and that

he would not be able to pay what he owed. In the second conversation, Poeta had surmised that Resnick had some involvement with the bank's collapse and told Resnick to take care of his family. While Resnick could only speculate how Poeta knew that Resnick was involved, Poeta had cashed a check there and Resnick had told Poeta that his relationship with the bank was close and that they [bank officials] did things out of the ordinary for him. Tr. 53-56.

17. Resnick had reviewed the government exhibits and stated that the checks to Poeta were in payment of illegal gambling debts. Tr. 57.

18. Resnick had few assets in 2002. He previously filed bankruptcy in Case No. 96 B 34223. Tr. 57-59.

19. Resnick described himself as a compulsive gambler. He cited, by way of illustration and to distinguish him from a "professional gambler," the circumstances of June 26, 2002, when casino videos recorded that he was up "north of $8 million" and couldn't walk away from the gambling table. Tr. 64-66. On cross examination, he subscribed to the view of his treating psychologist that his compulsion was manifested by a magical belief that the next bet will be the big win to replace all losses. Tr. 90.

20. On cross-examination, Resnick described the process by which Universal authorized him to sign on the NEA account. He signed the signature card but did not provide Toni Navarro with identification or his social security number and date of birth. Tr. 79

21. Resnick stood by his description of his intent in the book *Bust*: honest, but deluded and sick, viewing gambling as his business. Transcript 8. He bet to win. Tr. 85, 89-90

22. Among the deposits that Resnick made to the NEA account, was a $70,000 Orco bank check payable to Poeta. This was either winnings or a refund from the off-shore book. Tr. 87-88.

23.     On another occasion, Resnick gave Toni Navarro $50,000 in winnings from Poeta to deposit in the NEA account. Tr. 103, Govt. Ex. D at 209.

24.     Several years after the Universal Bank collapse Poeta gave Resnick $5000 for a cash counting machine, far in excess of its value. The transaction was viewed as a gift.  Tr. 106.

B.     Richard McKinlay

25.     Richard McKinlay was the chairman of the board at Universal Bank. Tr. 128.  He testified that, as required by federal law, Universal Bank maintained a customer identification program.  He conceded that the requirements of federal law were ignored with respect to the inclusion of Resnick on the NEA account signature card, and that this was done as a courtesy to NEA. Tr. 129-30. Under cross examination, McKinlay stated that the federal regulations are intended to establish the ownership of the account. Tr. 140

26.     McKinlay testified that the bank had a practice of notifying customers of check returns at their business address and confirmed that NEA checks were bouncing as early as January 2002. Tr. 132.

27.     In the first half of 2002, Universal Bank underwent a successful audit from the Office of Thrift Supervision. Tr. 134

28.     Similarly an audit by the bank's auditing firm of Cobitz Vandenberg & Fenessy , prepared for Universal Bank's May board meeting and which included review of the NEA account, reported no problems. Tr. 135-36.

C.     Lawrence Elisco

29.     Elisco was a former principal of NEA.  Tr. 143. He identified Defendant's Exhibit 1 as the signature card for the NEA account, although he confirmed that Adam Resnick signed at a later

time. He acknowledged that NEA was the account owner and that Resnick was never an employee, officer, shareholder or director of NEA. Tr. 144-48.

30.     Elisco acknowledged writing certain checks from the NEA account but claimed that they were authorized by Resnick. Tr. 149-52.

31.     Elisco acknowledged that he had never heard of an accounting firm maintaining a custodial account for a client and admitted that the practice raises ethical concerns. Tr. 162, 165.

32.     Elisco acknowledged that he sent a June 20, 2002 fax to Richard McKinlay (Defendant's Ex. 10) ascribing Resnick's use of the NEA account to legitimate business purposes. Tr. 165. Elisco relied on Resnick and never verified the accuracy of the representations before passing them on to McKinlay. Tr. 165-66.

33.     Elisco has a restitution claim against Resnick that he believes is in the area of $60,000. Tr. 166-67.

D.     <u>Maureen Navarro</u>

34.     Maureen Navarro was president, chief security officer and chief compliance officer of Universal Bank. Tr. 17. Terry is her son. Tr. 174. Toni is her daughter. Tr. 185

35.     Maureen Navarro knew that Adam Resnick was using American National Bank for deposits to the NEA account. This privilege was extended because of Terry Navarro. Tr. 181. She might have told Robert Regnerus of American National Bank that she authorized this activity. Tr. 184.

36.     Maureen conceded that the volume of activity in the NEA probably should have triggered a suspicious activity report. Tr. 185. She was not aware that in the first six months of 2002, Universal transferred in excess of $6,000,000 to casinos. *Id*.

13

37. She was aware that Toni was driving a new BMW automobile in 2002. Id. Toni's annual salary was approximately $30,000. Tr. 186

E. Terry Navarro

38. Terry Navarro appeared through his counsel, Joseph Duffy, who represented that Mr. Navarro would assert his privilege against self-incrimination in response to each question propounded in Defendant's Ex. 4. Consequently, it was stipulated that Terry's answers to each of the questions would be in the affirmative, including these admissions:

a. Terry Navarro requested $230,000 in cashier's checks be paid from the NEA account to Ticor and also requested a $35,000 cashier's check be paid to him See also Defendant's Ex. 8.

b. Terry Navarro wrote an $8200 check to his company from the NEA account. See also Defendant's Ex. 9.

c. The payments referred to in subparagraphs a and b, *supra*, were for Terry's personal or business benefit.

d. Terry permitted Resnick to use the account despite the fact that he knew Adam couldn't establish a banking relationship and was a heavy gambler.

e. Terry received the NEA Account bank statements and NSF notices.

f. Terry lied when he wrote his sister, Toni, on May 16, 2002 that the NEA Account was one of several custodial accounts that received deposits and disbursed all funds to other checking accounts of his clients.

g. Adam Resnick lent Terry money, gave him gifts and trips, and made him money in several deals.

h.    Despite his concerns in late April that Resnick was dealing drugs or money laundering, he never talked to Adam and continued to let him use the NEA account without restrictions.

i.    Finally, Terry would have conceded that NEA at all times maintained ownership in the bank account at Universal Bank.

39.    Defendant's Ex. 2 consisted of NEA bank statements. In closing argument, Poeta's counsel compared the balances reflected in the statements at the time that Resnick wrote each check for Poeta:

a.    12/20/01: Adam Resnick gives to Domenic Poeta $27,400 check; NEA Account balance was $45,031.Defendant's Exhibit 2 UN26518.

b.    01/03/02: Adam Resnick gives Domenic Poeta $15,000 cashier's check; NEA Account balance was $459, 075.99. *Id*. at UN26555

c.    01/11/02: Adam Resnick gives Domenic Poeta $27, 400 cashier's check; NEA Account balance was $48, 801.35. *Id*.

d.    02/14/02: Adam Resnick gives Domenic Poeta $20,000 check; NEA Account balance was $66,748.50. *Id*. at UN 26600

e.    02/25/02: Adam Resnick gives Domenic Poeta $20,000 check; NEA Account balance was over $143,400. *Id*.

f.    03/04/02: Adam Resnick gives Domenic Poeta $20,000 check; NEA Account balance was $20, 094.84. *Id.* at  UN26632

g.    03/08/02: Adam Resnick gives Domenic Poeta $50,000 check; NEA Account balance was $152, 916.58. *Id*.

h.　03/22/02: Adam Resnick gives Domenic Poeta $25,000 check; NEA Account balance was $101,453.49. *Id.*

i.　03/25/02: Adam Resnick gives Domenic Poeta $25,000 check; NEA Account balance was $7215.30. *Id.*

j.　03/28/02: Adam Resnick gives Domenic Poeta $30,000 check; NEA Account balance was over $187, 500. *Id.*

k.　03/30/02: Adam Resnick gives Domenic Poeta $100,000 cashier's check; NEA Account balance was over $329,000. *Id.*

l.　03/31/02 Adam Resnick gives Domenic Poeta $100,000 cashier's check; NEA Account balance was over $330,000. *Id.*

m.　04/02/02: Adam Resnick gives Domenic Poeta $55,000 check to cash; NEA Account balance was 289,592.94. *Id.* at UN26679

n.　04/05/02: Adam Resnick gives Domenic Poeta $12,300 check to cash; NEA Account balance was $197,634.94. *Id.*

o.　05/15/02 Adam Resnick gives Domenic Poeta $72,000 check to cash; NEA account balance was $462,078.26. *Id.* at UN 26773.

p.　05/15/02 Adam Resnick gives Domenic Poeta $48,111.11 check to cash; NEA account balance was $462,078.26. *Id.*

The court found this evidence unpersuasive because the balances were inflated by the check kite.

II.　<u>Proposed Conclusions of Law</u>

40.　Red R. Civ. P. 69 provides, in pertinent part: "The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution

shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable. In Illinois, 735 ILCS 5/2-1402 establishes citation proceeding to "discover assets or income of the debtor not exempt from the enforcement of the judgment."

41.     The funds that Resnick used to pay Poeta was not his money. *United States v. Intermountain Region Concrete Co.*, 636 F. Supp. 280 (D Utah 1988)

42.     Plaintiff must prove elements of fraudulent transfer by clear and convincing evidence. *Loyal Cheese Co. v. Wood County Nat'l Bank & Trust Co.*, 969 F.2d 515, 518 (7th Cir. 1992).

43.     A transfer is not made until the debtor has acquired rights in the asset transferred. 28 USC § 3305(4).

44.     The monies that Poeta gave to Resnick (¶¶ 22-24, *supra*), totaling $125,000 [should be deducted from the government's claim because a cash payment constitutes equivalent value. Alternatively, under an unjust enrichment theory, the claim should be reduced to Poeta's net receipts from Resnick.] [should not be deducted because . . . .][3]

45.     The court did not consider evidence of substantial amounts of cash received by Resnick from Poeta to be equivalent value nor to enter into its calculations under the unjust enrichment theory [because . . . .][4]

---

[3] Poeta requests that if the Court has determined that the monies that Poeta gave to Resnick should not be considered in any amount as an offset, it provide the parties and the appellate court with its legal reasoning.

[4]See fn3,*supra*.

46.     The government's claim for restitution, based on unjust enrichment is subject to the Illinois five year statute of limitations. *Burns Philp Food, Inc. v. Cavalea Continental Freight*, Inc., 135 F.3d 526, 527-28 (7th Cir. 1998).

47.     Damages in unjust enrichment cases are measured by the defendant's gains, not plaintiff's losses. See *Ellis v. Allstate Ins. Co.*, 479 F. Supp. 2d 782 (N.D. Ill.2006) ( Bucklo, J.); *Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 248, 257-58, 807 N.E.2d 439, 444-45, 282 Ill. Dec. 815 (2004).

Respectfully, submitted,

  /s/ Eric S. Palles
One of the attorneys for Domenic Poeta

ERIC S. PALLES
GARY RAVITZ
RAVITZ & PALLES, P.C.
203 N. LaSalle, Suite 2100
Chicago, IL 60601
(312) 558-1689